# EXHIBIT A

FILED
12/12/2018 1:42 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

GERALDINE DONAHUE, individually,
and on behalf of others similarly situated,   )
)
)
     Plaintiff,                     )
)
v.                                  )
)
MGM RESORTS INTERNATIONAL,     )
)
     Defendant.                )
)
)

**CASE No.:** 2018CH15419

**JURY TRIAL DEMANDED**

FILED DATE: 12/12/2018 1:42 PM  2018CH15419

<u>**CLASS ACTION COMPLAINT**</u>

     Plaintiff Geraldine Donahue, on behalf of herself and other similarly situated individuals, sues MGM Resorts International ("MGM"), and alleges as follows based on personal knowledge as to herself and on information and belief as to all other matters, and demands trial by jury:

**INTRODUCTON**

     1.    This action arises from Defendant's violations of the Fair and Accurate Credit Transactions Act ("FACTA") amendment to the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (the "FCRA"), which requires Defendant to truncate certain credit card and debit card information on printed receipts provided to consumers. Despite the clear language of the statute, Defendant knowingly or recklessly failed to comply with the FCRA by printing eight (8) digits of its customers' credit card or debit card numbers on their transaction receipts. As such, Plaintiff and other consumers who conducted business with Defendant during the time frame relevant to this Complaint, each of whom engaged in a transaction using a credit card or debit card, suffered a number of harms including, but not limited to, violation of their substantive statutory rights under 15 U.S.C. § 1681c(g), breach of their confidence in the safe handling of their account information,

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

invasion of their privacy as a result of the disclosure of their account information to those of Defendant's staff that handled the receipts, exposure to an elevated risk of identity theft as determined by Congress, the burden of having to keep or destroy the receipt to prevent further disclosure of their account information, and monetary harm as a result of having paid a fee for a secure and legally-compliant transaction that was anything but. Accordingly, Plaintiff and the unnamed class members are entitled to an award of statutory damages and other relief as further detailed herein.

## JURISDICTION AND VENUE

2. The Court has jurisdiction over this action pursuant to 735 ILCS 5/2-209(a)(1) because Defendant conducts business in Illinois, committed tortious acts within Illinois, and the conduct giving rise to Plaintiff's claim on behalf of the class occurred, in part, in Illinois.

3. Venue is proper because Defendant conducted substantial business in Cook County, including by owning the Grand Victoria Casino in Cook County, at the time Plaintiff's cause of action arose, and because the cause of action with respect to the class arose, in part, in Cook County.

## PARTIES

4. Plaintiff Geraldine Donahue is a natural person who resides, and at all times relevant herein has resided, in Cook County, Illinois.

5. Defendant, MGM Resorts International is global casino conglomerate based in Paradise, Nevada. It has owned and operated numerous casinos throughout the United States, including the Grand Victoria Casino in Elgin, Illinois, during the preceding two-year period of time material to this case. Defendant's casino establishments reap exorbitant profits at the expense

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

of patrons, many of whom are among the most vulnerable members of society.  For 2017, for example, Defendant reported over $8 billion in net revenue from its domestic casino resorts.[1]

## FACTUAL ALLEGATIONS

### A.   BACKGROUND OF FACTA

6.      Identity theft is a serious issue affecting both consumers and businesses. As of 2018, a Harris Poll revealed that nearly 60 million Americans have been affected by identity theft.[2] There were a record high 16.7 million victims of identity fraud in 2017 alone, and account takeovers (when a thief opens a credit card account or other financial account using a victim's name and other stolen information) tripled in 2017 from 2016, causing $5.1 billion in losses.[3]

7.      Congress enacted FACTA to prevent identity theft and related harm. See Pub. L. No. 108-159 (December 4, 2003) ("An Act . . . to prevent identity theft . . . and for other purposes.")

8.      "[I]dentity theft is a serious problem, and FACTA is a serious congressional effort to combat it…the less information the receipt contains the less likely is an identity thief who happens to come upon the receipt to be able to figure out the cardholder's full account information." *Redman v. Radioshack Corp*., 768 F.3d 622, 626 (7th Cir. 2014).

9.      Upon signing FACTA into law, President George W. Bush remarked that "[s]lips of paper that most people throw away should not hold the key to their savings and financial

---

[1]      Source:    https://www.sec.gov/Archives/edgar/data/789570/000156459018003942/mgm-10k_20171231.htm, MGM Resorts International, 2018 10-K Report (Mar. 1, 2018).

[2]      Source: https://www.lifelock.com/learn-identity-theft-resources-how-common-is-identity-theft.html

[3]      Source: https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime.

FILED DATE: 12/12/2018 1:42 PM  2018CH15419

secrets." 39 Weekly Comp. Pres. Doc. 1746, 1757 (Dec. 4, 2003). President Bush added that the government, through FACTA, was "act[ing] to protect individual privacy." *Id.*

10.    One such FACTA provision was specifically designed to thwart identity thieves' ability to gain sensitive information regarding a consumer's credit or bank account from a receipt provided to the consumer during a transaction, which, through any number of ways, could fall into the hands of someone other than the consumer.

11.    Codified at 15 U.S.C. § 1681c(g), this provision states the following:

> Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

15 U.S.C. § 1681c(g) (the "Receipt Provision").

12.    After enactment, FACTA provided three (3) years in which to comply with its requirements, mandating full compliance with its provisions no later than December 4, 2006.

13.    The requirement was widely publicized among retailers and the FTC. For example, on March 6, 2003, in response to earlier state legislation enacting similar truncation requirements, then-CEO of Visa USA, Carl Pascarella, explained that, "Today, I am proud to announce an additional measure to combat identity theft and protect consumers. Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts. The card's expiration date will be eliminated from receipts altogether. . .. The first phase of this new policy goes into effect July 1, 2003 for all new terminals."[4] Within 24 hours, MasterCard and American Express announced they were imposing similar requirements.

---

[4]    Source: *Visa USA Announces Account Truncation Initiative to Protect Consumers from ID Theft*, PR NEWSWIRE (Mar 06, 2003).

FILED DATE: 12/12/2018 1:42 PM 2018CH15419

14.     Card issuing organizations proceeded to require compliance with FACTA by contract, in advance of FACTA's mandatory compliance date. For example, the publication, "Rules for Visa Merchants," which is distributed to and binding upon all merchants that accept Visa cards, expressly requires that "only the last four digits of an account number should be printed on the customer's copy of the receipt" and "the expiration date should not appear at all."[5]

15.     Because a handful of large retailers did not comply with their contractual obligations with the card companies and the straightforward requirements of FACTA, Congress passed The Credit and Debit Card Receipt Clarification Act of 2007 in order to make temporary changes to the definition of willful noncompliance with respect to violations involving the printing of an expiration date on certain credit and debit card receipts before the date of the enactment of this Act.[6]

16.     Importantly, the Clarification Act did not amend FACTA to allow publication of the expiration date or more than the last five digits of the card account number. Instead, it simply provided amnesty for certain past violators who disclosed card expiration dates, and only up to June 3, 2008. Expert proof continues to show the disclosure of excess card account number information or card expiration date information creates an increased risk of identity theft.

17.     Accordingly, card processing companies continued to alert their merchant clients, including Defendant, of FACTA's requirements. According to a Visa Best Practice Alert in 2010:

> Some countries already have laws mandating PAN truncation and the suppression of expiration dates on cardholder receipts. For example, the United States Fair and Accurate Credit Transactions Act (FACTA) of 2006 prohibits merchants from printing more than the last five digits of the PAN or the card expiration date on any

---

[5]     Source: *Rules for Visa Merchants* (Sept. 1, 2007).

[6]     Source: https://www.govtrack.us/congress/bills/110/hr4008/text, *.R. 4008 (110th): Credit and Debit Card Receipt Clarification Act of 2007* (May 20, 2008).

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

cardholder receipt. (Please visit http://www.ftc.gov/os/statutes/fcrajump.shtm for more information on the FACTA.) To reinforce its commitment to protecting consumers, merchants, and the overall payment system, Visa is pursuing a global security objective that will enable merchants to eliminate the storage of full PAN and expiration date information from their payment systems when not needed for specific business reasons. To ensure consistency in PAN truncation methods, Visa has developed a list of best practices to be used until any new global rules go into effect.

18.     As noted above, the processing companies have required that credit card or debit card expiration dates not be shown since 2003 and still require it. For example, American Express requires:

> Pursuant to Applicable Law, truncate the Card Number and do not print the Card's Expiration Date on the copies of Charge Records delivered to Card Members. Truncated Card Number digits must be masked with replacement characters such as "x," "*," or "#," and not blank spaces or numbers.

19.     Similarly, MasterCard required in a section titled Primary Account Number (PAN) truncation and Expiration Date Omission:

> A Transaction receipt generated by an electronic POI Terminal, whether attended or unattended, must not include the Card expiration date. In addition, a Transaction receipt generated for a Cardholder by an electronic POI Terminal, whether attended or unattended, must reflect only the last four digits of the primary account number (PAN). All preceding digits of the PAN must be replaced with fill characters, such as "X," "*," or "#," that are neither blank spaces nor numeric characters.

20.     According to data from the Federal Trade Commission's 2016 Consumer Sentinel Network Data Book, Illinois has among the highest per capita rate of reported fraud and other types of complaints.  For identity theft in particular, Illinois is ranked No. 5 in the country with a

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

total of 17,660 complaints. Also, several of the top 50 metro areas for identity theft are in Illinois, according to the report.[7]

21.     So problematic is the crime of identity theft that the three main credit reporting agencies, Experian, Equifax, and Transunion, joined to set-up a free website (http://www.annualcreditreport.com) in order to comply with FACTA requirements and to provide the citizens of this country with a means of monitoring their credit reports for possible identity theft.

22.     FACTA expressly prohibits printing of more than the last five (5) digits of the card account number on transaction receipts to protect persons from identity theft and other evils.

**B.     CASINOS SUCH AS DEFENDANT'S ESTABLISHMENT ARE BREEDING GROUNDS FOR IDENTITY THIEVES AND OTHER WHITE-COLLAR CRIMINALS**

23.     Consumer identity theft, which the Receipt Provision was designed to protect against, is especially rampant at gambling establishments like the one operated by Defendant.

*24.*     It has been estimated that "40 percent of white-collar crime has its root in gambling."[8]

25.     "[T]he ready availability of credit in and around casinos," including in Defendant's establishment, "can lead to irresponsible gambling and problem and pathological gambling behavior. Forty to sixty percent of the cash wagered by individuals in casinos is not physically brought onto the premises. Each year casinos extend billions of dollars in loans to their customers

---

[7]     Source:  https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-january-december-2016/csn_cy-2016_data_book.pdf, *Consumer Sentinel Network Data Book for January-December 2016.*
[8]     Source: https://www.congress.gov/crec/1997/02/10/CREC-1997-02-10-pt1-PgH401.pdf, The Congressional Record, Feb. 10, 1997.

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

in the form of credit markers. Additional sums are charged by casino customer on their credit cards as cash advances. Casinos charge fees for cash advances ranging from 3 percent to 10 percent or more."[9]

26.     "Not surprisingly, . . . many problem and pathological gamblers steal or commit other crimes to finance their habit.   According to the National Research Council, 'as access to money becomes more limited, gamblers often resort to crime in order to pay debts, appease bookies, maintain appearances, and garner more money to gamble.'"[10]   In fact, the correlation between casino gambling and crime is so strong that, "[d]uring the first three years of casino gambling [in] Atlantic City, [the city] went from 50th in the nation in per capita crime to first. Overall, from 1977 to 1990, the crime rate in that city rose by an incredible 230%."[11]

27.     "Over the past two decades, there have been numerous suggestions in the academic literature and in political debate that gambling is associated with white-collar crimes, such as embezzlement, forgery and fraud."[12]  (emphasis added).  For instance, "[i]n a survey of nearly 400 Gamblers Anonymous members, 57 percent admitted stealing to finance their gambling. Collectively they stole $30 million, for an average of $135,000 per individual. One witness before the Commission indicated that '80 to 90 percent of people in Gamblers Anonymous will tell you

---

[9]     Source: https://govinfo.library.unt.edu/ngisc/reports/7.pdf, Chapter 7: Gambling's Impact on People and Places, *National Gambling Impact Study Commission Report* (June 18, 1999).

[10]    Source: *Id.* at 7-13.

[11]    Source: https://www.fdle.state.fl.us/cms/FCJEI/Programs1/SLP/Documents/Full-Text/Yates.aspx, *Casino Gambling: Is it A Good Bet for Florida's Future?*, Jerry J. Yates, at 11.

[12]    Source: http://www.leg.state.fl.us/GamingStudy/docs/FGIS_Spectrum_28Oct2013.pdf, *Gambling Impact Study: Part 1, Section A: Assessment of the Florida Gaming Industry and its Economic Effects*, Spectrum Gaming Group (Oct. 28, 2013).

FILED DATE: 12/12/2018 1:42 PM    2018CH15419

they did something illegal in order to get money to gamble.' <u>A lot of them do white collar crimes, fraud, credit card and employee theft</u>."[13] (emphasis added).

28.     Indeed, casinos throughout the United States have been bastions of identity theft, credit card fraud and other white-collar crime for nearly three decades.  For example, since as far back as 1992, there have been numerous instances in which "tens of thousands of dollars" have been stolen by individuals using forged or stolen credit cards in casinos -- including, by way of illustration, through the following scam employed at the "Foxwoods" casino in Connecticut:

> The men fed forged or stolen credit cards into machines at the casino
> that are designed to check credit limits and authorize cash advances
> instantly. If the advance is approved, the machine notifies a teller in
> the casino cashier's booth and spits out a receipt for the borrower.
> The borrower takes the receipt to the teller and is issued cash after
> showing the credit card and other identification.[14]

29.     More recently, in November 2010 and February 2011, five people were arrested in Rancho Mirage, California and two in Santa Barbara, California for using fake credit cards at casinos, manufactured using stolen personal information.[15]  In March 2012, a Connecticut man was arrested for "leading a criminal organization using counterfeit Discover cards at Mohegan Sun

---

[13]    Source: *Chapter 7: Gambling's Impact on People and Places,* Final Report of the National Gambling Impact Study Commission, Government Publishing Office, at 7-13.

[14]    Source: *Gaming Industry Encounters Misfortune, Fortune*, The Courant (May 16, 1992), http://articles.courant.com/19920516/news/0000201897_1_creditcardscamcasinocashiercasinosopening (last accessed Mar. 12, 2017).

[15]    Source: *2 Arrested, Accused of Casino Credit Card Fraud,* The Orange County Register (Nov. 28, 2010), http://www.ocregister.com/articles/casino-277896-cards-credit.html (last accessed Mar. 12, 2017); *Deputies Nab Five for Credit Card Fraud*, Santa Barbara Independent (Feb. 18, 2011), http://www.independent.com/news/2011/feb/18/deputiesnabfivecreditcardfraud/ (last accessed Mar. 12, 2017).

FILED DATE: 12/12/2018 1:42 PM    2018CH15419

and Foxwoods casinos to obtain cash advances at least twice a week over three months[.]"[16]  In 2014, "[a] New York man pleaded guilty . . . to conspiracy to use counterfeit cards to draw cash advances in Louisiana casinos,"[17] and ten people were arrested in New Orleans, Louisiana "on racketeering charges in an identity theft and counterfeit credit card scheme involving a group of New Yorkers who received tens of thousands of dollars in allegedly fraudulent cash advances from Harrah's New Orleans Casino."[18]  And in January 2016, "[a] man suspected of making fake credit cards was arrested at a hotel at Foxwoods casino[.]"[19]

30.    The Federal Trade Commission Red Flags Rule requires businesses and organizations such Defendant to implement a written Identity Theft Prevention Program designed to detect the warning signs – or red flags – of identity theft in their day-to-day operations.

31.    Casinos like Defendant's are subject to an array of federal laws and regulations, including the Bank Secrecy Act and the 2003 FACTA amendments to FCRA, under which federal agencies such as the Federal Trade Commission ("FTC") and Securities and Exchange

---

[16]    Source: *Police Break Up Casino Credit Card Scam*, NBC Connecticut (Mar. 16, 2012), http://www.nbcconnecticut.com/news/local/PoliceBreakUpCasioCreditCardScam142965455.ht ml (last accessed Mar. 12, 2017).

[17]    Source: Guilty plea entered in casino scam case, The Acadiana Advocate (May 19, 2014), http://www.theadvocate.com/acadiana/news/article_3ee22c93-0eb7-5d46-a571-2f624954b84f.html (last accessed Mar. 12, 2017); *10 charged in cash-advance fraud scheme at Harrah's Casino*, The Acadiana Advocate (July 31, 2014), http://www.theadvocate.com/new_orleans/news/article_bba2fa01-e821-563b-b9b7-43f7bb8129ea.html (last accessed Mar. 12, 2017).
[18] Source: *10 charged in cash-advance fraud scheme at Harrah's Casino*, (July 31, 2014) http://www.theadvocate.com/new_orleans/news/article_bba2fa01-e821-563b-b9b7-43f7bb8129ea.html (last accessed Feb. 12, 2018).

[19] Source: *Police Make Credit Card Fraud Arrests at Foxwoods Hotel*, NBC Connecticut (Jan. 19, 2016), http://www.nbcconnecticut.com/news/local/PoliceMakeCreditCardFraudArrestsatFoxwoodsHote l365746371.html (last accessed Mar. 12, 2017).

Commission ("SEC") have promulgated anti-money-laundering and identity-theft Red Flag Rules. Among other requirements, these Red Flag Rules require "creditors," which includes casinos like Defendant, to: 1) develop and implement a written identity theft protection programs designed to detect, prevent and mitigate identity theft; and 2) periodically perform risk assessments to determine whether the casino's practices pose any "reasonably foreseeable risk" of identity theft to its patrons. Failure to comply with the Red Flags Rules could risk regulatory penalties, loss of licensure, and civil liability.

32.  In developing, implementing, and refining its Red Flag Rule identity-theft compliance program, Defendant would certainly have considered and addressed, among other things, the need for strict compliance with FACTA's receipt truncation provisions. This would include training cage personnel and other employees to prioritize and keep in confidence patrons' credit card numbers and other sensitive financial information, a review of best practices for identity theft prevention in consumer financial transactions, including a review of current best practices for compliance with FACTA's receipt truncation requirements, and an ongoing periodic review and refinement of cage processes and procedures in light of current guidance from their own payment processors and other relevant vendors, as well as from major payment processors, such as VISA and Mastercard.

33.  As part of its ongoing duty to consistently update its identity-theft prevention program, Defendant would periodically hire third-party service providers to audit and propose improvements to its compliance program and to train Defendant's cage and other personnel in best practices for identity-theft prevention. These training programs routinely emphasize the critical importance of strict compliance with FACTA, and the severe identity-theft risks posed by casinos' failure to comply. Through these and other training programs, Defendant would have repeatedly

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

been presented with and considered the requirements of and need for FACTA compliance, including FACTA's receipt truncation requirements.

### C.   DEFENDANT'S PRIOR KNOWLEDGE OF FACTA

35.     Defendant had actual knowledge of FACTA's truncation requirement before it began failing to comply with the requirement *en masse*.

36.     Moreover, Defendant's current employees tout Defendant's knowledge of these requirements.  For example, Kathryn Miller, Compliance Officer at the Grand Victoria Casino in Elgin, claims to be a Certified Anti-Money Laundering Specialist with a CAMS designation, which designation required her to pass a rigorous CAMS examination addressing in detail the full range of financial and identity-theft regulations, best practices, and strict compliance with, *inter alia*, the Red Flags rules, the Bank Secrecy Act, Title 31, as well as FACTA's truncation requirement.[20]

37.     Plaintiff is informed and believes, and thereupon alleges, that Ms. Miller and other employees of Defendant, in the course of performing these duties, learned of Defendant's failure to comply with the requirements of FACTA's truncation provision, and that Defendant nonetheless thereafter continued to violate FACTA.

38.      There are numerous Illinois statutes and operating regulations governing gambling, pari-mutuel wagering, slot machines and card rooms -- all of which Miller and Defendant's other employees are well-versed in -- that require Defendant to maintain its establishment in full compliance with state and federal regulations such as FACTA.

---

[20]     Source: *Kathyn Miller*, LinkedIn, https://www.linkedin.com/in/kathryn-miller-cams-7850b0a6/ (last accessed May 9, 2018); *see also* https://www.acams.org.

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

39.     Defendant's self-professed knowledge and experience regarding federal laws governing financial transactions no doubt translates to Defendant having intimate knowledge of the requirements of FACTA, a federal law governing financial transactions.

40.     Most of Defendant's business peers and competitors currently and diligently ensure their credit card and debit card receipt printing process remains in compliance with FACTA by consistently verifying their card machines and devices comply with the Receipt Provision. Defendant could have readily done the same.

41.     Not only was Defendant informed not to print more than the last five digits of credit cards or debit cards on transaction receipts, it was contractually prohibited from doing so. Defendant accepts credit cards and debit cards from all major issuers, such as Visa, MasterCard, American Express and Discover Card.  Each of these companies sets forth requirements that merchants, including Defendant, must follow, including the Receipt Provision.

42.     As discussed above, the casino gaming industry is one of the main targets for identity theft.  As such, companies operating in the sector should apply extra care in preserving customers' data and preventing identity theft. Given the size and years of experience of Defendant's business, and the various state and federal regulations governing its business, not to mention the prevalence of financial crimes in and around its establishment, at minimum Defendant acted in reckless disregard of FACTA's requirements and purpose when it allowed its system to print eight (8) digits of its customers' credit cards and debit cards on transaction receipts, together with other pieces of information about its customers, including their initialed signatures.

43.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has a written policy in place requiring compliance with all federal regulations governing its financial activities, including the requirement that it truncate credit card and debit card numbers on

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

transaction receipts printed and provided to customers; this is evidenced by the fact that Defendant used to, subsequent to the enactment of FACTA and prior to the violative conduct alleged herein, truncate credit card and debit card account numbers in compliance with FACTA.

44.     Upon information and belief, it would take an individual less than one minute to run a test receipt to determine whether Defendant's system was in compliance with federal law(s) or Defendant's own alleged written policy requiring the truncation of credit card and debit card numbers.

45.     Moreover, Plaintiff is informed and believes, and thereupon alleges, that Defendant has had, for well over the past year, actual knowledge of other FACTA litigation initiated and threatened to be initiated in courts throughout the country against other gaming establishments that use the same exact debit and credit card processing technology Defendant uses to process transactions and print receipts.   Remarkably, Defendant's printing of transaction receipts in violation of FACTA's truncation requirement continued unabated for much if not all of that period of time, in disregard of the law and its patrons' financial privacy and security.

### D.  PLAINTIFF'S FACTUAL ALLEGATIONS

46.     On or about February 22, 2018, Plaintiff used her personal credit card to perform a transaction at the Grand Victoria Casino in Elgin, Illinois, an establishment which, at the time of Plaintiff's transaction, was owned by Defendant.

47.     In order to complete the transaction, Plaintiff was forced to pay a transaction fee to Defendant in the amount of $12.99, in addition to principal amount of the transaction.

48.     Plaintiff paid using her personal credit card and Defendant subsequently presented her with an electronically-printed receipt bearing the first four (4) and last four (4) digits of her debit card account number.

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

49.     In addition to bearing eight (8) digits of her credit card, the receipt identifies the complete first and last name and initialed signature of Plaintiff, the individual to whom the card is issued, as well as the card issuer (in this case VISA) and the transaction date and time.

50.     The printing of the receipt invaded Plaintiff's privacy as it disclosed her private card account information to the casino employee who handed her the receipt.

51.     The printing of the receipt breached Plaintiff's confidence in Defendant to properly handle her account information, and also constitutes a breach of implied bailment.

52.     The printing of the receipt additionally harmed Plaintiff because Defendant had imposed on and unjustly retained a substantial service fee from Plaintiff for the privilege of making the credit card transaction at issue in this case in a supposedly secure manner, which is the exact opposite of the true nature of the way in which Defendant processed the transaction.

53.     As a direct result of receiving the receipt containing the first and last four digits of her card number, Plaintiff took action to safeguard the receipt.

**E.     DEFENDANT'S MISDEEDS**

54.     At all times relevant herein, Defendant was acting by and through its subsidiaries, agents, servants and/or employees, each of which acted within the course and scope of their agency or employment, and under the direct supervision and control of Defendant.

55.     At all times relevant herein, the conduct of the Defendant, as well as that of its subsidiaries, agents, servants and/or employees, was in willful, knowing, or reckless disregard for federal law and the rights of the Plaintiff and other members of the class.

56.     Plaintiff is informed and believes, and thereupon alleges, that Defendant implements, oversees, and maintains control over the same uniform debit and credit card payment processing policies, practices, and procedures for the consumer-oriented transactions at issue in

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

this case at all of its establishments nationwide (including the Grand Victoria Casino at the time it was owned by Defendant) – including by, without limitation, negotiating, entering into, and acting pursuant to various contracts and agreements with the electronic payment processing company whose technology Defendant uses to process all such transactions at its establishments nationwide (including without limitation at the Grand Victoria Casino at the time it was owned by Defendant).

57.     It is Defendant's policy and procedure to issue an electronically-printed receipt to individuals at the transaction location – i.e., immediately upon receipt of credit card or debit card payment.

58.     The systems of Defendant, and/or of its agent or agent(s), including without limitation the electronic payment processing company retained by Defendant, maintain records of all payment transactions and store customers' information, including duplicate hard copies and electronic copies of all payment receipts provided to customers.

59.     Notwithstanding the fact that it has extensive knowledge of the requirements of FACTA and the dangers imposed upon consumers through its failure to comply, Defendant issued thousands, perhaps millions, of transaction receipts containing the first four (4) and last four (4) digits of credit and debit card account numbers.

60.     By shirking the requirements of this important federal statute on such a large scale, in an environment already ripe for identity theft and other evils, *see supra* at pp. 7-11, Defendant uniformly invaded Plaintiff's and the other putative Class members' privacy, breached their confidence, mishandled their personal account information, and exposed them to an elevated risk of identity theft.  Defendant's conduct alleged herein resulted in the disclosure of Plaintiff's and the Class members' private financial information to the world, including to persons who might

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

find the receipts in the trash or elsewhere, such as identity thieves who thrive in environments such as Defendant's establishment, and those of the Defendant's employees who handled the receipts.

61.     Simply put, by printing numerous transaction receipts in violation of this long-standing, and well-known federal statute, Defendant has caused – to paraphrase the words of the Honorable Judge Posner (retired) – "an unjustifiably high risk of harm that [wa]s either known or so obvious that it should [have been] known" to Defendant. *Redman v. RadioShack Corp.*, 768 F.3d 622, 627 (7th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

62.     Moreover, Defendant also harmed Plaintiff and other consumers by imposing and unjustly retaining substantial service fees from Plaintiff and the Class members for the privilege of making the debit and credit card transactions at issue in this case in a supposedly secure manner. Indeed, a substantial portion of the service fees that Defendant charged to Plaintiff and the other members of the Class to facilitate their debit and credit card transactions was supposedly attributable to the various procedural safeguards and compliance monitoring measures that Defendant and its payment processor had implemented to ensure the safe, secure, and legally-compliant processing of consumer transactions. And in fact, Plaintiff and the other Class members paid these service fees to Defendant with the expectation that their transactions would be processed and their data secured in compliance with all applicable federal laws, including the truncation requirement of FACTA.

63.     In other words, what Plaintiff and the other members of the Class received (insecure transactions recorded on receipts printed and provided to them in violation of federal law) was less valuable than what they paid for (transactions securely processed and recorded on written receipts in compliance with federal data-privacy laws and regulations). Had Plaintiff and the other members of the Class known that Defendant would process their transactions and safeguard their

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

transaction data insecurely, including by printing and providing to them receipts in violation of FACTA's truncation requirement, they would not have paid as much of a fee, if any fee at all, for the privilege of making the debit and credit card purchases at issue in this case.

64.     In view of the substantial harm and other risks to Plaintiff and the Class caused by Defendant's willfully unlawful conduct, *see Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007) (defendant is liable for willfully violating FACTA where violation was committed with "reckless disregard" for the law), and the likelihood that such harms and risks will continue absent judicial relief, the Court should enjoin Defendant from continuing to print receipts at its casino terminals in violation of FACTA.

## CLASS REPRESENTATION ALLEGATIONS

65.     This action is brought as a Class Action under 735 ICLS Section 5/2-801. Plaintiff proposes the following class, defined as follows, subject to modification by the Court as required:

> **All persons in the United States who, within the two (2) years prior to the filing of the complaint through the date of the Court's order granting class certification, (i) engaged in one or more transactions using a debit card or credit card at one or more establishment(s) then-owned by Defendant and located on non-tribal-owned land in the United States, and (ii) for which Defendant's system was programmed to generate a printed customer receipt displaying more than the last 5 digits of the credit or debit card number used in connection with such transaction(s).**

66.     Plaintiff falls within the class definition and is a member of the class. Excluded from the class is Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, Plaintiff's attorneys and their employees, the Judge to whom this action is assigned and any member of the Judge's staff and immediate family, and claims for personal injury, wrongful death, and/or emotional distress.

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

67.     The members of the class are capable of being described without any significant managerial or administrative problem. The members of the class are readily ascertainable from the information and records in the possession, custody or control of Defendant.

68.     Defendant provides printed receipts to credit card and/or debit card transaction customers numerous times per day, 365 days per year. Therefore, based upon Defendant's annual flow of guests and net income, *supra*, it is reasonable to conclude that the class is sufficiently numerous such that individual joinder of all members is impractical, as required by 735 ILCS 5/2-801(1). The disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits. The Class can be identified through Defendant's records or Defendant's agents' records, and through the records of the entities that processed the card transactions at issue, and the records of the banks that issued the credit/debit cards.

69.     Although FACTA does not distinguish between consumer and business transactions, on information and belief all or most transactions at Defendant's establishments for which a FACTA-violative receipt was provided were paid for using a consumer card rather than a business card. To the extent this is an issue, the payments made with the two types of cards are easily discernible: merchants are charged different interchange fees for card transactions that vary based on whether the card is a business card or a consumer card. There are different interchange categories and codes assigned to each transaction that distinguish whether a card used for a transaction is a business card or a consumer card. Defendant and its merchant bank could easily identify whether a particular transaction involved a business card or a consumer card.

70.     While all Class Members have experienced actual harm as previously explained herein, this suit seeks only statutory damages and injunctive relief on behalf of the class and it

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

expressly is not intended to request any recovery for personal injury and claims related thereto. Plaintiff reserves the right to expand the class definition to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

71.     The class is defined so that each class member will have identical claims or defenses. As such, common questions of fact and law exist as to all members of the class, which predominate over any questions affecting only individual members of the class, including Plaintiff. *See* 735 ILCS 5/2-801(2). Such questions common to the class include, but are not limited to;

    a.    Whether, within the two (2) years prior to the filing of this Complaint, Defendant and/or its agents completed transactions by credit or debit card and subsequently provided a printed receipt upon which more than the last five (5) digits of the card number was displayed;

    b.    Whether Defendant's violation was knowing or reckless;

    c.    Whether Defendant is liable for damages, and the extent of statutory damages for each such violation; and

    d.    Whether Defendant should be enjoined from engaging in such conduct in the future.

72.     The principal question is whether Defendant violated section 1681c(g) of the FCRA by providing Class Members with electronically-printed receipts in violation of the Receipt Provision. The secondary question is whether Defendant knowingly or recklessly provided such electronically printed receipts.

73.     Plaintiff and his counsel will fairly and adequately protect the interests of the class, as required by 735 ILCS 5/2-801(3). Plaintiff has no interests that conflict with the interests of the class, and seeks the same relief as the class. Plaintiff is interested in pursuing her claims vigorously

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

and has retained counsel competent and experienced in class and complex litigation, including under the TCPA.

74.     In light of the numerosity of the class members, the commonality of issues of law and fact among class members, and Plaintiff and her counsel's willingness and ability to fairly and adequately protect the interests of the class, a class action is an appropriate method for the fair and efficient adjudication of the controversy, as required by 735 ILCS 5/2-801(4). Moreover, class-wide damages are essential to induce Defendant to comply with the law. The interest of Class Members in individually controlling the prosecution of separate claims against Defendant is small. The maximum statutory damages in an individual action for a violation of this statute are minimal. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

75.     Plaintiff and the members of the class have all suffered harm as a result of the Defendant's unlawful and wrongful conduct. Absent a class action, the class, along with countless future patrons of Defendant's establishment, will continue to face the potential for irreparable harm. In addition, these violations of law would be allowed to proceed without remedy and Defendant will continue such illegal conduct. Because of the size of the individual Class Members' claims, few Class Members could afford to seek legal redress for the wrongs complained of herein.

76.     Defendant has acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## COUNT I – VIOLATIONS OF 15 U.S.C. § 1691(c)(g)

77.     Plaintiff incorporates the foregoing allegations as if fully alleged herein.

78.     15 U.S.C. §1681c(g) states as follows:

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

> Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

79.     This section applies to any "device that electronically prints receipts" (hereafter "Devices") at the transaction location. 15 U.S.C. §1681c(g)(3).

80.     Defendant employed the said Devices for transactions at the Grand Victoria Casino establishment in Elgin, Illinois at the time Defendant owned Grand Victoria Casino.  Likewise, Defendant employed and continues to employ said Devices for transactions at numerous other establishments it owns (or previously owned during the statutory period) nationwide that are located on non-tribal-owned land.

81.     On or before the date on which this complaint was filed, Plaintiff and members of the class were provided receipt(s) by Defendant that failed to comply with the Receipt Provision.

82.     At all times relevant to this action, Defendant was aware, or should have been aware, of both the Receipt Provision.

83.     Notwithstanding the three-year period to comply with FACTA and its accompanying provisions, and the subsequent years since FACTA became effective, and despite having knowledge of the Receipt Provision and FACTA as a whole, Defendant knowingly, knowingly or recklessly violated and continues to violate the Receipt Provision.

84.     By printing more than the last five (5) digits of Plaintiff's credit card number on Plaintiff's transaction receipt, Defendant caused Plaintiff to suffer numerous harms as described above. This includes, but not limited to, a breach of confidence; heightened risk of identity theft, especially as the receipt displays the full name of the card holder on the it together with other sensitive information including the card holder's initialed signature; exposure of Plaintiff's private information to those of Defendant's employees who handled the receipt; being forced to take

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

action prevent further disclosure of the information displayed on the receipt; and monetary harm in the amount of the transaction fees that Plaintiff and the unnamed class members were forced to pay Defendant in exchange for a secure and legally-compliant transaction (the exact opposite of what they received).

85.     As a result of Defendant's willful violations of the FCRA, Defendant is liable to Plaintiff and members of the class pursuant to 15 U.S.C. § 1681n for statutory damages, punitive damages, attorney's fees and costs.

*          *          *

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in favor of her and the class against Defendant, as follows:

a.      Granting certification of the Class;

b.      Awarding statutory damages;

c.      Awarding punitive damages;

d.      Awarding injunctive relief;

e.      Awarding attorneys' fees, litigation expenses and costs of suit; and

f.      Awarding such other and further relief as the Court deems proper under the circumstances.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 12, 2018.

Respectfully submitted,

GERALDINE DONAHUE, individually,
and on behalf of others similarly situated,

By:  _s/ Keith J. Keogh_
        Keith J. Keogh

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

One of Plaintiff's Attorneys

Keith J. Keogh
KEOGH LAW, LTD.
55 W. Monroe St., Ste. 3390
Chicago, Il 60603
Tel: 312-726-1092
Fax: 312-726-1093
Keith@KeoghLaw.com

Scott D. Owens
SCOTT D. OWENS, P.A.
3800 S. Ocean Dr., Ste. 235
Hollywood, FL 33019
Tel: 954-589-0588
Fax: 954-337-0666
scott@scottdowens.com

Frank S. Hedin
HEDIN HALL, LLP
1395 Brickell Ave, Suite 900
Miami, Florida 33131
Tel: 305-357-2107
Fax: 305-200-8801
fhedin@hedinhall.com

*Counsel for Plaintiff*

Chancery Division Civil Cover Sheet
General Chancery Section

(5/26/16) CCCH 0623

FILED
12/12/2018 1:42 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419

FILED DATE: 12/12/2018 1:42 PM   2018CH15419

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

Geraldine Donahue

Plaintiff

v.

MGM Resorts International

Defendant

No. 2018CH15419

## CHANCERY DIVISION CIVIL COVER SHEET
## GENERAL CHANCERY SECTION

A Chancery Division Civil Cover Sheet - General Chancery Section shall be filed with the initial complaint in all actions filed in the General Chancery Section of Chancery Division. The information contained herein is for administrative purposes only. Please check the box in front of the appropriate category which best characterizes your action being filed.

0005 ☐ Administrative Review
0001 ☒ Class Action
0002 ☐ Declaratory Judgment
0004 ☐ Injunction

0007 ☐ General Chancery
0010 ☐ Accounting
0011 ☐ Arbitration
0012 ☐ Certiorari
0013 ☐ Dissolution of Corporation
0014 ☐ Dissolution of Partnership
0015 ☐ Equitable Lien
0016 ☐ Interpleader
0017 ☐ Mandamus
0018 ☐ Ne Exeat

0019 ☐ Partition
0020 ☐ Quiet Title
0021 ☐ Quo Warranto
0022 ☐ Redemption Rights
0023 ☐ Reformation of a Contract
0024 ☐ Rescission of a Contract
0025 ☐ Specific Performance
0026 ☐ Trust Construction
☐ Other (specify) _____

By: /s/ Keith J. Keogh

☒ Atty. No.: 39042          ☐ Pro se 99500
Name: Keith J. Keogh
Atty. for: Plaintiff
Address: 55 W. Monroe St, Suite 3390
City/State/Zip: Chicago, IL 60603
Telephone: 312-726-1092
Primary Email: Keith@KeoghLaw.com
Secondary Email: MSeckel@KeoghLaw.com
Tertiary Email: RWollenschlager@KeoghLaw.com

**Pro Se Only:** ☐ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice from the **Clerk's Office** for this case at this Email address:

_____

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
12/12/2018 3:54 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

|  |  |  |
|---|---|---|
| GERALDINE DONAHUE, individually and on behalf of others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | **CASE No.: 2018-CH-15419** |
| v. | ) ) ) | **JURY TRIAL DEMANDED** |
| MGM RESORTS INTERNATIONAL, | ) ) ) | |
| Defendant. | ) | |

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Pursuant to 735 ILCS 5/2-801, Plaintiff Geraldine Donahue, individually and on behalf of all others similarly situated, moves for class certification to remedy Defendant MGM Resorts International's widespread violations of the Fair and Accurate Credit Transactions Act ("FACTA"),[1] a federal consumer protection statute that, *inter alia*, requires merchants like Defendant to truncate all but the last five (5) digits of any credit or debit card account number appearing on a printed consumer transaction receipt.

---

[1] FACTA is an amendment to the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA").

1

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

## I.    INTRODUCTION

1.      Identity theft is a serious and ever-growing concern for consumers and businesses alike.  As of 2018, nearly 60 million Americans have been affected by identity theft.[2]  There were a record high 16.7 million victims of identity fraud in 2017 alone, and account takeovers (when a thief opens a credit card account or other financial account using a victim's name and other stolen information) tripled in 2017 from 2016, causing $5.1 billion in losses.

2.      Congress enacted FACTA "to prevent identity theft" and other related evils. *See* Pub. L. No. 108-159 (December 4, 2003) ("An Act . . . to prevent identity theft . . . and for other purposes."); *Redman v. Radioshack Corp*., 768 F.3d 622, 626 (7th Cir. 2014) ("[I]dentity theft is a serious problem, and FACTA is a serious congressional effort to combat it…the less information the receipt contains the less likely is an identity thief who happens to come upon the receipt to be able to figure out the cardholder's full account information.").

3.      When President George W. Bush signed FACTA into law, he explained that the Act was enacted "to protect individual privacy," and emphasized the importance of the truncation provision as follows: "Slips of paper that most people throw away should not hold the key to their savings and financial secrets." 39 Weekly Comp. Pres. Doc. 1746, 1757 (Dec. 4, 2003).

4.      In order to vindicate this important consumer protection statute, Plaintiff seeks to have this Court certify the following class:

> **All persons in the United States who, within the two (2) years prior to the filing of the complaint through the date of the Court's order granting class certification, (i) engaged in one or more transactions using a debit card or credit card at one or more establishment(s) then-owned by Defendant and located on non-tribal-owned land in the United States, and (ii) for which**

---

[2]      Source: https://www.lifelock.com/learn-identity-theft-resources-how-common-is-identity-theft.html.

FILED DATE: 12/12/2018 3:54 PM    2018CH15419

> **Defendant's system was programmed to generate a printed customer receipt displaying more than the last 5 digits of the credit or debit card number used in connection with such transaction(s).**

5.      The proposed class is an ideal candidate for certification because every class member's claim arises from the same uniform course of conduct by Defendant and is thus based on the same facts and subject to the same defenses. *See Bush v. Calloway Consol. Group River City, Inc.*, No. 3:10-CV-841-J-37MCR, 2012 WL 1016871, at *11 (M.D. Fla. Mar. 26, 2012) ("Courts routinely find class resolution superior in consumer protection actions, including those brought pursuant to FACTA."); *In re Toys "R" Us – Delaware, Inc. – Fair and Accurate Credit Trans. Act (FACTA) Litig.*, 300 F.R.D. 347, 376 (C.D. Cal. 2013) ("The vast majority of courts outside this district have similarly found that common questions predominate in FACTA class actions.").[3]

6.      Indeed, courts throughout the country regularly find class treatment appropriate in actions brought to vindicate widespread violations of FACTA's truncation provision.[4]

---

[3]      Because the procedural requisites of class certification are virtually the same under both 735 ILCS 5/2-801 and Federal Rule of Civil Procedure 23, this Court should find persuasive and adopt the reasoning of the federal FACTA decisions cited herein. *See Cruz v. Unilock Chicago, Inc.*, 383 Ill. App. 3d 752, 761 (2d Dist. 2008).

[4]      *E.g., Velasco v. Sogro, Inc.*, No. 08-C-0244, 2014 WL 3737971, at *3-4 (E.D. Wis. July 30, 2014) (finding class certification appropriate in FACTA truncation action); *Legg v. Spirit Airlines, Inc.*, 315 F.R.D. 383 (same); *Altman v. White House Black Market, Inc.*, 2017 WL 8780202 (N.D. Ga. Oct. 25, 2017), *report and recommendation adopted*, 2018 WL 1704110 (N.D. Ga. Feb. 12, 2018) (same); *Rogers v. Khatra Petro, Inc.*, No. 2:08 CV 294, 2010 WL 3894100, at *6 (N.D. Ind. Feb. 14, 2011) (same); *Miller-Huggins v. Mario's Butcher Shop, Inc.*, No. 09 C 3774, 2010 WL 658863, at *5 (N.D. Ill. Feb. 22, 2010) (same); *Shurland v. Bacci Café & Pizzeria on Ogden, Inc.*, 259 F.R.D. 151, 161 (N.D. Ill. 2009) (same); *Harris v. Best Buy Co., Inc.*, 254 F.R.D. 82, 90 (N.D. Ill. 2008) (same); *Redmon v. Uncle Julio's of Illinois, Inc.*, 249 F.R.D. 290, 294-98 (N.D. Ill. 2008) (same); *Meehan v. Buffalo Wild Wings, Inc.*, 249 F.R.D. 284, 288 (N.D. Ill. 2008) (same); and *Matthews v. United Retail, Inc.*, 248 F.R.D. 210, 217 (N.D. Ill. 2008) (same);

FILED DATE: 12/12/2018 3:54 PM    2018CH15419

## II.    FACTA'S TRUNCATION PROVISION IS WELL ESTABLISHED

7.    Defendant had years to learn about and comply with the truncation requirement

before it went into effect. Although FACTA was enacted in 2003, merchants were given ample

time to comply, as they were not obligated to start meeting the truncation requirement until

December 4, 2006. 15 U.S.C. §1681c(g)(3). Moreover, the truncation requirement was highly-

publicized long before its effective date.[5] Thereafter, VISA, MasterCard and American Express

began to contractually require merchants to comply with the truncation requirement.[6]

8.    The truncation requirement made news again in 2008, after numerous merchants

were sued for violating the "expiration date" element of the requirement. *See Bateman v. Am.*

---

*Brown v. 22nd Dist. Agric. Ass'n*, No. 15-CV-2578-DHB, 2017 WL 2172239, at *2 (S.D. Cal. May 15, 2017) (same, during settlement approval); and *Harper v. Law Office of Harris & Zide LLP*, No. 15-CV-01114-HSG, 2017 WL 995215, at *10 (N.D. Cal. Mar. 15, 2017) (same); *Flaum v. Doctor's Assoc., Inc.*, No. 16-cv-61198-CMA (S.D. Fla. March 23, 2017) (same); *Guarisma v. Microsoft*, 15-cv-24326-CMA, ECF No. 79 (S.D. Fla. Oct. 27, 2017) (same); *Legg v. Lab. Corp. of Am. Holdings*, 2016 U.S. Dist. LEXIS 122695 (S.D. Fla. Feb. 18, 2016) (same); *Muransky v. Godiva Chocolatier, Inc.*, 2016 U.S. Dist. LEXIS 133695 (S.D. Fla. Sept. 28, 2016) (same); *Wood v. J Choo USA, Inc.*, Case No. 15-cv-81487- BLOOM/Valle, ECF No. 97 (S.D. Fla. May 9, 2017) (same); *Kirchen v. Pet Supermarket, Inc.*, 16-cv-60090, ECF No. 31 at pp. 2-4 (S.D. Fla. Aug. 22, 2016) (same, vacated on other grounds).

5    For example, on March 6, 2003, the CEO of Visa USA announced "an additional measure to combat identity theft and protect consumers. Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts. The card's expiration date will be eliminated from receipts altogether…." [Complaint ¶ 13], *quoting PR Newswire*, "Visa USA Announces Account Truncation Initiative to Protect Consumers from ID Theft; Visa CEO Announces New Initiative at Press Conference with Sen. Dianne Feinstein" (March 6, 2003)). And within twenty-four hours after the VISA announcement, MasterCard and American Express announced they were imposing similar requirements. (*Id.*)

6    For example, the 2006 edition of "Rules for Visa Merchants" (p.62), which is distributed to and binding upon all merchants that accept VISA cards, expressly provides that "only the last four digits of an account number should be printed on the customer's copy of the receipt" and "the expiration date should not appear at all." [Complaint ¶ 14.]

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

*Multi- Cinema*, 623 F.3d 708, 717 (9th Cir. 2010). Congress addressed this situation by passing a "Clarification Act" to absolve a specific type of violation that had occurred *before* June 3, 2008. *Id.* Importantly, however, the Clarification Act did *not* eliminate or otherwise absolve any violation of truncation requirement going forward. Thereafter, card-processing companies continued to alert merchants about FACTA's truncation requirements.[7]

9.       Finally, to incentivize merchants to learn about and comply with FACTA, and encourage private litigants to enforce it, Congress gave the law teeth. Specifically, Congress incorporated FACTA into the Fair Credit Reporting Act, 15 U.S.C. §1681, *et seq.* ("FCRA"), which entitles a successful plaintiff to statutory damages, punitive damages, costs and attorneys' fees for any "willful" conduct that violates the law. *See Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1306-1307 (11th Cir. 2009) (citing 15 U.S.C. §1681n(a)(1)(A), and (2)). This includes knowing or reckless conduct, such as when a defendant violates the statute despite being aware of its requirements. *See id.* at 1310 (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 59-60 (2007) (an FCRA violation is "willful" if it is knowing or reckless)); *Steinberg v. Stitch & Craft, Inc.*, No. 09-60660, 2009 U.S. Dist. LEXIS 72908, *9 (S.D. Fla. Aug. 18, 2009) (a complaint states claim for willful violation under FACTA if the defendant violated statute despite knowing its requirements).

---

[7]       A Visa Best Practice Alert in 2010 stated "Some countries already have laws mandating PAN truncation and the suppression of expiration dates on cardholder receipts. For example, the United States Fair and Accurate Credit Transactions Act (FACTA) of 2006 prohibits merchants from printing more than the last five digits of the [account number] … on any cardholder receipt." [Complaint ¶ 17]. Likewise, MasterCard warned merchants that: "A Transaction receipt generated by an electronic POI Terminal, whether attended or unattended, must not include the Card Expiration Date." *Id.* ¶ 19.

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

### III.    FACTS

10.    The complaint's allegations are "taken as true for purposes of determining class certification." *Chultem v. Ticor Title Ins. Co.*, 401 Ill. App. 3d 226, 235 (1st Dist. 2010).

11.    On or about February 22, 2018, Plaintiff used her personal credit card to perform a transaction at the Grand Victoria Casino in Elgin, Illinois, an establishment which, at the time of Plaintiff's transaction, was owned by Defendant. [Complaint ¶ 46.]

12.    Plaintiff paid using her personal credit card and Defendant subsequently presented her with an electronically-printed receipt bearing the first four (4) and last four (4) digits of her credit card account number.  [*Id.* ¶ 48.]

13.    In addition to bearing eight (8) digits of her credit card, the receipt identifies the complete first and last name and initialed signature of Plaintiff, as well as the card issuer (in this case VISA) and the transaction date and time. [*Id.* ¶ 49.]

14.    Defendant's casino establishments profit handsomely at the expense of Defendant's patrons, many of whom are among the most vulnerable members of society. [*Id.* ¶ 5.] For 2017, for example, Defendant reported over $8 billion in net revenue from its domestic casino resorts.[8] [*Id.* ¶ 5.]

---

[8]    Source:   https://www.sec.gov/Archives/edgar/data/789570/000156459018003942/mgm-10k_20171231.htm, MGM Resorts International, 2018 10-K Report (Mar. 1, 2018).

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

## IV.    CLASS CERTIFICATION IS APPROPRIATE

15.    Class certification is a matter left to the Court's discretion, so long as such discretion is "exercised within the framework of the rules of civil procedure governing class actions." *Id.* (citing *Smith v. Ill. Central R.R. Co.*, 223 Ill. 2d 441, 447 (2006)).

16.    The rule of civil procedure governing class certification is 735 ILCS 5/2-801, which has four requirements: (1) the class is so numerous that joinder of all members as parties is impracticable ("Numerosity"); (2) Plaintiff's and the class members' claims present common questions of law or fact that predominate over any questions affecting only individual members ("Commonality"); (3) Plaintiff will fairly and adequately represent the class ("Adequacy"); and (4) a class action is an appropriate method for fairly and efficiently resolving the dispute. ("Appropriateness"). *See* 735 ILCS 5/2-801.  Each requirement is readily satisfied in this case.

17.    <u>Numerosity.</u> "A class consisting of more than forty members generally satisfies the numerosity requirement." *Chavez v. Don Stoltzner Mason Contr., Inc.*, 272 F.R.D. 450, 454 (N.D. Ill. 2011); *accord Heritage Operations Grp., LLC v. Norwood*, 322 F.R.D. 321, 325 (N.D. Ill. 2017).  Here, Defendant generated printed receipts bearing the first four and last four digits of customers' credit and debit card numbers numerous times per day, 365 days per year. Therefore, based upon Defendant's annual flow of guests and net income, *see supra*, Section III., ¶ 14, it is reasonable to conclude that the class is sufficiently numerous such that individual joinder of all members is impractical, as required by 735 ILCS 5/2-801(1).).[9]

---

[9]    Plaintiff is "not required to specify the exact number of persons in the class…" *Chavez*, 272 F.R.D. at 453, *quoting Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989). Furthermore, "[c]ourts rely on common sense to determine whether an estimate of a class size is reasonable." *Chavez*, 272 F.R.D. at 454 (quoting *Schmidt v. Smith & Wollensky, LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010)).

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

18.     <u>Commonality.</u> "Determining whether issues common to the class predominate over individual issues requires the court to identify the substantive issues that will control the outcome, assess which issues will predominate, and then determine whether these issues are common to the class." *Ramirez v. Midway Moving & Storage, Inc.*, 378 Ill. App. 3d 51, 54-55 (1st Dist. 2007) (quoting *Smith*, 223 Ill. 2d at 449). This requirement is met because the substantive issues that control the outcome of this case are: Such questions common to the class include, but are not limited to;

a.  Whether, within the two (2) years prior to the filing of this Complaint, Defendant and/or its agents completed transactions for which Defendant's system was programmed to generate a printed customer receipt displaying more than the last 5 digits of the credit or debit card number used in connection with such transaction(s);

b.  Whether Defendant's violation was knowing or reckless;

c.  Whether Defendant is liable for damages, and the extent of statutory damages for each such violation; and

d.  Whether Defendant should be enjoined from engaging in such conduct in the future.

19.     The principal question is whether Defendant violated section 1681c(g) of the FCRA by providing class members with electronically-printed receipts in violation of the Receipt Provision. The secondary question is whether Defendant knowingly or recklessly provided such electronically printed receipts.

20.     These questions predominate because "the successful adjudication of the plaintiff's individual claims will establish a right of recovery in favor of the other class members." *S37 Mgmt. v. Advance Refrigeration Co.*, 2011 IL App (1st) 102496, ¶ 17 (1st Dist. 2011) (citing *Hall v. Sprint Spectrum, L.P.*, 376 Ill. App. 3d 822, 831 (5th Dist. 2007)). Moreover, these questions are common

FILED DATE: 12/12/2018 3:54 PM    2018CH15419

because all class members were Defendants' tenants and subject to the same utility disclosure and utility billing practices, and the same security deposit practices. (Compl. ¶ 46).

21.    <u>Adequacy.</u> This element requires that the named plaintiff's interests be aligned with and not antagonistic to the interests of the unnamed class members, and that the plaintiff's counsel be qualified, experienced and generally able to conduct the litigation. *See Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 338-39 (1977); *Ramirez*, 378 Ill. App. 3d at 56. That is the case here. Plaintiff's and the class members' interests align perfectly because all of their claims arise from the same underlying uniform course of conduct, resulting in materially identical violations of FACTA. Moreover, as a result of Defendant's uniform violations of the truncation provision of FACTA, Plaintiff and unnamed class members are each entitled to recover the same statutory damages.

22.    Plaintiff's counsel and proposed class counsel at Scott D. Owens, P.A., Hedin Hall LLP, and Keogh Law, LTD., all possess significant consumer class action litigation experience (in the FACTA context and otherwise) and have all previously been found adequate and appointed class counsel in numerous similar class actions. *See Flaum*, 16-cv-61198-CMA, ECF No. 83 ¶ 6 ("[T]he Court determines that Plaintiff's counsel, Scott D. Owens, Keith J. Keogh, Michael S. Hilicki, Bret L. Lusskin, are adequate to represent the Class and appoints them Class Counsel."); *Guarisma*, 15-cv-24326-CMA, ECF No. 57, ¶ 5 (S.D. Fla. Feb. 28, 2017) ("[T]he Court determines that Plaintiff's counsel, Scott D. Owens, Keith J. Keogh, … are adequate to represent the Class and appoints them Class Counsel."); *Legg v. Spirit*, 315 F.R.D. at 390 ("The Court has no cause for concern . . . Plaintiff's attorneys are experienced and capable, and have served as class counsel in similar consumer class actions before."); *Muransky*, 2016 U.S. Dist. LEXIS 133695 at *7

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

("Class Counsel effectively pursued the Settlement Class Members' claims before this Court.");
*Legg v. Lab. Corp.*, No. 14-61543-CV, 2016 WL 3944069 at *2 (S.D. Fla. Feb. 18, 2016) ("[T]his
Court recognizes the experience of Class Counsel Michael Hilicki, Bret Leon Lusskin, Jr., Scott
David Owens[.]"); *Chimeno-Buzzi v. Hollister Co.,* 2015 WL 9269266, at *2 (S.D. Fla. 2014)
(appointing attorney of Hedin Hall LLP, "whom the Court finds [is] experienced and adequate,"
as class counsel in consumer privacy action in which he achieved $10 million settlement on behalf
of class); *Farnham v. Caribou Coffee Co., Inc.*, No. 16-cv-295 (W.D. Wisc. 2016) (appointing
attorney of Hedin Hall LLP as class counsel in consumer privacy action resulting in $8.5 million
class settlement); *Luczak v. Nat'l Beverage Corp.*, No. 18-cv-61631-KMM, docket entry no. 20,
at 4, 5 (S.D. Fla. Oct. 12, 2018) (noting that "Hedin Hall LLP . . . has extensive experience in class
actions"). *See Exhibit 1* (Hedin Declaration at ¶¶ 4-8); *Exhibit 2* (Owens Declaration) at ¶ 15-27;
and *Exhibit 3* (Keogh Declaration) at ¶ 7-14.

23. <u>Appropriateness.</u> A class action is an appropriate method for fairly and efficiently
resolving a dispute when it can "best secure economies of time, effort and expense or accomplish
the other ends of equity and justice that class actions seek to obtain." *Ramirez*, 378 Ill.App.3d at
56 (quoting *Walczak v. Onyx Acceptance Corp.*, 365 Ill. App. 3d 664, 679 (2d Dist. 2006)). A class
action will best secure economies of time, effort and expense here because it will resolve hundreds
of identical claims in one fell swoop instead of requiring individual litigation of the same issues
over and over. A class action also will accomplish the ends of equity and justice because the class
members are individuals, their claims are relatively small, and there is no reason to assume that
most or even many of them possess the time, energy and wherewithal to try to vindicate their rights
on their own. As noted by the First District:

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

> Our courts have recognized that, 'in a large and impersonal society, class actions are often the last barricade of consumer protection.' The consumer class action is an inviting procedural device to address frauds that cause small damages to large groups. When brought by plaintiffs who have no other avenue of legal redress, the consumer class action provides restitution to the injured and deterrence to the wrongdoer.

*Gordon v, Boden*, 224 Ill. App. 3d 195, 204 (1st Dist. 1991) (quotation omitted). Accordingly, a class action is an appropriate method for resolving this dispute.

24.     Because this case meets all of the requirements for class certification under Section 2-801, the proposed class should be certified.

25.     Plaintiff will submit a supplemental memorandum in support of this motion upon the completion of discovery.

## V.     CONCLUSION

It is beyond reasonable dispute that this case satisfies the requirements of 735 ILCS 5/2-801. To the extent the Defendant nonetheless chooses to contest class certification, discovery will quickly confirm that the requirements of 735 ILCS 5/2-801 are satisfied. Accordingly, Plaintiff requests the following relief:

a.     To the extent Defendant contests class certification, entry of a scheduling order setting dates for Plaintiff to file a memorandum in support of this motion (and for the parties to file response and reply briefs) after the completion of appropriate discovery;

b.     To the extent Defendant declines to contest class certification, an order certifying the proposed class as defined above (or whatever amended definition(s) the Court finds to be appropriate under the law and facts);

c.     Appointment of Ms. Donahue as representative of the certified class; and

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

    d.        Appointment of Scott D. Owens, P.A., Hedin Hall LLP, and Keogh Law, LTD. as class counsel.

Dated: December 12, 2018                Respectfully submitted,

                         /s/ Keith J. Keogh
                        Keith J. Keogh
                        Michael Hilicki
                        Keogh Law, LTD., Firm No. 39042
                        55 W. Monroe St., Ste. 3390
                        Chicago, Il 60603
                        Tel: 312-726-1092
                        Fax: 312-726-1093
                        keith@keoghlaw.com

                        Scott D. Owens
                        Scott D. Owens, P.A.
                        3800 S. Ocean Dr., Ste. 235
                        Hollywood, FL 33019
                        Tel: 954-589-0588
                        Fax: 954-337-0666
                        scott@scottdowens.com

                        Frank S. Hedin
                        David W. Hall
                        HEDIN HALL LLP
                        1395 Brickell Ave, Suite 900
                        Miami, Florida 33131
                        Tel: 305-357-2107
                        Fax: 305-200-8801
                        fhedin@hedinhall.com
                        dhall@hedinhall.com

                        *Counsel for Plaintiff*

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

# EXHIBIT 1

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

**COUNTY DEPARTMENT, CHANCERY DIVISION**

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

| | |
|---|---|
| GERALDINE DONAHUE, individually, and on behalf of others similarly situated, ) ) ) | **CASE No. _____** |
| Plaintiff, ) ) | **JURY TRIAL DEMANDED** |
| v. ) ) | |
| MGM RESORTS INTERNATIONAL, ) ) | |
| Defendant. ) ) ) | |

**DECLARATION OF FRANK S. HEDIN IN SUPPORT**
**OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

I, Frank S. Hedin, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and based on my own personal knowledge, that the following statements are true:

1.      I am one of the attorneys of record for Plaintiff Geraldine Donahue and the proposed class in the above-entitled action, and I submit this declaration in support of Plaintiff's motion for class certification.

2.      I am a member in good standing of the Florida Bar and the State Bar of California; of the United States District Courts for the Southern District of Florida, Northern District of California, Southern District of California, Central District of California, and Western District of Wisconsin; and of the United States Courts of Appeals for the Second Circuit and Seventh Circuit.

3.      I received my Bachelor of Arts from University of Michigan in 2008 and my Juris Doctor, *magna cum laude*, from Syracuse University College of Law in 2012.

4.      I served as law clerk to the Honorable William Q. Hayes, United States District Judge for the Southern District of California, from August 2012 through October 2013, during which time I worked on, *inter alia*, numerous class action matters at all stages of litigation.

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

5.      From early 2014 until February of this year, I practiced law at the Miami office of Carey Rodriguez Milian Gonya, LLP, where I represented both plaintiffs and defendants in consumer and data-privacy class actions, employment-related collective actions, and patent and trademark litigation, and routinely represented indigent litigants in civil rights and housing matters on a *pro bono* basis.  In just four years, I built Carey Rodriguez's class action litigation practice from the ground up, became a partner and was appointed head of the firm's practice in this area, and served as class counsel and lead plaintiffs' counsel in many matters of national significance.

6.      I co-founded Hedin Hall LLP in March 2018.  With offices in Miami, Florida and San Francisco, California, our firm specializes in securities, consumer protection, and data privacy matters and has "extensive experience in class actions," as recently noted by U.S. District Judge K. Michael Moore of the Southern District of Florida.[1]

7.      I have served as court-appointed class counsel and as lead plaintiffs' counsel in several nationwide class actions.  *E.g., Chimeno-Buzzi v. Hollister Co.,* 2015 WL 9269266, at *2 (S.D. Fla. 2014) (class counsel in consumer privacy action, $10 million class settlement); *Farnham v. Caribou Coffee Co., Inc.*, No. 16-cv-295 (W.D. Wisc. 2016) (class counsel in consumer privacy action, $8.5 million class settlement); *Luczak v. National Beverage Corp., et al.*, No. 18-cv-61631-KMM (S.D. Fla.) (class liaison counsel in federal securities action); *Norberg v. Shutterfly, Inc*, No. 15-cv-5351 (N.D. Ill.) (interim class counsel in consumer privacy action); *Cano Lopez v. Miami-Dade County, et al.*, No. 15-cv-22943-MGC (S.D. Fla.) (lead plaintiff's counsel in FACTA litigation); *Groover v. U.S. Corrections, LLC, et al.*, No. 15-cv-61902-BB (lead plaintiff's counsel in civil rights action); *Soukhaphonh v. Hot Topic, Inc.*, No. 16-cv-5024 (C.D. Cal.) (lead plaintiffs' counsel in consumer privacy action); *Rivera v. Google, Inc.*, No. 16-cv-02714 (N.D. Ill.) (lead plaintiffs' counsel in data-privacy action); *Monroy v. Shutterfly, Inc.*, No. 16-cv-10984 (N.D. Ill.) (same).

---

[1]     *See Luczak v. Nat'l Beverage Corp.*, No. 18-cv-61631-KMM, docket entry no. 20, at 4, 5 (S.D. Fla. Oct. 12, 2018) (noting that "Hedin Hall LLP . . . has extensive experience in class actions").

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

8.      My work has resulted in many favorable legal decisions for my clients, notable examples of which include the following published opinions:

   a.   *Norberg v. Shutterfly, Inc.*, 152 F. Supp. 3d 1103 (N.D. Ill. 2015);

   b.   *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088 (N.D. Ill. 2017);

   c.   *Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. 2017);

   d.   *Monroy v. Shutterfly, Inc.*, No. 16 C 10984, 2017 WL 4099846 (N.D. Ill. Sept. 15, 2017);

   e.   *Gullen v. Facebook, Inc.*, No. 3:16-CV-00937-JD, 2018 WL 1989497 (N.D. Cal. Mar. 2, 2018);

   f.   *Chimeno–Buzzi v. Hollister Co.*, No. 14-23120-CIV, 2015 WL 9269266 (S.D. Fla. Dec. 18, 2015);

   g.   *Soukhaphonh v. Hot Topic, Inc.*, No. CV165124DMGAGRX, 2017 WL 2909403 (C.D. Cal. Jan. 13, 2017);

   h.   *Groover v. Prisoner Transportation Servs., LLC*, No. 15-CV-61902, 2018 WL 4743555 (S.D. Fla. Oct. 2, 2018).

9.      Together with Ms. Donahue and co-counsel, I have thoroughly investigated the underlying facts and all potential claims in this matter.

10.     My law firm is well suited to continue to represent and protect the interests of Plaintiff and the proposed class in this matter, and will commit all necessary resources, financial, professional, and otherwise, to ensure that this litigation is administrated and prosecuted in the best interests of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of December 2018 at Miami, Florida.

Frank S. Hedin

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

# EXHIBIT 2

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| GERALDINE DONAHUE, individually | ) | |
| and on behalf of others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | **CASE No.: 2018-CH-15419** |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| MGM RESORTS INTERNATIONAL, | ) | |
| | ) | |
| Defendant. | | |

---

## DECLARATION OF SCOTT D. OWENS

I, Scott D. Owens, declare under penalty of perjury, as provided for by the laws of the United States, 28 U.S.C. § 1746, that the following statements are true:

1.      I am an attorney who heads a law firm which operates under the name Scott D. Owens, P.A. I am one of the attorneys representing Plaintiff in this matter.

2.      I am currently a member in good standing of the bars of the following courts:

| Court | Date Admitted |
|---|---|
| State of Florida | October 2, 2002 |
| United States District Court Southern District of Florida | October 10, 2008 |
| United States District Court Middle District of Florida | June 23, 2009 |
| Eleventh Circuit Court of Appeals | April 30, 2012 |
| United States District Court | January 9, 2014 |

1

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

| Eastern District of Michigan | |
|---|---|
| Sixth Circuit Court of Appeals | May 20, 2015 |

3.      I am a 2000 graduate of the New England School of Law. After a short time working in a debt collection law firm, I began to represent persons in consumer rights litigation, both in State and Federal Court; currently, 100% percent of my workload consists of consumer protection litigation, which includes claims brought under FACTA as well as both the FDCPA, and the TCPA. Since 2007, I have been an active member of the National Association of Consumer Advocates (NACA).

4.      My federal litigation practice was featured in the *Daily Business Review* on June 15, 2009 in an article entitled "Federal Law Used Against Abusive Debt Collectors."

5.      At the specific request of Judge Myriam Lehr of Miami-Dade County, I was asked to conduct a Continue Legal Education (CLE) seminar on the basics of FDCPA litigation entitled "How to Defend Against Abusive Debt Collectors"; the event was sponsored by the Miami-Dade Consumer Advocate and held on October 30, 2009.

6.      I was featured on WSVN News (Channel 7) on November 22, 2010 for my pro-consumer work in the area of the Fair Debt Collection Practices Act.

7.      I was a Guest Lecturer at the National Consumer Law Center's "Fair Debt Collection Training Conference" held in Jacksonville, Florida on March 5-6, 2010.

8.      I was Featured Guest Speaker at the request of the Miami-Dade Consumer Services Department during *National Consumer Protection Week* on March 11, 2011.

9.      I instructed a CLE seminar for Legal Services of Greater Miami, Inc., dealing with consumer protection (May 2011).

10.     I conducted a CLE on the topic of consumer protection at Florida International University (June 2012).

2

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

11.     I conducted a webinar dealing with the FDCPA and TCPA at the request of the National Association of Consumer Advocates (December 2012).

12.     I was invited by the Consumer Protection Law Committee to be a guest speaker at the Florida Bar's Annual Convention to be held in Orlando, Florida (June 25-28, 2014). My topics of discussion included the Telephone Consumer Protection Act.

13.     I regularly attend legal seminars hosted by the National Consumer Law Center (NCLC), including the following:

*National Consumer Law Center, 17th Annual Consumer Rights Litigation Conference (2008)*

*National Consumer Law Center, Fair Debt Collection Training Conference (2009)*

*National Association of Consumer Advocates, Fair Credit Reporting Act Conference (2009)*

*National Consumer Law Center, 18th Annual Consumer Rights Litigation Conference (2009)*

*National Consumer Law Center, Fair Debt Collection Training Conference (2010)*

*National Consumer Law Center, 19th Annual Consumer Rights Litigation Conference (2010)*

*National Consumer Law Center, 20th Annual Consumer Rights Litigation Conference (2011)*

*National Consumer Law Center, 21st Annual Consumer Rights Litigation Conference (2012)*

*National Consumer Law Center 22nd Annual Consumer Rights Litigation Conference (2013)*

*National Consumer Law Center, Fair Debt Collection Training Conference (2014)*

*National Consumer Law Center 23rd Annual Consumer Rights*

3

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

*Litigation Conference (2014)[1]*

*National Consumer Law Center, Fair Debt Collection Training Conference (2015)*

*National Consumer Law Center 24th Annual Consumer Rights Litigation Conference (2015)*

*National Consumer Law Center, Fair Debt Collection Training Conference (2016)*

*National Consumer Law Center 25th Annual Consumer Rights Litigation Conference (2016)*

*National Consumer Law Center, Fair Debt Collection Training Conference (2017)*

*National Consumer Law Center 26th Annual Consumer Rights Litigation Conference (2017)*

*National Consumer Law Center, Fair Debt Collection Training Conference (2018)*

*National Consumer Law Center 27th Annual Consumer Rights Litigation Conference (2018)*

14.     Of the aforesaid legal seminars, I have attended at least five intensive full-day seminars which have dealt exclusively with class action litigation; I am familiar with the ethical and professional guidelines governing class action litigation.

15.     I am generally regarded by my peers as one of the leading authorities in the State of Florida with respect to the Fair and Accurate Credit Transactions Act ("FACTA"), the Fair Debt Collection Practices Act, and the Telephone Consumer Protection Act.

16.     My law practice was featured on the cover of the Sun-Sentinel on September 11, 2011 in an article entitled *Ticked off at debt collectors calling their cellphones, Floridians are fighting back.* The article dealt specifically with the Telephone Consumer Protection Act.

---

[1] I also served as the co-chairperson for the aforementioned conference.

4

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

17.     I was appointed as class counsel in the matter of *McMullen v. Jennings & Valancy, P.A.*, Case No. 10-CV-60050. In certifying me for class counsel, Judge Adalberto Jordan stated, "I find that Mr. Owens can fairly and adequately represent the interests of the class…" and "Mr. Owens has the requisite mastery in these types of claims." I also served as class counsel in the case of *Lithgow v. Eisinger, Brown, Lewis, Frankel, Chaiet & Krut, P.A.* Case No. 0-10-cv-61185-WJZ [See Order dated Dec. 9, 2010]. In March 2012, I was appointed class counsel in *Lee v. Greenspoon Marder*, Case No. 10-cv-61184-Lenard/O'Sullivan and I also served as class counsel in *Bummolo v. The Law Offices of Charles W. McKinnon, P.L.*, No. 2:11- cv-14408-KMM and served as class counsel in *Collins v. Erin Capital Management, LLC*, No. 1:12−cv−22839−CMA; *Rigney v. Livingston Financial, LLC*, No. 6:12-cv-00617-RBD-TBS; and *Walker v. Greenspoon Marder, P.A.*, No. 13-CV-14487, 2015 WL 233472 (S.D. Fla. Jan. 5, 2015).

18.     I was also appointed joint interim lead counsel in the Southern District of Florida TCPA class action lawsuit, *Soto v. Gallup, Inc.*, No. 0:13-cv-61747-RSR wherein Judge Robin S. Rosenbaum stated that "**Scott D. Owens has vast experience in the area of consumer protection litigation**…" (emphasis added); I was later appointed co-lead counsel after the case was later certified ($12 million-dollar common fund settlement).

19.     I was appointed co-lead class counsel in the TCPA class action, *De Los Santos v. Millward Brown, Inc.*, No. 13-80670-CV, ECF No. 77 (S.D. Fla. Feb. 10, 2015). The case established an $11 million-dollar common fund settlement.

20.     I served as co-lead counsel in the TCPA class action, *Guarisma v. ADCAHB Medical Coverages, Inc., et al.*, No. 1:13-cv-21016 (S.D. Fla. June 24, 2015) wherein my firm established a common fund of $4.5 million dollars in settlement. My firm, along with co-counsel was awarded one-third of the common fund (plus costs).

21.     I served as co-lead counsel in the successful FACTA class action, *Legg v. Laboratory Corporation of America Holdings*, No. 14−61543-CIV (S.D. Fla. Filed July 6, 2014) ($11 million-dollar settlement).

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

22.    I served as co-lead counsel in the successful FACTA class action, *Legg v. Spirit Airlines, Inc.*, No. 14−cv-61978 (S.D. Fla. Filed August 29, 2014) ($7.5 million-dollar settlement).

23.    I served as co-lead counsel in the successful FACTA class action, *Wood v. J. Choo USA, Inc,* Case No. 15−cv−81487 (S.D. Fla. Filed Oct. 27, 2015) ($2.5 million-dollar class settlement).

24.    I served as co-lead counsel in the successful FACTA class action, *Guarisma v. Microsoft Corporation*, Case No. 15−cv−24326 (S.D. Fla. Filed Nov. 20, 2015) ($1.2 million-dollar class settlement).

25.    I served as co-lead counsel in the successful FACTA class action, *Legg v. E-Z Rent a Car*, No. 14−cv−01716−PGB−DAB (M.D. Fla. Filed Oct. 22, 2014).

26.    I am also co-counsel in *Melito v American Eagle Outfitters, Inc*., Case No. 14-cv-02440 (E.D.N.Y. Filed Apr. 8, 2014) ($14.5 million-dollar class settlement, currently on appeal).

27.    I represented the Appellee at the Eleventh Circuit in the matter of *Muransky v. Godiva Chocolatier, Inc.*, 905 F.3d 1200 (11th Cir. 2018) (holding that consumer plaintiff had suffered a concrete for alleged violation of FACTA and affirming a $6.3 million-dollar class settlement). The Objector-Appellant has petitioned for *en banc* review in that matter.

28.    I have conducted a thorough pre-suit investigation of this matter and am fully prepared to devote my firm's full resources to serve the best interest of the Class.

Executed at Hollywood, Florida, on Wednesday, December 12, 2018.

s/ *Scott D. Owens*
Scott D. Owens, Esq.
SCOTT D. OWENS, P.A.
3800 S. Ocean Dr., Suite 235
Hollywood, Florida 33019

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

Telephone: 954-589-0588
Facsimile: 954-337-0666
scott@scottdowens.com

FILED DATE: 12/12/2018 3:54 PM    2018CH15419

# EXHIBIT 3

FILED DATE: 12/12/2018 3:54 PM    2018CH15419

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| GERALDINE DONAHUE, individually and on behalf of others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | **CASE No.: 2018-CH-15419** |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| MGM RESORTS INTERNATIONAL, | ) ) | |
| Defendant. | ) ) ) | |

**DECLARATION OF KEITH J. KEOGH**

Keith J. Keogh declares under penalty of perjury, that the following statements are true:

1.      I am over the age of eighteen and am fully competent to make this declaration. This declaration is based upon my personal knowledge and if called upon to testify to the matters stated herein, I could and would do so competently.

2.      As shown below, my firm has regularly engaged in major complex litigation involving FACTA and other consumer issues. My firm has the resources necessary to conduct litigation of this nature, and has experience prosecuting class actions of similar size, scope, and complexity to the instant case. Additionally, I have often served as class counsel in similar actions.

3.      Keogh Law, Ltd. consists of six attorneys and focuses on consumer protection class actions.  I am a shareholder of the firm and member of the bars of the United States Court of Appeals for the First, Second, Third, Seventh, Ninth and Eleventh Circuits, Eastern District of Wisconsin, Northern District of Illinois, Central District of Illinois, Southern District of Indiana, District of Colorado, Middle District of Florida, Southern District of Florida, the Illinois State Bar,

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

and the Florida State Bar, as well as several bar associations and the National Association of Consumer Advocates.

4.      In 2015, the National Association of Consumer Advocates honored me as the Consumer Attorney of the Year for my work in courts and with the FCC insuring the safeguards of the TCPA were maintained.

5.      My firm was class counsel in the four largest all cash FACTA class action settlements. *Flaum v Doctors Associates,* 16-CV-61198-CMA (S.D. Fla. Pending Final Approval)($30.9 million dollars); *Legg v. Laboratory Corporation of America Holdings*, No. 14-cv-61543-RLR (S.D. Fla., filed July 6, 2014) ($11 million dollars); *Legg v. Spirit Airlines, Inc*., No. 14-cv-61978-JIC (S.D. Fla., filed Aug. 29, 2014) ($7.5 million dollars) and *Muransky v. Godiva Chocolatier, Inc*., 15-cv-60716-WPD (S.D. Fla., filed Apr. 6, 2015) ($6.3 million dollars)(on appeal).

6.      I was also appointed class counsel in numerous FACTA and FCRA class actions *Osada v. Experian Info. Solutions, Inc.*, 2012 U.S. Dist. LEXIS 42330 (N.D. Ill. Mar. 28, 2012) (FCRA class)*; Cicilline* v. *Jewel Food Stores, Inc.,* 542 F.Supp.2d 831 (N.D.Ill. 2008)(Co-Lead Counsel for FACTA class); *Harris* v. *Best Buy Co.,* 07 C 2559,2008 U.S. Dist. LEXIS 22166 (N.D.Ill. March 20, 2008)( FACTA class); *Matthews* v. *United Retail, Inc.,* 248 F.R.D. 210 (N.D.Ill. 2008)( FACTA class); *Redmon* v. *Uncle Julio's, Inc.,* 249 F.R.D. 290 (N.D.Ill. 2008)( FACTA class); *Harris* v. *Circuit City Stores, Inc.,* 2008 U.S. Dist. LEXIS 12596,2008 WL 400862 (N.D. Ill. 2008)( FACTA class); *Pacer* v *Rockenbach Chevrolet Sales, Inc.,* 07 C 5173 (N.D. Ill. 2008)( FACTA class).

7.      I am class counsel in some of the largest Telephone Consumer Protection Act ("TCPA") settlements in the country.  *See Hageman v. AT&T Mobility LLC, et al.*, Case 1:13-cv-

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

00050-DLC-RWA (D. MT.) (Co-Lead) (Final Approval Granted February 11, 2015 providing for a $45 million settlement for a class of 16,000 persons) and *Capital One Telephone Consumer Protection Act Litigation*, et al., 12-cv-10064 (N.D. Ill. Judge Holderman) (Liaison Counsel and additional Class Counsel)(Final Approval Granted February 12, 2015 for a $75 million settlement).

8.     In addition to the above, I was lead or class counsel in the following consumer class settlements: *See Leung v XPO Logistics, Inc.*, 15 CV 03877, (N.D. Ill. 2018) (TCPA); *Martinez v Medicredit*, 4:16CV01138 ERW (E.D. Mo. 2018) (TCPA); *Martin v. Wells Fargo Bank, N.A.*, 16-cv-09483 (N.D. Ill. 2018)(FCRA); *Town & Country Jewelers, LLC v. Meadowbrook Insurance Group, Inc., et al*, 15-CV-02419-PGS-LHG (D. NJ. 2018)(TCPA); *Legg v AEO*, 14-cv-02440-VEC (TCPA)(on appeal after final approval from professional objector); *Markos v Wells Fargo*, 15-cv-01156-LMM (N.D. Ga. (TCPA); *Ossola v Amex* 1:13-cv-04836 (N.D. Ill. 2016)(TCPA);  *Luster v. Wells Fargo,* 15-1058-TWT (N.D. Ga.)(TCPA); *Prather v Wells Fargo*, 15-CV-04231-SCJ (ND. Ga)(TCPA); *Joseph et al. v. TrueBlue, Inc. et al.*, Case No. 3:14-cv-05963 (D. Wa.) (TCPA case pending final approval for $5 million for 1,948 class members); *Tripp v. Berman & Rabin, P.A.,* 310 F.R.D. 499 (D. Kan. 2015); *Willett, et al. v. Redflex Traffic Systems, Inc., et al.*, Case No. 13-cv-01241-JCH-RHS; *In re Convergent Outsourcing, Inc. Telephone Consumer Protection Act Litigation,* Master Docket No. 3:13-cv-1866-AWT (D. Conn) (Interim Co-Lead); *De Los Santos v Millword Brown, Inc.*, 9:13-cv-80670-DPG (S.D. Fl) (TCPA); *Allen v. JPMorgan Chase Bank, N.A.* 13-cv-08285 (N.D. Ill. Judge Pallmeyer) (TCPA); *Cooper v NelNet*, 6:14-cv-314-Orl-37DAB (M.D. Fl.) (TCPA); *Thomas v Bacgroundchecks.*com, 3:13-CV-029-REP (E.D. Va.)(additional class counsel); *Carrero v. LVNV Funding*, LLC, 11-CV-62439-KMW (S.D. Fl. 2016)(Unlicensed debt collector under Fl. law); *Lopera v RMS*, 12-c-9649 (N.D. Ill. Judge Wood),  *Kubacki v Peapod*, 13-cv-729

- 3 -

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

(N.D. Ill. Judge Mason); *Wojcik v. Buffalo Bills, Inc.*, 8:12 CV 2414-SDM-TBM (M.D. Fl. Judge Merryday) (TCPA); *Curnal v LVNV Funding, LLC.*, 10 CV 1667 (Wyandotte County, KS 2014) (Unlicensed debt collector under KS law); *Cummings v Sallie Mae*, 12 C-9984 (N.D. Ill. Judge Gottschall)   (TCPA) (co-lead); *Brian J. Wanca, J.D., P.C. v. L.A. Fitness International, LLC*, Case No. 11-CV-4131 (Lake County, Il. Judge Berrones) (TCPA); *Osada v. Experian Info. Solutions, Inc.*, 2012 U.S. Dist. LEXIS 42330 (N.D. Ill. Mar. 28, 2012) (FCRA class); *Saf-T-Gard International, Inc. v. Vanguard Energy Services, L.L.C., et al*, 12-cv-3671 (N.D. Ill. 2013 Judge Gottschall) (TCPA); *Saf-T-Gard v TSI*, 10-c-7671, (N.D. Ill. Judge Rowland) (TCPA); *Cain v Consumer Portfolio Services, Inc.* 10-cv-02697 (N.D. Ill. Judge Keys) (TCPA); *Iverson v Rick Levin & Associates*, 08 CH 42955 Circuit Court Cook County (Judge Cohen) (TCPA); *Saf-T-Gard v Seiko*, 09 C 776 (N.D. Ill. Judge Bucklo) (TCPA); *Jones v. Furniture Bargains*, LLC, 09 C 1070 (N.D. Ill) (FLSA collective action); *Saf-T-Gard v Metrolift*, 07 CH 1266 Circuit Court Cook County (Judge Rochford) (Co-Lead) (TCPA); *Bilek* v *Countrywide,* 08 C 498 (N.D. Ill. Judge Gottschell); *Pacer* v *Rochenback,* 07 C 5173 (N.D. Ill. Judge Cole); *Overlord Enterprises* v. *Wheaton Winfield Dental Associates,* 04 CH 01613, Circuit Court Cook County (Judge McGann) (TCPA); *Whiting* v *SunGard,* 03 CH 21135, Circuit Court Cook County (Judge McGann) (TCPA); *Whiting* v. *Golndustry,03* CH 21136, Circuit Court Cook County (Judge McGann) (TCPA).

9.      I was the attorney primarily responsible for the following class settlements: *Wollert* v. *Client Services,* 2000 U.S. Dist. LEXIS 6485 (N.D. Ill. 2000); *Rentas* v. *Vacation Break USA,* 98 CH 2782, Circuit Court of Cook County (Judge Billik); *McDonald* v. *Washington Mutual Bank,* supra; *Wright* v. *Bank One Credit Corp.,* 99 C 7124 (N.D. Ill. Judge Guzman); *Arriaga* v. *Columbia Mortgage,* 01 C 2509 (N.D. Ill. Judge Lindberg); *Frazier* v. *Provident Mortgage,* 00 C

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

5464 (N.D. Ill. Judge Coar); *Largosa* v. *Universal Lenders,* 99 C 5049 (N.D. Ill. Judge Leinenweber); *Arriaga* v. *GNMortgage,* (N.D. Ill. Judge Holderman); *Williams* v. *Mercantile Mortgage,* 00 C 6441 (N.D. Ill. Judge Pallmeyer); *Reid* v. *First American Title,* 00 C 4000 (N.D. Ill. Magistrate Judge Ashman); *Fabricant* v. *Old Kent, 99* C 6846 (N.D. Ill. Magistrate Judge Bobrick); *Mendelovits* v. *Sears,* 99 C 4730 (N.D. Ill. Magistrate Judge Brown); *Leon* v. *Washington Mutual,* 01 C 1645 (N.D. Ill. Judge Alesia).

10.     The individual class members' recovery in some of these settlements was substantial. For example, in one of the cases against a major bank the class members' recovery was 100% of their actual damages resulting in a payout of $l,000 to $9,000 per class member. In another case against a major lender regarding mortgage servicing responses, each class member who submitted a claim form received $1,431.  *McDonald v. Washington Mutual Bank.*

11.     In addition, to the above settlements and class actions, I was appointed class counsel in *In Re Convergent Outsourcing, Inc. Telephone Consumer Protection Act Litigation*, Master Docket No. 3:13-cv-1866-AWT (D. Conn) (Interim Co-Lead);  *Galvan v. NCO Fin. Sys.*, 2012 U.S. Dist. LEXIS 128592 (N.D. Ill. 2012);*; Pesce v First Credit Services*, 11-cv-01379 (N.D. Ill. December 19 2011) (TCPA Class); *Smith v Greytsone Alliance*, 09 CV 5585 (N.D. Ill. 2010).

12.     Some reported cases of mine involving consumer protection include: *Franklin v. Parking Revenue Recovery Servs.*, 832 F.3d 741 (7th Cir. 2016);*Galvan v. NCO Portfolio Mgmt. Inc.*, 794 F.3d 716, 721 (7th Cir. 2015); *Leeb v. Nationwide Credit Corp.*, 806 F.3d 895 (7th Cir. 2015); S*mith v Greystone,* 772 F.3d 448 (7th Cir. 2014); *Clark v Absolute Collection Agency,* 741 F.3d 487 (4th 2014); *Lox v. CDA, Ltd.,* 689 F.3d 818 (7th Cir. 2012)*Townsel v. DISH Network L.L.C.*, 668 F.3d 967 (7th Cir. Ill. 2012); *Catalan v. GMAC Mortgage Corp.*, No. 09-2182 (7th Cir. 2011) ; *Gburek v Litton Loan*, 614 F.3d 380 (7th Cir. 2010); *Sawyer v. Ensurance Insurance*

FILED DATE: 12/12/2018 3:54 PM 2018CH15419

*Services* consolidated with *Killingsworth* v. *HSBC Bank Nev., NA.,* 507 F3d 614, 617 (7th Cir. 2007), *Echevarria et al.* v. *Chicago Title and Trust Co.,* 256 F3d 623 (7th Cir. 2001*); Demitro* v. *GMAC,* 388 Ill. App. 3d 15, 16 (lst Dist. 2009); *Hill* v. *St. Paul Bank,* 329 Ill. App. 3d 7051, 1768 N.E.2d 322 (lst Dist. 2002); *In re Mercedes-Benz Tele Aid Contract Litig., 2009* U.S. Dist. LEXIS 35595 (D.N.J. 2009); *Catalan v. RBC Mortg. Co.,* 2009 U.S. Dist. LEXIS 26963 (N.D. Ill. 2009); *Elkins v. Equifax, Inc.,* 2009 U.S. Dist. LEXIS 18522 (N.D. Ill. 2009*); Harris* v. *DirecTV Group, Inc.,* 2008 U.S. Dist. LEXIS 8240 (N.D. Ill. 2008); *In re TJX Cos., Inc., Fair & Accurate Credit Transactions Act* (FACTA) Litig., 2008 U.S. Dist. LEXIS 38258 (D. Kan. 2008); *Martin* v. *Wal- Mart Stores, Inc.,* 2007 U.S. Dist. LEXIS 89715 (N.D. Ill. 2007); *Elkins* v. *Ocwen Fed. Sav. Bank Experian Info. Solutions, Inc.,* 2007 U.S. Dist. LEXIS 84556 (N.D. Ill. 2007); *Harris* v. *Wal-Mart Stores, Inc.,* 2007 U.S. Dist. LEXIS 76012 (N.D. Ill. *2007); Stegvilas* v. *Evergreen Motors, Inc.,* 2007 U.S. Dist. LEXIS 35303 (N.D. Ill. 2007); *Cook* v. *River Oaks Hyundai, Inc.,* 2006 U.S. Dist. LEXIS 21646 (N. D. Ill. 2006); *Gonzalez* v. *W. Suburban Imps.,* Inc., 411 F. Supp. 2d 970 (N.D. Ill. 2006); *Eromon* v. *GrandAuto Sales, Inc.,* 333 F. Supp. 2d 702 (N.D. Ill. 2004); *Williams* v. *Precision Recovery, Inc.,* 2004 U.S. Dist. LEXIS 6190 (N.D. Ill. 2004); *Doe* v. *Templeton,* 2003 U.S. Dist. LEXIS 24471 (N.D. Ill. 2003); *Ayala* v. *Sonnenschein Fin. Servs.,* 2003 U.S. Dist. LEXIS 20148 (N.D. Ill. 2003); *Gallegos* v. *Rizza Chevrolet, Inc., 2003* U.S. Dist. LEXIS 18060 (N.D. Ill. 2003); *Szwebel* v. *Pap's Auto Sales, Inc.,* 2003 U.S. Dist. LEXIS 13044 (N.D. Ill. 2003); *Johnstone* v. *Bank of America,* 173 F. Supp.2d 809 (N.D. Ill. 2001); *Leon* v. *Washington Mutual Bank,* 164 F. Supp.2d 1034 (N.D. Ill. 2001); *Ploog v. HomeSide Lending,* 2001 WL 987889 (N.D. Ill. 2001); *Christakos* v. *Intercounty Title,* 196 F.R.D. 496 (N.D. Ill. 2000); *Batten* v. *Bank One,* 2000 WL 1364408 (N.D. Ill. 2000); *McDonald* v. *Washington Mutual Bank,* 2000 WL 875416 (N.D. Ill. 2000); and *Williamson* v.

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

*Advanta Mtge Corp.,* 1999 U.S. Dist. LEXIS 16374 (N.D. Ill. 1999). The *Christakos* case significantly broadened title and mortgage companies' liability under Real Estate Settlement Procedures Act ("RESPA") and *McDonald* is the first reported decision to certify a class regarding mortgage servicing issues under the Cranston-Gonzales Amendment of RESPA.

13.     I have argued before the Seventh Circuit, the First District of Illinois and the MultiLitigation Panel in *Townsel v. DISH Network L.L.C.*, 668 F.3d 967 (7th Cir. Ill. 2012)*; Catalan* v *GMACM* (7th Cir. 2010); *Gburek* v *Litton Loan Servicing* (7th Cir. 2009); *Sawyer* v *Esurance* (7th Cir. 2007), *Echevarria, et al.* v. *Chicago Title and Trust Co.* (7th Cir. 2001); *Morris* v *Bob Watson,* (lst. Dist. 2009); *Iverson* v *Gold Coast Motors Inc.,* (lst. Dist. 2009); *Demitro* v. *GMAC* (lst Dist. 2008), *Hill v. St. Paul Bank* (lst Dist. 2002), and *In Re: Sears, Roebuck* & *Company Debt Redemption Agreements Litigation* (MDL Docket No. 1389.) *Echevarria* was part of a group of several cases that resulted in a nine million dollar settlement with Chicago Title.

14.     My published works include co-authoring and co-editing the 1997 supplement to *Lane's Goldstein Trial Practice Guide* and *Lane's Medical Litigation Guide.*

15.     I have lectured extensively on consumer litigation, including extensively on class actions and consumer claims.  For example, I:

a.  Presented at the 2018 Fair Debt Collection Training Conference for two sessions on the TCPA.

b.  Presented at the National Consumer Law Center 2017 annual conference on the TCPA.

c.  Presented at the National Consumer Law Center 2016 annual conference on the TCPA.

d.  Presented at the 2016 Fair Debt Collection Training Conference for a session on TCPA Developments.

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

e.  Presented for the National Association of Consumer Advocates November 2015 webinar titled Developments and Anticipated Impact of Recent FCC TCPA Rules.

f.  Presented at the National Consumer Law Center 2015 annual conference in San Antonio, Tx. on the TCPA.

g.  Presented at the 2015 Fair Debt Collection Training Conference for three sessions on the TCPA.

h.  Presented at the National Consumer Law Center 2014 annual conference in Tampa Fl. for two sessions on the TCPA.

i.  Panelist for the December 2013 Strafford CLE Webinar titled TCPA Class Actions: Pursuing or Defending Claims Over Phone, Text and Fax Solicitations.

j.  Panelist for the December 2014 Chicago Bar Association Class Action Seminar titled "Class Action Settlements in the Seventh Circuit: Navigating Turbulent Waters."

k.  Presented at the 2014 Fair Debt Collection Training Conference for three sessions on the TCPA.

l.  Panelist for the December 2013 Strafford CLE Webinar titled Class Actions for Telephone and Fax Solicitation and Advertising Post-Mims. Leveraging TCPI lectured at the 2014 Fair Debt Collection Training Conference for three sessions on the TCPA.

m.  Panelist for the December 2013 Strafford CLE Webinar titled Class Actions for Telephone and Fax Solicitation and Advertising Post-Mims. Leveraging TCPA Developments in Federal Jurisdiction, Class Suitability, and New Technology.

n.  Presented for the National Association of Consumer Advocates November 2013 webinar titled Current Telephone Consumer Protection Act Issues Regarding Cell Phones.

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

o. Presenter for the November 2013 Chicago Bar Association Class Action Committee presentation titled Future of TCPA Class Actions.

p. Speaker at the Social Security Administration's Chicago office in August 2013 on a presentation on identity theft, which included consumers' rights under the Fair Credit Reporting Act.

q. Panelist for the May 14, 2013 Chicago Bar Association Class Action Seminar titled "The Shifting Landscape of Class Litigation" as well as for the March 20, 2013 Strafford CLE webinar titled "Class Actions for Telephone and Fax Solicitation and Advertising Post-Mims. Leveraging TCPA Developments in Federal Jurisdiction, Class Suitability, and New Technology."

r. Lectured at the June 6, 2013 Consumer Law Committee of the Chicago Bar Association on the topic "Employment Background Reports under the Fair Credit Reporting Act: Improper consent forms to failure to provide background report prior to adverse action."

s. Lectured at the 2013 Fair Debt Collection Training Conference for three sessions on the TCPA.

t. Presented at the 2012 National Consumer Law Center annual conference for a session on the TCPA.

u. Presented at the 2012 Fair Debt Collection Training Conference for a session on the TCPA.

v. Panelist for Solutions for Employee Classification & Wage/Hour Issues at the 2011 Annual Employment Law Conference hosted by Law Bulletin Seminars.

w. Lectured at the 2011 National Consumer Law Center conference for a session titled Telephone Consumer Protection Act: Claims, Scope, Remedies as well as lectured at the

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

same 2011 National Consumer Law Center conference for a double session titled ABC's of Class Actions.

x. Taught *Defenses to Foreclosures* for Lorman Education Services, which was approved for CLE credit, in 2008 and 2010.

y. Guest lecturer on privacy issues at University of Illinois at Urbana-Champaign School of Law. In March 2010.

z. Guest speaker for the Legal Services Office of The Graduate School and Kellogg MBA Program at Northwestern University for its seminar titled: "Financial Survival Guide: Legal Strategies for Graduate Students During A Period of Economic Uncertainty."

16.     I was selected as an Illinois Super Lawyer in 2018-2014 and an Illinois Super Lawyer Rising Star each year from 2008 through 2013 and my cases have been featured in local newspapers such as the Chicago Tribune, Chicago Sun-Times, The Naperville Sun, Daily Herald and RedEye.

17.     In April 2011, Timothy J. Sostrin joined the firm. He is a member in good standing of the Illinois bar, the U.S. District Court District of Colorado, U.S. District Court Northern District of Illinois, U.S. District Court Northern and Southern Districts of Indiana, U.S. District Court Eastern and Western Districts of Michigan, U.S. District Court Eastern District of Missouri, U.S. District Court Southern District of Texas and U.S. District Court Eastern and Western Districts of Wisconsin.

18.     Timothy J. Sostrin has zealously represented consumers in Illinois and in federal litigation nationwide against creditors, debt collectors, retailers, and other businesses engaging in unlawful practices.  Tim has extensive experience with consumer claims brought under the Fair Debt Collection Practices Act, The Telephone Consumer Protection Act, the Fair Credit Reporting

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

Act, the Electronic Fund Transfer Act, and Illinois law. Some of Tim's representative cases include: *Osada v. Experian Info. Solutions, Inc.*, 2012 U.S. Dist. LEXIS 42330 (N.D. Ill. Mar. 28, 2012) (granting class certification*); Galvan v. NCO Financial Systems, Inc.*, 2012 U.S. Dist. LEXIS 128592 (N.D. Ill. 2012)(granting class certification); *Saf-T-Gard International, Inc. v. Vanguard Energy Services, LLC*, (2012 U.S. Dist. LEXIS 174222 (N.D. Ill. December 6, 2012)(granting class certification; *Jelinek v. The Kroger Co.*, 2013 U.S. Dist. LEXIS 53389 (N.D. Ill. 2013)(denying defendant's motion to dismiss); *Hanson v. Experian Information Solutions, Inc.*, 2012 U.S. Dist. LEXIS 11450 (N.D. Ill. January 27, 2012)(denying defendant's motion for summary judgment); *Warnick v. DISH Network, LLC*, 2013 U.S. Dist. LEXIS 38549 (D. Colo. 2013)(denying defendant's motion to dismiss);*Torres v. Nat'l Enter. Sys.*, 2013 U.S. Dist. LEXIS 31238 (N.D. Ill. 2013)(denying defendant's motion to dismiss); *Griffith v. Consumer Portfolio Serv.*, 838 F. Supp. 2d 723 (N.D. Ill. 2011)(denying defendant's motion for summary judgment); *Frydman et al v. Portfolio Recovery Associates, LLC*, 2011 U.S. Dist. LEXIS 69502  (N.D. Ill 2011)(denying defendant's motion to dismiss); *Rosen Family Chiropractic S.C. v. Chi-Town Pizza*, 2013 U.S. Dist. LEXIS 6385 (N.D. Ill. 2013)(denying defendant's motion to dismiss); *Sengenberger v. Credit Control Services, Inc.*, 2010 U.S. Dist. LEXIS 43874 (N.D. Ill. May 5, 2010) (granting summary judgment on TCPA claim);

19.     Tim is a member of the National Association of Consumer Advocates and ISBA. He received his Juris Doctorate, *cum laude*, from Tulane University Law School in 2006.

20.     In 2014, Michael Hilicki joined the firm. He has spent nearly all of his approximately 20-year legal career helping consumers and workers subjected to unfair and deceptive business practices, and unpaid wage practices. He is experienced in a variety of consumer and wage-related areas including, but not limited to, the Fair Debt Collection Practices

FILED DATE: 12/12/2018 3:54 PM    2018CH15419

Act, Truth-in-Lending Act, Fair Credit Reporting Act, Real Estate Settlement Procedures Act, Illinois Consumer Fraud & Deceptive Business Practices Act, Telephone Consumer Protection Act, Fair Labor Standards Act and the Illinois Wage & Hour Law. He is experienced in all aspects of consumer and wage litigation, including arbitrations, trials and appeals.

21.    Examples of the numerous certified class actions in which Michael has represented consumers or workers include: *Legg v. Spirit Airlines, Inc.*, No. 14-61978-Civ (S.D. Fla.); *Eibert v. Jaburg & Wilk, P.C.*, 13-cv-301 (D. Minn.); *Brinkley v. Zwicker & Associates, P.C.*, 13 C 1555 (N.D. Ill.); *Kraskey v. Shapiro & Zielke, LLP*, 11-cv-3307 (D. Minn.); *Short v. Anastasi & Associates, P.A.*, 11-cv-1612 SRN/JSM (D. Minn.); *Kimball v. Frederick J. Hanna & Associates, P.C.*, 10-cv-130 MJD/JJG (D. Minn.); *Murphy v. Capital One Bank*, 08 C 801 (N.D. Ill.); *In re American Family Mut. Ins. Co. Overtime Pay Litig.*, 06-cv-17430 WYD/CBS (D. Colo.); *Nettles v. Allstate Ins. Co.*, 02 CH 14426 (Cir. Ct. Cook Cty.); *Sanders v. OSI Educ. Servs., Inc.*, 01 C 2081 (N.D. Ill.); *Kort v. Diversified Collection Servs., Inc.*, 01 C 0689 (N.D. Ill.); *Hamid v. Blatt Hasenmiller, et al.*, 00 C 4511 (N.D. Ill.); *Durkin v. Equifax Check Servs., Inc.*, 00 C 4832 (N.D. Ill.); *Torres v. Diversified Collection Services, et al.*, 99-cv-00535 (RL-APR) (N.D. Ind.); *Morris v. Trauner Cohen & Thomas*, 98 C 3428 (N.D. Ill.), *Mitchell v. Schumann*, 97 C 240 (N.D. Ill.); *Pandolfi, et al. v. Viking Office Prods., Inc.*, 97 CH 8875 (Cir. Ct. Cook Cty.); *Trull v. Microsoft Corp.*, 97 CH 3140 (Cir. Ct. Cook Cty.); *Deatherage v. Steven T. Rosso, P.A.*, 97 C 0024 (N.D. Ill.); *Young v. Meyer & Njus, P.A.*, 96 C 4809 (N.D. Ill.); *Newman v. Boehm, Pearlstein & Bright, Ltd.*, 96 C 3233 (N.D. Ill.); *Holman v. Red River Collections, Inc.*, 96 C 2302 (N.D. Ill.); *Farrell v. Frederick J. Hanna*, 96 C 2268 (N.D. Ill.); *Blum v. Fisher and Fisher*, 96 C 2194 (N.D. Ill.); *Riter v. Moss & Bloomberg, Ltd.*, 96 C 2001 (N.D. Ill.); *Clayton v. Cr Sciences Inc.*, 96 C 1401 (N.D. Ill.); *Thomas v. MAC/TCS Inc., Ltd.*, 96 C 1519 (N.D. Ill.); *Young v. Bowman, et al.*, 96 C

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

1767 (N.D. Ill.); *Depcik v. Mid-Continent Agencies, Inc.*, 96 C 8627 (N.D. Ill.); and *Dumetz v. Alkade, Inc.*, 96 C 4002 (N.D. Ill.)

22.     Michael has lectured on consumer law issues at Upper Iowa University and the Chicago Bar Association. He is a member of the Trial Bar of the United States District Court for the Northern District of Illinois, and he has represented consumers in state and federal courts around the country on a *pro hac vice* basis.

23.     Michael's published work includes *"AND THE SURVEY SAYS..." When Is Evidence of Actual Consumer Confusion Required to Win a Case Under Section 1692g of the Fair Debt Collection Practices Act in the Seventh Circuit?*, 13 Loy. Consumer L. Rev. 224 (2001).

24.     In 2015, Amy Wells joined the firm.  Amy brings a wealth of consumer litigation experience. In 2014, Amy Wells was installed as the President of the Miami Valley Trial Lawyers Association. The Miami Valley Trial Lawyers Association (MVTLA) is an association of attorneys throughout Ohio's Miami Valley (Montgomery, Miami, Darke, Preble, Clark, Greene, Warren, Champaign, and Butler Counties). Their members are dedicated to the advancement of fair trials and free access of individuals to the courts of this state. Their members represent injured persons, criminal defendants, consumers and families in the areas of negligence, criminal law, consumer protection, workers' compensation, professional malpractice, products liability, family law, insurance law, employment, and civil rights law.

25.     The Ohio Association for Justice named Ms. Wells as recipient of the 2012 President's Award. Ms. Wells was honored by Ohio Association for Justice at the Annual Convention, where she received her award from President Denise Houston at the Association's flagship President's Dinner on May 3, 2012. The dinner was attended by over 400 attorneys and their guests at the Hilton at Easton Town Center in Columbus, Ohio.

26. Ms. Wells received the highest possible Attorney rating (Superb) by Avvo, Inc., which ranks attorneys according to a variety of criteria, including feedback from clients and peers.

27. In 2011, Ms. Wells was selected to serve on Ohio Attorney General Mike DeWine's Advisory Committee. This panel was assembled by the OAG to review Ohio's primary consumer protection law, the Consumer Sales Practices Act (R.C. 1345 et seq.). Ms. Wells is the only consumer protection attorney in private practice selected for this committee. Ms. Wells has repeatedly been named by Super Lawyers Magazine as a Rising Star. Only 2.5 percent of the attorneys in the state are selected to the Rising Stars list. Super Lawyers, a Thomson Reuters business, is a rating service of attorneys from more than 70 practice areas who have attained a high-degree of peer recognition and professional achievement. The annual selections are made using a statewide survey of attorneys, independent research evaluation of candidates, and peer reviews by practice area. The Super Lawyers lists are published nationwide in Super Lawyers magazines and in leading city and regional magazines across the country.

**Education**

28. Ms. Wells graduated from the University of Dayton School of Law joint-degree program, earning a Juris Doctorate and Masters of Business Administration. She was the only student in her graduating class to receive this dual degree. During law school, Ms. Wells was a member of the Moot Court Team and Moot Court Board. Ms. Wells was Vice President of the UDSL Women's Caucus and also served as a teaching assistant in the legal research and writing program. Amy was a summer associate at a Dayton law firm in the litigation section. She also clerked in-house at NCR's world headquarters throughout law school, acting as the lead intern during her final year. Amy earned her undergraduate degree in business administration from Ohio University in Athens.

FILED DATE: 12/12/2018 3:54 PM    2018CH15419

FILED DATE: 12/12/2018 3:54 PM    2018CH15419

29.     Some of Ms. Wells published work include:

a.      2008 article - The Price of Identity Theft for Ohio Consumers was published in Ohio Trial Magazine, Volume 18, Issue 1.

b.      In April 2009 her article Protecting Consumers from a "New Breed" of Debt Collector was published in the Dayton Bar Association's Bar Briefs magazine.

c.      In 2011, the article titled Proposed Deconstruction of Ohio's UDAP Law, a National Trend? was published by the National Association of Consumer Advocate's publication, The Consumer Advocate, Volume 17, No. 4.

d.      Ms. Wells wrote Ohio's Consumer Protection Law, which was published in the October 2011 issue of the Advisory.

e.      In November 2011 "HB 275 – The Undoing of Ohio's Consumer Protection Law" was published in the Dayton Bar Briefs, Vol. 61, No.3.

f.      Ms. Wells is a featured blogger on Neighborhood Housing Services Consumer Law Center Blog

g.      Ms. Wells authored a chapter in the Consumer Law Basics book while serving as faculty of the Practicing Law Institute.

h.      Ms. Wells is a contributing freelance author for NOLO.com (2015- present)

30.     Speaking Engagements for Ms. Wells include:

a.      Ms. Wells is regularly invited to speak to attorneys and consumers on a state and national basis regarding consumer advocacy issues and laws. Recent presentations include:

b.      2010 National Consumer Law Center Fair Debt Collection Training Conference, Jacksonville, FL, "FDCP Fundamentals: The Care and Feeding of Your FDCP Case."

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

   c.  CORT Consumer Law Training 2010, Ann Arbor, MI, "Bringing Claims Under the FCRA and FACTA."

   d.  2010 Ohio Association for Justice Annual Convention, Columbus, OH, "Appraisal Litigation: Critical Evidence in an Inflated Appraisal Case & Eminent Domain: Friend or Foe?"

   e.  2011 Ohio Association for Justice Insurance Law CLE, Columbus & Dayton, OH, "Protect Thy Consumer, Today's Consumer Law Issues."

   f.  2011 Ohio Association for Justice Annual Convention, Columbus, OH, Moderator for the Consumer Law Continuing Legal Education panel.

   g.  2012 Ohio Association for Justice Annual Convention, Columbus, OH, "How to Practice Under the New Ohio Consumer Law."

   h.  2012 American Bankruptcy Law Forum, Dayton, OH, "Consumer Law for Bankruptcy Attorneys"

   i.  2013 Served as faculty for CLE about Representing the Pro Bono Client, Consumer Law Basics in San Francisco, CA. My presentation was entitled "Introduction to the Fair Credit Reporting Act."

   j.  2015 Ohio State Bar Association Consumer Law CLE, Columbus, OH, "The Basics of the FCRA Including Recent Changes/Oversight from the CFPB"

  31.  Ms. Wells has been featured in the following media:

   a.  Ms. Wells has been interviewed by various media outlets, including the following pieces.

   b.  ALEC Leads the Legal War Against Consumers, A Lawyers.com Series, Posted May 3, 2012.

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

c.     Right-to-cure bill seen powering its way to approval, Business First, Dec. 16, 2011.

d.     2012, Guest on Americas Workforce Radio, topic: consumer credit reporting.

32.     Finally, Ms. Wells served on the Board of Trustees of the Ohio Association for Justice and chaired the Consumer Law Section from 2009-2014. She also served on the Association's Legislative Committee. Ms. Wells is an active member of the National Association of Consumer Advocates and is currently a state chair for the organization. Ms. Wells currently sits on the board of the Miami Valley Trial Lawyers Association, and will served as the Association's President from 2014-2015. Ms. Wells is a member of the American Association for Justice, Illinois Bar Association, Lake County Bar Association, Ohio State Bar Association, and the Dayton Bar Association, Carl D. Kessler Inn of Court, and serves on the DBA Certified Grievance Committee.

33.     In 2015, Michael Karnuth joined the firm.  His practice focuses on Securities Fraud and Shareholder litigation, as well as consumer protection and other complex litigation matters.

34.     In the Securities Fraud area, Mr. Karnuth has extensive experience in prosecuting claims under the federal securities laws, and has actively litigated cases at all levels up to trial, and has obtained significant recoveries for investors. Representative cases and reported decisions include:

 In re DVI, Inc. Sec. Litig., 2:03-cv-5336 (E.D. Pa.).  Mike has been instrumental in representing equity and debt investors in case raising 10b-5 and 20(a) claims involving a failed healthcare financing company which misrepresented financial statements for several years.  To-date, the firm has recovered over $21 million for investors from ten different defendants, and has achieved important legal victories in the case, including prevailing on numerous motions to

FILED DATE: 12/12/2018 3:54 PM    2018CH15419

dismiss, In re DVI Inc. Sec. Litig., 2005 WL 1307959 (E.D. Pa. May 31, 2005); obtaining class certification, 249 F.R.D. 196 (E.D. Pa. 2008), aff'd, 639 F.3d 623 (3d Cir. 2011),*petition for rehearing and en banc denied* (June 24, 2011), and in prevailing on motions for summary judgment, 2010 WL 352086 (E.D. Pa. Sept. 3, 2010), and 2010 WL 3522090 (E.D. Pa. Sept. 3, 2010). Mike presented oral argument to the Third Circuit Court of Appeals and prevailed on an auditor defendant's challenges to market efficiency, loss causation and the adequacy of an institutional investor to be class representative based on its trading strategies and access to company management.

In re Safety-Kleen Corp. Rollins Shareholder Litigation, No. 3:00-1343-17 (D.S.C.). Mike was also instrumental in the firm's extensive representation of Rollins Environmental Services shareholders in a Section 14(a) proxy case, involving the reverse acquisition of Rollins by Laidlaw Environmental Services, Inc., predecessor of Safety Kleen Corp. The firm obtained a $3.15 million recovery for the class on the eve of trial, after overcoming numerous legal challenges. The class recovery represented a large percentage of the class's estimated damages in the case.

In re BankAmerica Corp. Sec. Litig., 228 F.Supp.2d 1061 (E.D. Mo. 2002). Mike assisted in the firm's role as Executive Committee Member of the BankAmerica shareholder class, which challenged the 1998 merger of BankAmerica and Nationsbank. Mike's involvement included reviewing discovery, taking depositions and drafting pleadings. The claims of the BankAmerica class settled for over $160 million.

35.    Mike also has extensive experience in consumer protection and other complex litigation. Representative cases and reported decisions include:

Empire Healthchoice Assur., Inc. v. McVeigh, 547 U.S. 677 (2006), where Mike filed an

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

amicus brief in support of both respondents and the firm's pending certiorari petition on behalf of injured FEHBA-plan insureds, which prevailed in a 5 to 4 ruling that then led to the favorable Supreme Court decision in the firm's case of <u>Cruz v. Blue Cross and Blue Shield of Illinois</u>, 548 U.S. 901 (2006). On remand to the Seventh Circuit, Mike successfully argued that federal preemption and creation of federal common law should not trump state law, which ultimately resulted in the case settling for $1.5 million in the pending state court case and the class obtaining full recovery of their losses. *See* <u>Blue Cross Blue Shield v. Cruz</u>, 495 F.3d 510 (7th Cir. 2007). Other notable and reported decisions in this case that Mike was integral in achieving include <u>Blue Cross Blue Shield of Illinois v. Cruz</u>, 2003 WL 22715815 (N.D. Ill. Nov. 17, 2003) (dismissing Blue Cross's federal action attacking plaintiff's state court rights); <u>Doyle v. Blue Cross Blue Shield of Illinois</u>, 149 F.Supp.2d 427 (N.D. Ill. 2001) (remanding insured's complaint to state court); and obtaining class certification and summary judgment for the named plaintiff in the state court class action, despite numerous challenges including a brief and oral argument submitted by the U.S. Department of Justice advocating for federal law trumping plaintiff's state law claims. An illustration of Mike's commitment and tenacity to class members' interests is shown in his further representation of a Blue Cross FEHBA-plan class member, a member of the military, who was denied a right to participate in the settlement because her claim form was submitted late. After a rigorous briefing and oral argument process, Mike prevailed in having her claim allowed, which resulted in an individual payment to her of over $30,000. See, March 23, 2011 Order allowing Taylor Claim.

<u>Doyle v. Blue Cross Blue Shield of Illinois</u>, 00 CH 14182 (Cir. Ct. Cook County, Ill., Chancery Division) (firm was co-counsel on behalf of ERISA-plan insureds and achieved a $6.95 million settlement and injunctive relief in 2004 for the class, representing near full recovery of estimated

FILED DATE: 12/12/2018 3:54 PM    2018CH15419

losses; case involved Blue Cross's alleged practice of liening against third-party recoveries obtained by their insureds in excess of what they were entitled to recover).

Primax Recoveries Inc. v. Sevilla, 324 F.3d 544 (7th Cir. 2003).  Mike successfully argued to the Seventh Circuit that federal law did not preempt health insured's state law claims seeking application of Illinois' common fund doctrine to insurer's reimbursement lien asserted against insured's third-party recoveries, and that insurer's strategic waiver in state court barred its claims in federal court. *See also* Primax Recoveries, Inc. v. Sevilla, 2002 WL 58816 (N.D. Ill. Jan. 15, 2002) (granting motion to dismiss); Health Cost Controls v. Sevilla, 365 Ill.App.3d 795 (1st Dist. 2006) (reversing denial of class certification).  In 2011, after 15 years of litigation, Mike was integral in the firm obtaining full recovery for the class, plus pre- and post-judgment interest, and attorneys' fees from the insurer.

LVNV Funding, Inc. v. Trice, 2011 Ill. App. (1st) 092,773 (Mike was integral in obtaining a modified decision which denied a debt collector's petition for rehearing of an order voiding a default judgment obtained by an unlicensed debt collector; and in having LVNV's petition for leave to appeal to the Illinois Supreme Court denied (Nov. 30, 2011)).

Citibank v. Busuioc, No. 09 CH 49196 (Cir. Ct. Cook County, Ill.) (Mike successfully and extensively briefed and argued a case brought on behalf of homeowners/borrowers who had a mortgage foreclosure pursued against them by an entity who purportedly acquired ownership of the loan through a fraudulent assignment prepared by Lender Processing Services and/or its subsidiary DocX and who lacked standing to pursue the foreclosure; Mike prevailed on Citibank's motion to dismiss the case pursuant to Illinois' Citizens Participation Act and in getting the petition for leave to appeal voluntarily dismissed).

FILED DATE: 12/12/2018 3:54 PM    2018CH15419

<u>Stinette v. Fisher & Shapiro, et al.</u>, No. 09 CH 19758 (Cir. Ct. Cook County, Ill.) (Mike successfully briefed and argued objections to a competing class's proposed settlement on behalf of debtors against a debt collector brought in federal court solely seeking relatively nominal relief under the FDCPA, but which released all viable non-FDCPA claims.

### Activities/Honors/Publications/Memberships

- September 2014 – article published in ISBA's Business & Securities Law Forum Newsletter titled "Dodd-Frank provides incentives and enhanced protections to blow its new, shiny "whistle," but Sarbanes-Oxley's old whistleblower protections may have more luster in certain situations."
- November 2013 – article published in ISBA's Business & Securities Law Forum Newsletter titled "*Amgen* eases securities fraud plaintiffs' burden at class certification, but the dissent invites challenges to the long-standing 'fraud-on-the-market' theory."
- 2012 – Speaker at the 7th Annual Illinois Public Employee Retirement Systems Summit on the topic of Securities Litigation (Identifying and Pursuing Recoverable Losses).
- 2010 – Speaker and Panelist at Chicago Bar Association Seminar "Defending Federal Securities Class Actions" (May 12, 2010)
- 2009 and 2008 – selected as an Illinois Rising Star by Super Lawyer's Magazine
- 2008 – Speaker and Panelist at Best Practices Forum regarding litigation against accounting firms (September 3, 2008)
- 2006 to Present – Pro bono attorney for the Center for Disability and Elder Law; volunteer attorney to low income, disabled and elderly individuals on various legal issues
- 2010 to Present – Pro bono attorney for Chicago Volunteer Legal Services; providing assistance to homeowners facing foreclosure
- Member of CBA, ISBA, ABA, AICPA and ICPAS; member of ISBA's Business & Securities Law Section (June 2012 to present).

### Education

Mike earned his J.D. from Chicago-Kent College of Law, December 1998 (w/ Honors) and received Merit Scholarships, Deans List recipient and received CALI Award in Advanced Research – Securities.  Mike interned for United States District Court Judge Blanche Manning of the Northern District of Illinois, Spring 1998. In addition to obtaining his law degree, Mike is a Certified Public Accountant since 1991 (passed entire exam on first attempt).

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

36.     In March 2018, Theodore H. Kuyper joined the firm.  Ted is currently a member in good standing of the Illinois State Bar, the United States District Court for the Northern District of Illinois, and the Seventh Circuit Court of Appeals, and has been admitted to practice *pro hac vice* in several additional United States District Courts.

37.     Ted has diverse experience prosecuting and defending class action and other large-scale litigation in trial and appellate courts under a variety of substantive laws, including without limitation the Telephone Consumer Protection Act, the Racketeer Influenced & Corrupt Organizations Act (RICO), the Fair Credit Reporting Act, the Illinois Consumer Fraud & Deceptive Business Practices Act, and the Real Estate Settlement Procedures Act, as well as Illinois and other state statutory and common law.

38.     Since joining the firm, Ted has represented consumers as counsel of record or otherwise in the following putative class actions: *Cranor v. Skyline Metrics, LLC*, No. 4:18-cv-00621-DGK (W.D. Mo.); *Cranor v. The Zack Group, Inc.*, No. 4:18-cv-00628-FJG (W.D. Mo.); *Cranor v. Classified Advertising Ventures, LLC, et al.*, No. 4:18-cv-00651-HFS (W.D. Mo.); *Morgan v. Orlando Health, Inc., et al.*, No. 6:17-cv-01972-CEM-GJK (M.D. Fla.); *Morgan v. Adventist Health System/Sunbelt, Inc.*, No. 6:18-cv-01342-PGB-DCI (M.D. Fla.); *Burke v. Credit One Bank, N.A., et al.*,

- 22 -

FILED DATE: 12/12/2018 3:54 PM    2018CH15419

No. 8:18-cv-00728-EAK-TGW (M.D. Fla.); *Motiwala v. Mark D. Guidubaldi & Associates, LLC*, No. 1:17-cv-02445 (N.D. Ill.); *Buja v. Novation Capital, LLC*, No. 9:15-cv-81002-KAM (S.D. Fla.); and *Detter v. Keybank, N.A.*, No. 1616-CV10036 (Circuit Ct. of Jackson County, Missouri).

39.     Immediately prior to joining Keogh Law, Ted worked at a boutique Chicago law firm where he represented clients in a range of complex commercial and other litigation, including contract, tort, professional liability, premises and products liability, bad faith and class action. Previously, he was an associate at a nationally-renowned class action law firm, where he focused on complex commercial, consumer, class action and other large-scale, high-stakes litigation.

40.     Ted earned his Juris Doctorate from Washington University School of Law in St. Louis in 2007. During law school, he worked as a Summer Extern for Magistrate Judge Morton Denlow (Ret.) of the United States District Court for the Northern District of Illinois, served as primary editor and executive board member of the Global Studies Law Review, and authored a student note that was published in 2007. Ted also earned a number of scholarships and other academic accolades, including the Honors Scholar Award (top 10% for academic year) and repeated appearances on the Dean's List.

FILED DATE: 12/12/2018 3:54 PM   2018CH15419

Executed at Chicago, Illinois, on December 12, 2018.

Keith J. Keogh

FILED
2/21/2019 2:21 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419

FILED DATE: 2/21/2019 2:21 PM    2018CH15419

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

GERALDINE DONAHUE, individually, and
on behalf of others similarly situated,

        Plaintiff,

      v.

MGM RESORTS INTERNATIONAL,

        Defendant.

No. 2018CH15419

### DEFENDANT MGM RESORTS INTERNATIONAL'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO 735 ILCS 5/2-301 AND 735 ILCS 5/2-619

**NOW COMES** the Defendant, MGM Resorts International, by and through its attorneys,

CUNNINGHAM, MEYER & VEDRINE, P.C. and GIBSON, DUNN & CRUTCHER LLP, for its

Motion to Dismiss pursuant to 735 ILCS 5/2-301 and 735 ILCS 5/2-619, and in support thereof,

states as follows:

### I.    INTRODUCTION

The Plaintiff in this case, Geraldine Donahue, alleges that, in February 2018, upon

completing a credit-card transaction at the Grand Victoria Casino in Elgin, Illinois, she received

an electronically-printed receipt bearing more than the last five digits of her card account number,

in alleged violation of 15 U.S.C. § 1681c(g) (the Fair and Accurate Credit Transactions Act

("FACTA")).  (*See* Complaint, attached hereto as **Exhibit 1** ¶¶ 46-49).  But rather than sue the

entity "that accept[ed her] credit card[] or debit card[]," 15 U.S.C. § 1681c(g)(1)—i.e., the Grand

Victoria Casino (an Illinois business)—as the statute requires, Plaintiff instead sued MGM Resorts

International ("MGM"), a Delaware corporation headquartered in Nevada that (1) does not conduct

business in Illinois, and (2) was not involved *in any way* in Plaintiff's alleged transaction.

Indeed, at the time of the alleged transaction, MGM was merely the parent company of another out-of-state corporation (Mandalay Resort Group), which owned a third out-of-state corporation (MGM Elgin Sub, Inc.), which was a 50% partner in a joint venture that made up the Grand Victoria Casino. (*See* Affidavit of William T. Martin ("Martin Affidavit"), attached hereto as **Exhibit 2** ¶ 7 & Ex. A at 3 n.9, 72 & Ex. 21 ("Subsidiaries of MGM Resorts International"); Exs. C-D). Another unrelated entity—an affiliate of Hyatt Gaming—held the other 50% stake in the Grand Victoria Casino, was the managing partner of the joint venture (which was organized as a general partnership), and operated the casino. (*See id.* ¶ 8 & Ex. A at 3 n.9, 72). In other words, at the time of the alleged transaction, MGM was an entirely separate company—and many layers removed—from the Grand Victoria Casino, and did not operate the casino. MGM had absolutely nothing to do with the conduct challenged in the Complaint.

Because MGM is not a proper defendant in this action, MGM's counsel made several requests to Plaintiff's counsel that Plaintiff voluntarily dismiss MGM from the case and/or substitute a proper defendant. Plaintiff refused to do so, however, necessitating this motion.

This action should be dismissed for three reasons. *First*, the Court does not have personal jurisdiction over MGM—a Delaware corporation with its principal place of business in Nevada—that has neither "continuous and systematic" contacts with, nor "purposefully directed its activities to," the State of Illinois. *Sabados v. Planned Parenthood of Greater Indiana*, 378 Ill. App. 3d 243, 248 (2007). *Second,* even if MGM were subject to personal jurisdiction in Illinois, under a plain reading of FACTA, MGM simply is not a proper defendant in this action because it is not the entity that accepted Ms. Donahue's credit card. *See* 15 U.S.C. § 1681c(g)(1) (FACTA applies to the "person that accepts credit cards or debit cards for the transaction of business"). *Third*, to the extent Plaintiff seeks to hold MGM liable as the ultimate parent company of a subsidiary that was

FILED DATE: 2/21/2019 2:21 PM   2018CH15419

a partial owner of the Grand Victoria Casino, well-established principles of American and Illinois corporate law prevent her from doing so. *See, e.g., Dole Food Co. v. Patrickson,* 538 U.S. 468, 474 (2003) ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities."); *Gass v. Anna Hosp. Corp.,* 392 Ill. App. 3d 179, 184-85 (2009) ("A parent corporation is not liable for the acts of its subsidiaries.").

Nothing prevents Plaintiff from pursuing her FACTA claims against a proper party (and one that is subject to the jurisdiction of this Court), but that party is not MGM.[1] The Court should therefore dismiss the action against MGM with prejudice.

## II.  PERTINENT FACTS

### A.  The Grand Victoria Casino Allegedly Gives Plaintiff An Inadequately Truncated Receipt, In Alleged Violation Of FACTA

Plaintiff alleges that in February 2018, she "used her personal credit card to perform a transaction at the Grand Victoria Casino in Elgin, Illinois." (**Exhibit 1** ¶ 46). She alleges that she was given an "electronically-printed receipt bearing the first four (4) and last four (4) digits of her debit card account number." (*Id.* ¶ 48). She alleges that this conduct violates FACTA, which provides in pertinent part that "no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction." 15 U.S.C. § 1681c(g)(1).

Plaintiff does not claim that her identity was stolen or that she suffered any other concrete injury as a result of the transaction; rather, she alleges she was harmed by the printing of the receipt because it "disclosed her private card account information to the casino employee who handed her

---

[1]  A plaintiff may sue to remedy an alleged FACTA violation up to two years after discovering the violation. 15 U.S.C. § 1681p. Accordingly, based on her own allegations, Plaintiff has until February 2020 to bring an action against a proper defendant.

FILED DATE: 2/21/2019 2:21 PM   2018CH15419

FILED DATE: 2/21/2019 2:21 PM   2018CH15419

the receipt," imposed on her a service fee for the transaction, and breached both implied bailment and her confidence in the casino to properly handle her account information. (**Exhibit 1** ¶¶ 50-52). Despite these alleged harms, Plaintiff seeks no actual damages—"only statutory damages and injunctive relief." (*Id.* ¶ 70).

Rather than bring her action against the Grand Victoria Casino—the Illinois entity that allegedly "accept[ed her] credit card[] or debit card[] for the transaction of business" and gave her a receipt—she sued MGM, a Delaware corporation with its principal place of business in Nevada that is not licensed to do business in Illinois. (*See* Martin Affidavit ¶¶ 2-4 & Ex. A at 1-2; Ex. B). MGM is not the Grand Victoria Casino, nor, at the time of the alleged transaction, was the Grand Victoria Casino "owned by [MGM]," as the Complaint baldly and incorrectly asserts. (**Exhibit 1** ¶ 46).

Based on this sole alleged transaction at the Grand Victoria Casino, Plaintiff seeks to certify a nationwide class of "[a]ll persons in the United States who . . . (i) engaged in one or more transactions using a debit card or credit card at one or more establishment(s) then-owned by Defendant . . . , and (ii) for which Defendant's system was programmed to generate a printed customer receipt displaying more than the last 5 digits of the credit or debit card number used in connection with such transaction(s)." (*Id.* ¶ 65).

Plaintiff has pled no facts—and there are none—that any casinos owned and operated by MGM (none of which are in Illinois) violated FACTA. Rather, her only alleged facts relate to her transaction at the Grand Victoria Casino in 2018.

**B.**   **While MGM Had An Indirect Ownership Interest In The Grand Victoria Casino At The Time, MGM Was Not The Owner Of The Grand Victoria Casino And Never Operated The Casino**

At the time of Plaintiff's alleged transaction, MGM had an indirect ownership interest in the Grand Victoria Casino. (*See* Martin Affidavit ¶ 7). Specifically, MGM Elgin Sub, Inc., a

Nevada corporation, was a 50% partner in a joint venture that made up the Grand Victoria Casino (which was organized as an Illinois partnership). (*Id.* ¶ 7 & Ex. A at 72 & Ex. 21; Ex. C). MGM Elgin Sub, Inc., in turn, was owned by Mandalay Resort Group, a Nevada corporation owned by MGM. (*Id.* ¶ 7 & Ex. A at Ex. 21 ("Subsidiaries of MGM Resorts International"); Ex. D).

At the time of the alleged wrongdoing, the other 50% interest in the Grand Victoria Casino was owned by an affiliate of Hyatt Gaming. (*Id.* ¶ 8 & Ex. A at 3, 72). That entity was the managing partner in the joint venture and operated the resort. (*Id.* ¶ 8 & Ex. A at 3 n.9). MGM Elgin Sub, Inc. (not to mention MGM) did not operate the casino—a point made abundantly clear in the MGM Form 10-K cited in footnote 1 of Plaintiff's Complaint. (*See* **Exhibit 1** at 3 n.1; Martin Affidavit, Ex. A at 3 n.9 (stating that "[t]he other 50% of Grand Victoria is owned by an affiliate of Hyatt Gaming, *which also operates the resort*") (emphasis added); *id.*, Ex. A at 72 (explaining that "an affiliate of Hyatt Gaming owns the other 50% of Grand Victoria and *also operates the resort*") (emphasis added)). Nor were the individuals who worked at the Grand Victoria Casino (who presumably would have accepted Plaintiff's credit card) employed by MGM. (*See* Martin Affidavit ¶ 5).

In August 2018, both parties to the joint venture (the Hyatt Gaming affiliate and MGM Elgin Sub, Inc.) sold their interests in the Grand Victoria Casino to Eldorado Resorts. (*Id.* ¶ 10 & Ex. E at 8, 13). Since the sale, neither MGM nor any of its affiliates has had any ownership interest in the Grand Victoria Casino. (*Id.* ¶ 11). Plaintiff filed her suit against MGM in December 2018.

**C.     MGM Is An Out-Of-State Corporation That Does Not Do Business In Illinois**

MGM is a Delaware corporation with its headquarters and principal place of business in Nevada. (*Id.* ¶ 2; Ex. A at 1-2; Ex. B). MGM has never been incorporated or headquartered in Illinois. (*Id.* ¶ 3). MGM is not licensed to do business in Illinois and does not have a registered

FILED DATE: 2/21/2019 2:21 PM   2018CH15419

FILED DATE: 2/21/2019 2:21 PM    2018CH15419

agent for service of process in Illinois. (*Id.* ¶ 4). MGM does not own, lease, or rent any office space, real property, residence, or place of business in Illinois. (*Id.* ¶ 5). Nor does MGM have any employees, bank accounts, or personal property in Illinois. (*Id.*).

## III.    **LEGAL STANDARDS**

MGM brings this Motion pursuant to 735 ILCS 5/2-619(a)(9) based on "affirmative matter," outside the pleadings, that "avoid[s] the legal effect of or defeat[s]" Plaintiff's claim. "'[A]ffirmative matter' encompasses any defense other than a negation of the essential allegations" of Plaintiff's claims, *Kedzie & 103rd Currency Exch., Inc. v. Hodge*, 156 Ill. 2d 112, 115 (1993), including a lack of personal jurisdiction, *Old Orchard Urban Ltd. P'ship v. Harry Rosen, Inc.*, 389 Ill. App. 3d 58, 59 (2009) (affirming 2-619 dismissal of nonresident parent corporation of Illinois subsidiaries for lack of personal jurisdiction). *See also* 735 ILCS 5/2-301 ("a party may object to the court's jurisdiction over the party's person . . . by filing a motion to dismiss the entire proceeding"). "The purpose of a section 2-619 motion is to dispose of issues of law and easily proved issues of fact early in the litigation." *Czarobski v. Lata*, 227 Ill. 2d 364, 369 (2008).

MGM satisfies its "initial burden" on a section 2-619 motion by "presenting adequate affidavits supporting the asserted defense." *Kedzie & 103rd Currency Exch., Inc.*, 156 Ill. 2d at 116. "The burden then shifts" to Plaintiff, who "must establish that the defense is unfounded or requires the resolution of" a disputed material fact. *Id.* Importantly, a "counteraffidavit is necessary . . . to refute evidentiary facts properly asserted by affidavit supporting the motion [or] else the facts are deemed admitted." *Id.* at 116-17 (finding fact admitted for purposes of motion where no counteraffidavit was supplied). The Court need not credit a plaintiff's "conclusions of law [or] conclusory allegations not supported by specific facts." *Rajterowski v. City of Sycamore*, 405 Ill. App. 3d 1086, 1092 (2010). If, after reviewing the pleadings and supporting affidavits,

the Court finds that Plaintiff has failed to carry her burden, the cause of action may be dismissed. *Kedzie & 103rd Currency Exch., Inc.*, 156 Ill. 2d at 116.

## IV. LEGAL ANALYSIS & ARGUMENT

### A. This Action Should Be Dismissed Pursuant To 735 ILCS 5/2-301 and 735 ICLS 5/2-619 Because MGM Is Not Subject To Personal Jurisdiction In Illinois

Illinois' long-arm statute permits jurisdiction over nonresident defendants only if the due-process protections afforded by both the U.S. and Illinois Constitutions are satisfied. *Hoekstra v. Bose*, 302 Ill. App. 3d 704, 707 (1998); 735 ILCS 5/2-209. Federal due process requires a nonresident defendant to have "minimum contacts" with the forum state such that bringing the action there "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Similarly, Illinois permits jurisdiction only where it is "fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests in Illinois." *Knaus v. Guidry*, 389 Ill. App. 3d 804, 815 (2009).

Under both federal and Illinois law, there are two types of jurisdiction: general and specific. The United States Supreme Court has made clear that "only a limited set of affiliations with a forum will render a defendant" subject to general jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). General jurisdiction arises only where a defendant has contacts "so continuous and systematic as to render it essentially at home in the forum state." *Id.* at 139 (cleaned up); *see also Sabados*, 378 Ill. App. 3d at 246. In Illinois, this "rather high" standard is met only when a nonresident defendant carries out business in the state "with permanence and continuity." *Sabados*, 378 Ill. App. 3d at 250-51. "Specific jurisdiction arises where the defendant purposefully directed its activities" at the forum, and the injuries at issue in the litigation "arose out of or were

7

FILED DATE: 2/21/2019 2:21 PM   2018CH15419

caused by those activities." *Id.* at 250 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471 (1985)).

Plaintiff bears the burden of establishing MGM is subject to personal jurisdiction in Illinois. *Id.* at 246; *Knaus*, 389 Ill. App. 3d at 813. Although the Court must resolve all conflicts in Plaintiff's favor, if the "well-alleged facts contained in" MGM's affidavits are "not contradicted by a counteraffidavit, they must be taken as true notwithstanding any contrary averments in [plaintiff's] pleadings." *Khan v. Van Remmen, Inc.*, 325 Ill. App. 3d 49, 56 (2001). Accordingly, even if Plaintiff makes a prima facie case, it may be defeated if MGM "presents uncontradicted evidence" that jurisdiction is lacking. *Sabados*, 378 Ill. App. 3d at 246.

Here, Plaintiff has not met—and cannot meet—her burden to show that MGM is subject to the personal jurisdiction of this Court. The Complaint summarily alleges that the Court has jurisdiction "because Defendant conducts business in Illinois, committed tortious acts in Illinois, and the conduct giving rise to Plaintiff's claim on behalf of the class occurred, in part, in Illinois." (**Exhibit 1** ¶ 2). But Plaintiff's failure to plead *facts* (not just conclusions) establishing sufficient contacts between MGM and Illinois, as well as the affidavit of William T. Martin (Vice President and Legal Counsel for MGM), conclusively demonstrate that personal jurisdiction is lacking. *See Rajterowski*, 405 Ill. App. 3d at 1092 (conclusory allegations insufficient); *Kedzie & 103rd Currency Exch., Inc.*, 156 Ill. 2d at 116 (action should be dismissed where pleadings and affidavits show plaintiff has not carried burden).

### 1.   MGM Is Not Subject To General Jurisdiction In Illinois

MGM is not subject to general jurisdiction in Illinois, as Plaintiff has pled no facts that establish MGM is "at home" in Illinois. *See Daimler AG*, 571 U.S. at 139; *Sabados*, 378 Ill. App. 3d at 246. Nor could she—MGM is a Delaware corporation with its principal place of business in

8

FILED DATE: 2/21/2019 2:21 PM  2018CH15419

Nevada. (*See* Martin Affidavit ¶ 2; Ex. A at 1-2; Ex. B; *see also* **Exhibit 1** ¶ 5 (alleging that MGM is "based in Paradise, Nevada")).

Additionally, MGM has never been incorporated or headquartered in Illinois. (Martin Affidavit ¶ 3). It is not licensed to do business in Illinois. (*Id.* ¶ 4). It does not have a registered agent for service of process in Illinois.[2] (*Id.*). It does not own, lease, or rent any property in Illinois, and has no employees in Illinois. (*Id.* ¶ 5). It has no bank accounts in Illinois. (*Id.*).

Accordingly, MGM does not have Illinois contacts "so continuous and systematic as to render it essentially at home in the forum state." *Daimler AG*, 571 U.S. at 139 (cleaned up); *Sabados*, 378 Ill. App. 3d at 246. The "rather high" standard for Illinois general jurisdiction plainly is not met here. *Sabados*, 378 Ill. App. 3d at 250-51 (nonresident defendant corporation not subject to general jurisdiction where it "did not maintain an office or conduct sales in Illinois," despite serving "approximately 1,500 Illinois residents a year").

### 2. MGM Is Not Subject To Specific Jurisdiction Because The Alleged Injuries Did Not Arise Out Activities Directed At Illinois By MGM

Nor has Plaintiff pled facts that establish MGM purposefully availed itself of the benefits of Illinois with respect to the injuries at issue in this litigation. *Id.* at 248. The Complaint contains only conclusory allegations that jurisdiction is proper because "Defendant conducts business in Illinois, [and] committed tortious acts within Illinois, and the conduct giving rise to Plaintiff's claim . . . occurred, in part, in Illinois." (**Exhibit 1** ¶ 2); *see Rajterowski*, 404 Ill. App. 3d at 1092 (conclusory allegations insufficient).

But MGM does not conduct business in Illinois, has no offices or employees in Illinois, and does not own or manage any property in Illinois. (Martin Affidavit ¶¶ 4-5). Likewise, MGM did not commit any tortious acts in Illinois (or elsewhere). In fact, MGM's only connection to

---

[2]     Plaintiff served her Complaint on MGM's agent in Nevada.

FILED DATE: 2/21/2019 2:21 PM    2018CH15419

Illinois with respect to this litigation is that it is the ultimate parent of two subsidiaries, one of which was a (non-managing) partner in a joint venture that made up the Grand Victoria Casino at the time of Plaintiff's alleged transaction. (*Id.* ¶¶ 7-8). That is insufficient to exercise personal jurisdiction over MGM with respect to a transaction with which MGM had no involvement whatsoever.

Plaintiff's bald allegation, based only upon information and belief, "that Defendant implements, oversees, and maintains control over . . . the consumer-oriented transactions at issue in this case" is factually incorrect and does not alter the outcome. (*See* **Exhibit 1** ¶ 56). As discussed above, neither MGM nor any of its subsidiaries operated the casino, a point the Form 10-K cited by Plaintiff in her Complaint makes clear. (*See* **Exhibit 1** at 3 n.1; Martin Affidavit ¶¶ 8-9 & Ex. A at 3 n.9, 72 ("an affiliate of Hyatt Gaming owns the other 50% of Grand Victoria and also operates the resort"); *Khan*, 325 Ill. App. 3d at 56 (affidavits "not contradicted by a counteraffidavit . . . must be taken as true notwithstanding any contrary averments in [plaintiff's] pleadings")). MGM was not involved in any way in the credit and debit card payment processing policies, practices, and procedures for consumer-oriented transactions at the Grand Victoria Casino. (*See* Martin Affidavit ¶ 9).

Jurisdiction over MGM based on the contacts of the Grand Victoria Casino with Illinois would likewise be improper. The Casino was an Illinois partnership, and Illinois law provides that "[a] partnership is an entity distinct from its partners" (of which MGM was not one, in any event). 805 ILCS 206/201. Even if the Grand Victoria Casino had been a subsidiary of MGM (rather than a joint venture in which an indirect MGM subsidiary had an ownership interest), "Illinois courts cannot assert personal jurisdiction over the nonresident parent corporation simply because they have personal jurisdiction over the local subsidiary." *Palen v. Daewoo Motor Co.*, 358 Ill. App.

FILED DATE: 2/21/2019 2:21 PM  2018CH15419

3d 649, 660 (2005); *see also Petrich v. MCY Music World, Inc.*, 371 Ill. App. 3d 332, 344 (2007) ("The mere fact that a corporation" in which a nonresident is a shareholder "is subject to Illinois jurisdiction does not subject that nonresident to jurisdiction.").

Rather, to show specific jurisdiction exists, a plaintiff must show the *defendant* itself purposefully directed its activities at Illinois, and that plaintiff's alleged injuries arose from that purposeful conduct. *Young v. Ford Motor Co.*, 418 Ill. Dec. 489, 496, 500 (2017) (emphasizing "it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over [it]"). Here, Plaintiff has not made and cannot make that showing.

Moreover, "[i]n determining whether a defendant's contacts were purposefully directed towards Illinois, the relevant time period to be reviewed by the court begins when the claim arose and extends to the date the lawsuit was filed and service attempted, with 'the critical point of inquiry [being] the time the defendant was made a party to the suit and was served.'" *Palen*, 358 Ill. App. 3d at 659 (quoting *Riemer v. KSL Recreation Corp.*, 348 Ill. App. 3d 26, 35-36 (2004)). As noted above, in August 2018, the Hyatt Gaming affiliate and MGM Elgin Sub, Inc. sold their interests in the Grand Victoria Casino to Eldorado Resorts (Martin Affidavit ¶ 10 & Ex. E at 8, 13), meaning that when MGM was sued and served in in this matter in December 2018—"the critical point of inquiry"—neither MGM, MGM Elgin Sub, Inc., nor any other MGM affiliate had any interest in the Grand Victoria Casino (*id.* ¶ 11). *Palen*, 358 Ill. App. 3d at 659. This only underscores the unreasonableness and unfairness of subjecting MGM to personal jurisdiction here. *See id.* (affirming dismissal based on lack of personal jurisdiction).

**B.    This Action Should Be Dismissed Pursuant To 735 ILCS 5/2-619 Because MGM Did Not Accept Plaintiff's Credit Card Or Provide Her With A Receipt And Thus Is Not A Proper Defendant In This Action**

Even if personal jurisdiction over MGM were appropriate here (and it is not), the Court should still dismiss the case because MGM is simply not a proper defendant.

FILED DATE: 2/21/2019 2:21 PM 2018CH15419

FACTA proscribes an entity "that accepts credit cards or debit cards for the transaction of business" from "print[ing] more than the last 5 digits of the card number or the expiration date upon any receipt." 15 U.S.C. § 1681c(g)(1). Plaintiff alleges she "used her personal credit card to perform a transaction at the Grand Victoria Casino in Elgin, Illinois," and "was subsequently presented [with] an electronically-printed receipt bearing" more than the permissible number of digits, in alleged violation of FACTA. (**Exhibit 1** ¶¶ 46-48). But neither MGM nor an MGM employee accepted Plaintiff's credit card and gave her a receipt. Rather, the *Grand Victoria Casino* accepted her card "for the transaction of business," and allegedly "print[ed] more than the last 5 digits of the card number ... upon [her] receipt." 15 U.S.C. § 1681c(g)(1). Yet Plaintiff inexplicably *sued MGM* for allegedly violating FACTA.

Under the plain language of the statute, MGM did not engage in the proscribed conduct, and is therefore not liable with respect to the alleged transaction. *See, e.g., Maddux v. Blagojevich*, 233 Ill. 2d 508, 527 (2009) ("a court has no authority to depart from the law's plain meaning"); *Murray v. Chicago Youth Ctr.*, 224 Ill. 2d 213, 235 (2007) ("Statutory language must be given its plain and ordinary meaning, and courts are not free to construe a statute in a manner that alters the plain meaning of the language adopted by the legislature.").

Because Plaintiff "simply sued the wrong" party, her action against MGM should be dismissed.[3] *See Sharpness v. Grondfelt*, 307 Ill. App. 3d 676, 681-82 (1999) (affirming dismissal because plaintiff "simply sued the wrong person").

---

[3]     According to her own allegations regarding the timing of the alleged transaction, Plaintiff still has a year to bring her claims against a proper defendant before the two-year statute of limitations expires in February 2020.

FILED DATE: 2/21/2019 2:21 PM    2018CH15419

**C.    This Action Should Be Dismissed Pursuant To 735 ILCS 5/2-619 Because MGM Cannot Be Held Liable For The Acts Of The Grand Victoria Casino**

To the extent Plaintiff seeks to hold MGM liable for the acts of a casino in which one of its indirect subsidiaries was a 50% owner, it is blackletter corporate law that a shareholder is generally not liable for the acts of the companies in which it invests. *See, e.g., Dole Food Co.*, 538 U.S. at 474 ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities."); *Anderson v. Abbott*, 321 U.S. 349, 362 (1944) ("Limited liability is the rule, not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted."); *Gass*, 392 Ill. App. 3d at 184-85 ("A parent corporation is not liable for the acts of its subsidiaries."); *In re Rehabilitation of Centaur Ins. Co.*, 238 Ill. App. 3d 292, 299 (1992), *aff'd*, 158 Ill. 2d 166 (1994) ("A corporation is [a] legal entity, which exists separate and distinct from its stockholders, officers, and directors, who generally are not liable for the corporation's obligations."); *id.* ("This is true even though the corporation is a subsidiary corporation, where the stock is wholly owned by a parent corporation."). Plaintiff has pled no facts—and there are no facts—that would permit an exception to this rule in this case.

**D.    Because Plaintiff's Individual Claim Against MGM Fails, The Court Need Not Consider Claims Of The Proposed Class**

Finally, because Plaintiff is the sole representative of the purported class, and her claim against MGM fails, dismissal of all purported class claims against MGM is likewise proper. *See Yu v. Int'l Bus. Machines Corp.*, 314 Ill. App. 3d 892, 899 (2000) (dismissing class action where sole named plaintiff's claims failed). "It is established in Illinois" that the Court "may rule upon a defendant's motion to dismiss a class action complaint prior to deciding whether the suit should be certified as a class action." *Oliveira v. Amoco Oil. Co.*, 201 Ill. 2d 134, 156 (2002). "Unless a named plaintiff has a valid individual cause of action, there cannot be a valid class action." 4 Ill. Practice, Civil Procedure Before Trial § 30:2 (2d ed. Nov. 2018) (Certification of a class action).

FILED DATE: 2/21/2019 2:21 PM   2018CH15419

Accordingly, Plaintiff's Complaint should be dismissed in its entirety. *Oliveira*, 201 Ill. 2d at 156-57.

## V.   CONCLUSION

There is no basis for the Court to exercise personal jurisdiction—either general or specific—over MGM. And even if the Court were to find jurisdiction proper, MGM is not liable as a matter of law for the conduct alleged in Plaintiff's Complaint, as that conduct had nothing to do with MGM and MGM cannot be held liable for the acts of a casino in which it indirectly invested. Nothing prevents Plaintiff from naming a proper defendant (and one that is subject to the jurisdiction of the Court). That defendant plainly is not MGM, and MGM respectfully requests that the Court dismiss Plaintiff's Complaint in its entirety and with prejudice. *See, e.g., Hurd v. Wildman, Harrold, Allen & Dixon*, 303 Ill. App. 3d 84, 95 (1999) (affirming dismissal with prejudice on 2-619(a)(9) motion).

14

FILED DATE: 2/21/2019 2:21 PM   2018CH15419

Respectfully submitted,

Dated:  February 21, 2019

CUNNINGHAM, MEYER & VEDRINE, P.C.

By: _____
                        Robert E. Sidkey

Robert E. Sidkey
CUNNINGHAM, MEYER & VEDRINE, P.C.
One East Wacker Drive, Suite 2200
Chicago, Illinois 60601
rsidkey@cmvlaw.com
(312) 578-0049
Attorney No. 39107

GIBSON, DUNN & CRUTCHER LLP


By: /s/ Joshua A. Jessen
                        Joshua A. Jessen

Joshua A. Jessen (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, California 92612-4412
jjessen@gibsondunn.com
(949) 451-3800
Attorney No. 6330976

15

Return Date: No return date scheduled
Hearing Date: 4/25/2019 10:00 AM - 10:00 AM
Courtroom Number:
Location:

FILED
4/12/2019 4:07 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419

4677201

**Firm No. 39042**

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

GERALDINE DONAHUE, individually          )
and on behalf of others similarly situated,   )
                                              )
     Plaintiff,                            )   No.: 2018-CH-15419
                                              )
v.                                            )   Judge Atkins
                                              )
MGM RESORTS INTERNATIONAL,                    )
                                              )
     Defendant.                           )

## PLAINTIFF'S CORRECTED MOTION TO FILE FIRST AMENDED COMPLAINT

Pursuant to 735 ILCS 5/2-616, Plaintiff Geraldine Donahue hereby moves to file an amended complaint in the proposed form attached hereto as <u>Exhibit 1</u>, which adds Everi Payments, Inc. and Everi Holdings, Inc. (collectively, "Everi") as party defendants in place of MGM Resorts International ("MGM"), and includes additional substantive allegations in support of Plaintiff's and the proposed class's claims. In support of this motion, Plaintiff states:

1.    This proposed class action arises under the Fair and Accurate Credit Transactions Act ("FACTA"), a federal consumer protection statute that, *inter alia*, requires merchants to truncate all but the last five (5) digits of any credit or debit card account number appearing on a printed consumer transaction receipt.

2.    As alleged in the original complaint, Plaintiff's FACTA rights were violated when, on February 22, 2018, she used her personal credit card in a transaction performed at a point-of-sale at the Grand Victoria Casino in Elgin, Illinois, an establishment which at that time was part-owned by MGM.

1

74072

FILED DATE: 4/12/2019 4:07 PM  2018CH15419

3.     However, since filing this lawsuit in December, 2018, Plaintiff's counsel has learned that, although the Grand Victoria casino was part-owned by MGM at the time Plaintiff's FACTA rights were violated, the credit and debit card cash-advance services offered to patrons of the Grand Victoria Casino at that time were provided by Everi. Likewise, Plaintiff's counsel also recently learned, after filing this lawsuit, that the proposed class members' FACTA rights were violated in the same manner at various establishments nationwide, in connection with the same cash-access services provided by Everi.

4.     For these and other reasons, Plaintiff's counsel now believes that Everi (collectively Everi Payments, Inc. and Everi Holdings, Inc.) was involved in the transaction giving rise to Plaintiff's and the proposed class members' claims for relief in such a way that it is appropriate to substitute Everi in place of MGM as the party defendants. Accordingly, Plaintiff requests leave to file an amended complaint substituting Everi for MGM, which is attached as Exhibit 1.

5.     The proposed amendment is proper under 735 ILCS 5/2-616, which states in pertinent part:

> At any time before final judgment amendments may be allowed on just and reasonable terms, introducing any party who ought to have been joined as plaintiff or defendant, dismissing any party, ... and in any matter, either of form or substance, in any process, pleading, bill of particulars or proceedings, which may enable the plaintiff to sustain the claim for which it was intended to be brought ...

735 ILCS 5/2-616(a). As this broad, permissive language implies, pleading amendments are liberally allowed to facilitate the resolution of cases on their merits. *See Selcke v. Bove*, 258 Ill.App.3d 932, 937 (1st Dist. 1994) ("This section should be liberally construed to permit resolution of cases on the merits [citation omitted], with any doubts resolved in favor of allowing

2

FILED DATE: 4/12/2019 4:07 PM 2018CH15419

amendments."). *Id.* "The overriding consideration is whether allowing the amendment of the pleadings will further the ends of justice." *Id.* (citation omitted).

6. Substituting Everi for MGM is consistent with this liberal policy, and furthers the ends of justice, because Plaintiff's counsel presently believes the amendment would facilitate the proper and efficient adjudication of Plaintiff's and the class members' claims, making it the most prudent and efficient course forward in the litigation for the proposed class at this time.

7. Allowing the proposed amendment is also reasonable because the case is only a few months old, and Plaintiff brought this motion in response to an initial motion to dismiss claiming MGM is not a proper defendant. Moreover, ample time remains to add new parties because FACTA provides at least two years to sue (15 U.S.C. §1681p), Plaintiff's claim arose in February 2018, and thus a minimum of ten months remain in the limitations period.

8. Finally, removing MGM will not cause MGM any prejudice, and granting leave to amend now rather than later serves the interests of judicial economy and the parties by sparing the Court and the litigants the need to address MGM's pending motion to dismiss.

WHEREFORE, Plaintiff should be granted leave to file the amended complaint attached as Exhibit 1, to substitute Everi Payments, Inc. and Everi Holdings, Inc. in as party defendants in the place of Defendant MGM.

Dated: April 12, 2019

Respectfully submitted,

/s/ Michael S. Hilicki
Keith J. Keogh
Michael Hilicki
Keogh Law, LTD., Firm No. 39042
55 W. Monroe St., Ste. 3390
Chicago, Il 60603
Tel: 312-726-1092

3

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

Fax: 312-726-1093
keith@keoghlaw.com
mhilicki@keoghlaw.com

Scott D. Owens
Scott D. Owens, P.A.
3800 S. Ocean Dr., Ste. 235
Hollywood, FL 33019
Tel: 954-589-0588
Fax: 954-337-0666
scott@scottdowens.com

Frank S. Hedin
David W. Hall
HEDIN HALL LLP
1395 Brickell Ave, Suite 900
Miami, Florida 33131
Tel: 305-357-2107
Fax: 305-200-8801
fhedin@hedinhall.com
dhall@hedinhall.com

*Counsel for Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2019, I caused Plaintiff's Corrected Motion to File First

Amended Complaint to be filed and served on the following individuals appearing in this matter

for Defendant through the Court's electronic filing system:

Robert E. Sidkey
Cunningham, Meyer, & Vedrine, P.C.
One East Wacker Drive, Suite 2200
Chicago, Illinois 606061
(312) 578-0049

s/Michael Hilicki
Michael S. Hilicki
Keogh Law, Ltd.

4

# EXHIBIT 1

Firm No. 39042

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

GERALDINE DONAHUE, individually )
and on behalf of others similarly situated, )
                                            )
        Plaintiff,                          )       **CASE No.: 2018-CH-15419**
                                            )
v.                                          )
                                            )
EVERI PAYMENTS, INC.; and EVERI             )
HOLDINGS, INC.,                             )
                                            )
        Defendant.                          )

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Geraldine Donahue, on behalf of herself and other similarly situated individuals,

hereby sues Everi Payments, Inc. and Everi Holdings, Inc. (collectively hereinafter, "Defendant"

or "Everi"), and alleges as follows based on personal knowledge as to herself and on information

and belief as to all other matters, and demands trial by jury:

## INTRODUCTON

1.      This action arises from Defendant's violations of the Fair and Accurate Credit

Transactions Act ("FACTA") amendment to the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et*

*seq.* (the "FCRA"), which requires Defendant to truncate certain credit card and debit card

information on printed receipts provided to consumers. Despite the clear language of the statute,

Defendant knowingly or recklessly failed to comply with the FCRA by printing eight (8) digits of

its customers' credit card or debit card numbers on their transaction receipts. As such, Plaintiff and

other consumers who conducted business with Defendant during the time frame relevant to this

Complaint, each of whom engaged in a transaction using a credit card or debit card, suffered a

number of harms including, but not limited to, violation of their substantive statutory rights under

74073

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

15 U.S.C. § 1681c(g), breach of their confidence in the safe handling of their account information, invasion of their privacy as a result of the disclosure of their account information to those of Defendant's and its casino-clients' staff or agents who handled the receipts, exposure to an elevated risk of identity theft as determined by Congress, the burden of having to keep or destroy the receipt to prevent further disclosure of their account information, and monetary harm as a result of having paid a fee for a secure and legally compliant transaction that was anything but. Accordingly, Plaintiff and the unnamed class members are entitled to an award of statutory damages and other relief as further detailed herein.

## JURISDICTION AND VENUE

2.    The Court has jurisdiction over this action pursuant to 735 ILCS 5/2-209(a)(1) because Defendant is registered to do business in Illinois and conducts substantial business in Illinois, and because Defendant committed the tortious acts complained of in substantial part within Illinois, either directly or through its agent or agent(s) acting on its behalf at the Grand Victoria Casino in Cook County, Illinois, such that the conduct giving rise to Plaintiff's claim, on behalf of herself and the class, occurred in substantial part from the Defendant's conduct in Illinois.

3.    Venue is proper because Plaintiff resides, and at all times relevant herein resided, in Cook County, Illinois; because the cause of action alleged by Plaintiff, on behalf of herself and the class, arose in substantial part from the Defendant's conduct in Cook County, Illinois; and because Defendant conducts, and conducted at all relevant times alleged herein, substantial business in Cook County, Illinois, including at the Grand Victoria Casino in Cook County, Illinois at the time Plaintiff's cause of action arose.

74073

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

## PARTIES

4.      Plaintiff Geraldine Donahue is a natural person who resides, and at all times relevant herein resided, in Cook County, Illinois.

5.      Defendants Everi Payments, Inc. and Everi Holdings, Inc. are each a Delaware corporation whose corporate headquarters and principal office is located at 7250 South Tenaya Way, Suite 100, Las Vegas, NV 89113, and whose registered agent for service of process is Registered Agent Solutions, Inc. 4625 W. Nevso Drive, Suite 2, Las Vegas, NV 89103. Everi provides, among other things, debit and credit card cash advance transaction services to gamblers at thousands of casino gaming and other wagering establishments across the country and the world. Everi is the principal merchant in each cash-access transaction that a patron performs at each establishment where Everi's services are provided, and Everi's clients (the owners and operators of these underlying establishments) act as Everi's agent in providing such services to patrons.

6.      Acting as the principal merchant, Everi provides – either directly or through its gaming establishment clients (with whom it contracts) acting as its agents -- various cash-access services at thousands of points-of-sale located at its clients' gaming establishments across the country – including by dispensing cash withdrawn from its proprietary automated teller machines leased to its clients ("ATMs") and by processing credit and debit card cash-advance transactions on electronic terminals (also owned by Everi and leased to its clients) located at points-of-sale ("POS") in its clients' gaming establishments.

74073

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

## FACTUAL ALLEGATIONS

### A.   BACKGROUND OF FACTA

7.      Identity theft is a serious issue affecting both consumers and businesses. As of 2018, a Harris Poll revealed that nearly 60 million Americans have been affected by identity theft.[1] There were a record high 16.7 million victims of identity fraud in 2017 alone, and account takeovers (when a thief opens a credit card account or other financial account using a victim's name and other stolen information) tripled in 2017 from 2016, causing $5.1 billion in losses.[2]

8.      Congress enacted FACTA to prevent identity theft and related harm. See Pub. L. No. 108-159 (December 4, 2003) ("An Act . . . to prevent identity theft . . . and for other purposes.")

9.      "[I]dentity theft is a serious problem, and FACTA is a serious congressional effort to combat it...the less information the receipt contains the less likely is an identity thief who happens to come upon the receipt to be able to figure out the cardholder's full account information." *Redman v. Radioshack Corp.*, 768 F.3d 622, 626 (7th Cir. 2014).

10.      Upon signing FACTA into law, President George W. Bush remarked that "[s]lips of paper that most people throw away should not hold the key to their savings and financial secrets." 39 Weekly Comp. Pres. Doc. 1746, 1757 (Dec. 4, 2003). President Bush added that the government, through FACTA, was "act[ing] to protect individual privacy." *Id.*

11.      One such FACTA provision was specifically designed to thwart identity thieves' ability to gain sensitive information regarding a consumer's credit or bank account from a receipt

---

[1]      Source: https://www.lifelock.com/learn-identity-theft-resources-how-common-is-identity-theft.html

[2]      Source: https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime.

74073

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

provided to the consumer during a transaction, which, through any number of ways, could fall into the hands of someone other than the consumer.

12.     Codified at 15 U.S.C. § 1681c(g), this provision states the following:

> Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

15 U.S.C. § 1681c(g) (the "Receipt Provision").

13.     After enactment, FACTA provided three (3) years in which to comply with its requirements, mandating full compliance with its provisions no later than December 4, 2006.

14.     The requirement was widely publicized among retailers and the FTC. For example, on March 6, 2003, in response to earlier state legislation enacting similar truncation requirements, then-CEO of Visa USA, Carl Pascarella, explained that, "Today, I am proud to announce an additional measure to combat identity theft and protect consumers. Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts. The card's expiration date will be eliminated from receipts altogether. ... The first phase of this new policy goes into effect July 1, 2003 for all new terminals."[3] Within 24 hours, MasterCard and American Express announced they were imposing similar requirements.

15.     Card issuing organizations proceeded to require compliance with FACTA by contract, in advance of FACTA's mandatory compliance date. For example, the publication, "Rules for Visa Merchants," which is distributed to and binding upon all merchants that accept

---

[3]     Source: *Visa USA Announces Account Truncation Initiative to Protect Consumers from ID Theft*, PR NEWSWIRE (Mar 06, 2003).

74073

FILED DATE: 4/12/2019 4:07 PM 2018CH15419

Visa cards, expressly requires that "only the last four digits of an account number should be printed on the customer's copy of the receipt" and "the expiration date should not appear at all."[4]

16.    Because a handful of large retailers did not comply with their contractual obligations with the card companies and the straightforward requirements of FACTA, Congress passed The Credit and Debit Card Receipt Clarification Act of 2007 in order to make temporary changes to the definition of willful noncompliance with respect to violations involving the printing of an expiration date on certain credit and debit card receipts before the date of the enactment of this Act.[5]

17.    Importantly, the Clarification Act did not amend FACTA to allow publication of the expiration date or more than the last five digits of the card account number. Instead, it simply provided amnesty for certain past violators who disclosed card expiration dates, and only up to June 3, 2008. Expert proof continues to show the disclosure of excess card account number information or card expiration date information creates an increased risk of identity theft.

18.    Accordingly, card processing companies continued to alert their merchant clients, including Defendant, of FACTA's requirements. According to a Visa Best Practice Alert in 2010:

> Some countries already have laws mandating PAN truncation and the suppression of expiration dates on cardholder receipts. For example, the United States Fair and Accurate Credit Transactions Act (FACTA) of 2006 prohibits merchants from printing more than the last five digits of the PAN or the card expiration date on any cardholder receipt. (Please visit http://www.ftc.gov/os/statutes/fcrajump.shtm for more information on the FACTA.) To reinforce its commitment to protecting consumers, merchants, and the overall payment system, Visa is pursuing a global security objective that will enable merchants to eliminate the storage of full PAN and expiration date information from their payment systems when not needed for

---

[4]      Source: *Rules for Visa Merchants* (Sept. 1, 2007).

[5]      Source: https://www.govtrack.us/congress/bills/110/hr4008/text, .R. 4008 (110th): Credit and Debit Card Receipt Clarification Act of 2007 (May 20, 2008).

74073

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

specific business reasons. To ensure consistency in PAN truncation methods, Visa has developed a list of best practices to be used until any new global rules go into effect.

19.     As noted above, the processing companies have required that credit card or debit card expiration dates not be shown since 2003 and still require it. For example, American Express requires:

> Pursuant to Applicable Law, truncate the Card Number and do not print the Card's Expiration Date on the copies of Charge Records delivered to Card Members. Truncated Card Number digits must be masked with replacement characters such as "x," "*," or "#," and not blank spaces or numbers.

20.     Similarly, MasterCard required in a section titled Primary Account Number (PAN) truncation and Expiration Date Omission:

> A Transaction receipt generated by an electronic POI Terminal, whether attended or unattended, must not include the Card expiration date. In addition, a Transaction receipt generated for a Cardholder by an electronic POI Terminal, whether attended or unattended, must reflect only the last four digits of the primary account number (PAN). All preceding digits of the PAN must be replaced with fill characters, such as "X," "*," or "#," that are neither blank spaces nor numeric characters.

21.     According to data from the Federal Trade Commission's 2016 Consumer Sentinel Network Data Book, Illinois has among the highest per capita rate of reported fraud and other types of complaints. For identity theft in particular, Illinois is ranked No. 5 in the country with a total of 17,660 complaints. Also, several of the top 50 metro areas for identity theft are in Illinois, according to the report.[6]

22.     So problematic is the crime of identity theft that the three main credit reporting agencies, Experian, Equifax, and Transunion, joined to set-up a free website

---

[6]     Source: https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-january-december-2016/csn_cy-2016_data_book.pdf, *Consumer Sentinel Network Data Book for January-December 2016.*

74073

FILED DATE: 4/12/2019 4:07 PM 2018CH15419

(http://www.annualcreditreport.com) in order to comply with FACTA requirements and to provide the citizens of this country with a means of monitoring their credit reports for possible identity theft.

23.    FACTA expressly prohibits printing of more than the last five (5) digits of the card account number on transaction receipts to protect persons from identity theft and other evils.

**B.    THE ESTABLISHMENTS OF DEFENDANT'S CASINO-CLIENTS ARE BREEDING GROUNDS FOR IDENTITY THIEVES AND OTHER WHITE-COLLAR CRIMINALS**

24.    Consumer identity theft, which the Receipt Provision was designed to protect against, is especially rampant at gambling establishments like those served by Defendant.

25.    It has been estimated that "40 percent of white-collar crime has its root in gambling."[7]

26.    "[T]he ready availability of credit in and around casinos," including in    the establishments of Defendant's casino-clients, "can lead to irresponsible gambling and problem and pathological gambling behavior. Forty to sixty percent of the cash wagered by individuals in casinos is not physically brought onto the premises. Each year casinos extend billions of dollars in loans to their customers in the form of credit markers. Additional sums are charged by casino customer on their credit cards as cash advances. Casinos charge fees for cash advances ranging from 3 percent to 10 percent or more."[8]

27.    "Not surprisingly, . . . many problem and pathological gamblers steal or commit other crimes to finance their habit.    According to the National Research Council, 'as access to

---

[7]    Source: https://www.congress.gov/crec/1997/02/10/CREC-1997-02-10-pt1-PgH401.pdf, The Congressional Record, Feb. 10, 1997.

[8]    Source: https://govinfo.library.unt.edu/ngisc/reports/7.pdf, Chapter 7: Gambling's Impact on People and Places, *National Gambling Impact Study Commission Report* (June 18, 1999).

74073

FILED DATE: 4/12/2019 4:07 PM  2018CH15419

money becomes more limited, gamblers often resort to crime in order to pay debts, appease bookies, maintain appearances, and garner more money to gamble.'"[9]  In fact, the correlation between casino gambling and crime is so strong that, "[d]uring the first three years of casino gambling [in] Atlantic City, [the city] went from 50th in the nation in per capita crime to first. Overall, from 1977 to 1990, the crime rate in that city rose by an incredible 230%."[10]

28.    "Over the past two decades, there have been numerous suggestions in the academic literature and in political debate that gambling is associated with <u>white-collar crimes, such as embezzlement, forgery and fraud</u>."[11] (emphasis added).  For instance, "[i]n a survey of nearly 400 Gamblers Anonymous members, 57 percent admitted stealing to finance their gambling. Collectively they stole $30 million, for an average of $135,000 per individual. One witness before the Commission indicated that '80 to 90 percent of people in Gamblers Anonymous will tell you they did something illegal in order to get money to gamble.' <u>A lot of them do white collar crimes, fraud, credit card and employee theft</u>."[12] (emphasis added).

29.    Indeed, casinos throughout the United States have been bastions of identity theft, credit card fraud and other white-collar crime for nearly three decades.  For example, since as far back as 1992, there have been numerous instances in which "tens of thousands of dollars" have

---

[9]     Source: *Id.* at 7-13.

[10]    Source: https://www.fdle.state.fl.us/cms/FCJEI/Programs1/SLP/Documents/Full-Text/Yates.aspx, *Casino Gambling: Is it A Good Bet for Florida's Future?*, Jerry J. Yates, at 11.

[11]    Source: http://www.leg.state.fl.us/GamingStudy/docs/FGIS_Spectrum_28Oct2013.pdf, *Gambling Impact Study: Part 1, Section A: Assessment of the Florida Gaming Industry and its Economic Effects*, Spectrum Gaming Group (Oct. 28, 2013).

[12]    Source: *Chapter 7: Gambling's Impact on People and Places,* Final Report of the National Gambling Impact Study Commission, Government Publishing Office, at 7-13.

74073

FILED DATE: 4/12/2019 4:07 PM    2018CH15419

been stolen by individuals using forged or stolen credit cards in casinos -- including, by way of illustration, through the following scam employed at the "Foxwoods" casino in Connecticut:

> The men fed forged or stolen credit cards into machines at the casino that are designed to check credit limits and authorize cash advances instantly. If the advance is approved, the machine notifies a teller in the casino cashier's booth and spits out a receipt for the borrower. The borrower takes the receipt to the teller and is issued cash after showing the credit card and other identification.[13]

30.     More recently, in November 2010 and February 2011, five people were arrested in Rancho Mirage, California and two in Santa Barbara, California for using fake credit cards at casinos, manufactured using stolen personal information.[14]  In March 2012, a Connecticut man was arrested for "leading a criminal organization using counterfeit Discover cards at Mohegan Sun and Foxwoods casinos to obtain cash advances at least twice a week over three months[.]"[15]  In 2014, "[a] New York man pleaded guilty . . . to conspiracy to use counterfeit cards to draw cash advances in Louisiana casinos,"[16] and ten people were arrested in New Orleans, Louisiana "on

---

[13]     Source: *Gaming Industry Encounters Misfortune, Fortune*, The Courant (May 16, 1992), http://articles.courant.com/19920516/news/0000201897_1_creditcardscamcasinocashiercasinoso pening (last accessed Mar. 12, 2017).

[14]     Source: *2 Arrested, Accused of Casino Credit Card Fraud*, The Orange County Register (Nov. 28, 2010), http://www.ocregister.com/articles/casino-277896-cards-credit.html (last accessed Mar. 12, 2017); *Deputies Nab Five for Credit Card Fraud*, Santa Barbara Independent (Feb. 18, 2011), http://www.independent.com/news/2011/feb/18/deputiesnabfivecreditcardfraud/ (last accessed Mar. 12, 2017).

[15]     Source: *Police Break Up Casino Credit Card Scam*, NBC Connecticut (Mar. 16, 2012), http://www.nbcconnecticut.com/news/local/PoliceBreakUpCasioCreditCardScam142965455.ht ml (last accessed Mar. 12, 2017).

[16]     Source: Guilty plea entered in casino scam case, The Acadiana Advocate (May 19, 2014), http://www.theadvocate.com/acadiana/news/article_3ee22c93-0eb7-5d46-a571-2f624954b84f.html (last accessed Mar. 12, 2017); *10 charged in cash-advance fraud scheme at Harrah's Casino*, The Acadiana Advocate (July 31, 2014), http://www.theadvocate.com/new_orleans/news/article_bba2fa01-e821-563b-b9b7-43f7bb8129ea.html (last accessed Mar. 12, 2017).

74073

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

racketeering charges in an identity theft and counterfeit credit card scheme involving a group of New Yorkers who received tens of thousands of dollars in allegedly fraudulent cash advances from Harrah's New Orleans Casino."[17]  And in January 2016, "[a] man suspected of making fake credit cards was arrested at a hotel at Foxwoods casino[.]"[18]

31.     The Federal Trade Commission Red Flags Rule requires businesses and organizations such Defendant's casino clients to implement a written Identity Theft Prevention Program designed to detect the warning signs – or red flags – of identity theft in their day-to-day operations.

32.     Casinos like those of Defendant's clients are subject to an array of federal laws and regulations, including the Bank Secrecy Act and the 2003 FACTA amendments to FCRA, under which federal agencies such as the Federal Trade Commission ("FTC") and Securities and Exchange Commission ("SEC") have promulgated anti-money-laundering and identity-theft Red Flag Rules.  Among other requirements, these Red Flag Rules require "creditors," which includes casinos like those served by Defendant, to:  1) develop and implement a written identity theft protection programs designed to detect, prevent and mitigate identity theft; and 2) periodically perform risk assessments to determine whether the casino's practices pose any "reasonably foreseeable risk" of identity theft to its patrons.  Failure to comply with the Red Flags Rules could risk regulatory penalties, loss of licensure, and civil liability.

---

[17] Source: *10 charged in cash-advance fraud scheme at Harrah's Casino*, (July 31, 2014) http://www.theadvocate.com/new_orleans/news/article_bba2fa01-e821-563b-b9b7-43f7bb8129ea.html (last accessed Feb. 12, 2018).

[18] Source: *Police Make Credit Card Fraud Arrests at Foxwoods Hotel*, NBC Connecticut (Jan. 19, 2016), http://www.nbcconnecticut.com/news/local/PoliceMakeCreditCardFraudArrestsatFoxwoodsHotel365746371.html (last accessed Mar. 12, 2017).

74073

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

33.     In developing, implementing, and refining its Red Flag Rule identity-theft compliance program, Defendant and their casino-clients would certainly have considered and addressed, among other things, the need for strict compliance with FACTA's receipt truncation provisions. This would include training cage personnel and other employees to prioritize and keep in confidence patrons' credit card numbers and other sensitive financial information, a review of best practices for identity theft prevention in consumer financial transactions, including a review of current best practices for compliance with FACTA's receipt truncation requirements, and an ongoing periodic review and refinement of cage processes and procedures in light of current guidance from their own payment processors and other relevant vendors, as well as from major payment processors, such as VISA and Mastercard.

34.     As part of its ongoing duty to consistently update its identity-theft prevention program, Defendant and their casino-clients would periodically hire third-party service providers to audit and propose improvements to its compliance program and to train cage and other personnel in best practices for identity-theft prevention. These training programs routinely emphasize the critical importance of strict compliance with FACTA, and the severe identity-theft risks posed by casinos' failure to comply. Through these and other training programs, Defendant would have repeatedly been presented with and considered the requirements of and need for FACTA compliance, including FACTA's receipt truncation requirements.

C.     DEFENDANT'S PRIOR KNOWLEDGE OF FACTA

35.     Defendant had actual knowledge of FACTA's truncation requirement before it began failing to comply with the requirement *en masse*.

36.     Everi provides credit and debit card cash-access services to its clients' patrons at points of sale located in all of its clients' gaming establishments.

74073

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

37.     Everi provides these services to each of its clients' patrons, including the owner and/or operator of the Grand Victoria Casino in Elgin, Illinois during the time period relevant to this action (which, on information and belief, was MGM Resorts International, Inc. or one of its subsidiaries or affiliates), pursuant to a contractual relationship that Everi maintains with all of its clients across the country, pursuant to a standardized services agreement written by Everi at its complete and sole discretion, the material terms of which do not vary in a way material way for purposes of this litigation. On information and belief, the standardized services agreement entered into between Everi and each of its clients, including the owner and/or operator of the Grand Victoria Casino in Elgin, Illinois during the time period relevant to this action, specifically provides that Everi acts as the principal merchant and each of Everi's clients acts as Everi's agent in performing and processing all of the credit and debit card cash-access purchases performed by patrons of Everi's clients at points-of-sale located in all of the gaming establishments owned or operated by Everi's clients, including the Grand Victoria Casino in Elgin, Illinois at all times relevant to this action.

38.     The underlying technology used by Everi to perform such transactions (including all equipment and software) – by way of each of its clients acting as its agent, including the owner and/or operator of the Grand Victoria Casino in Elgin, Illinois during the time period relevant to this action – is proprietary to Everi; owned by Everi (and leased to its clients); operated, maintained, and controlled by Everi; and overseen remotely on a cloud-based system by Everi. All of the guidelines, procedures, and requirements for processing cash-access transactions via such technology are developed, controlled, and strictly maintained, mandated, and uniformly imposed by Everi.  Everi develops and provides various training programs to the employees of each of Everi's clients with respect to the processing of cash-access transactions, including the

74073

FILED DATE: 4/12/2019 4:07 PM 2018CH15419

printing and providing of receipts to customers. And the information printed on the automatically-printed customer-copy transaction receipts that Everi provides to patrons in connection with all such transactions is controlled entirely by Everi.

39.     Simply put: it is Everi, the principal merchant, acting through each of its gaming conglomerate clients as its agent, including the owner and/or operator of the Grand Victoria Casino in Elgin, Illinois during the time period relevant to this action, who processes and performs all of the credit and debit card cash-access transactions conducted by its clients' patrons at points-of-sale at its clients' establishments nationwide, and it is therefore Everi who prints and provides paper transaction receipts to all of the patrons with whom it transacts.

40.     Everi's clients and their employees, who thereafter act as Everi's agents in processing the cash-access transactions in question, have been well trained by Everi regarding the requirements imposed by FACTA and its truncation provision. For instance, current employees at the Grand Victoria Casino tout knowledge of these requirements. For example, Kathryn Miller, Compliance Officer at the Grand Victoria Casino in Elgin, claims to be a Certified Anti-Money Laundering Specialist with a CAMS designation, which designation required her to pass a rigorous CAMS examination addressing in detail the full range of financial and identity-theft regulations, best practices, and strict compliance with, *inter alia*, the Red Flags rules, the Bank Secrecy Act, Title 31, as well as FACTA's truncation requirement.[19]

41.     There are numerous state and federal statutes and operating regulations governing the gambling, pari-mutuel wagering, slot machines and card rooms where Everi's cash-access services are provided – all of which Ms. Miller and Defendant's and its casino-clients' other

---

[19]     Source: *Kathryn Miller*, LinkedIn, https://www.linkedin.com/in/kathryn-miller-cams-7850b0a6/ (last accessed May 9, 2018); *see also* https://www.acams.org.

74073

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

employees are well-versed in – which require Defendant to maintain full compliance with state and federal regulations such as FACTA.

42.     Most of Defendant's business peers and competitors currently and diligently ensure their credit card and debit card receipt printing process remains in compliance with FACTA by consistently verifying their card machines and devices comply with the Receipt Provision. Defendant could have readily done the same.

43.     Defendant's self-professed knowledge and experience regarding federal laws governing financial transactions no doubt translates to Defendant having intimate knowledge of the requirements of FACTA, a federal law governing financial transactions.

44.     Not only was Defendant informed not to print more than the last five digits of credit cards or debit cards on transaction receipts, it was contractually prohibited from doing so. Defendant accepts credit cards and debit cards from all major issuers, such as Visa, MasterCard, American Express and Discover Card. Each of these companies sets forth requirements that merchants, including Defendant, must follow, including the Receipt Provision.

45.     Defendant, and thus each of its casino clients, each of whom acted and acts as Everi's agent in the course of performing the transactions in questions in this litigation, had actual knowledge, at all relevant times, of FACTA's truncation provision and of Defendant's failure to comply with the requirements of FACTA's truncation provision at all of its clients' establishments nationwide. Despite having such knowledge, Everi chose to systematically violate FACTA anyway.

46.     Cynically, Defendant intentionally violated FACTA to protect itself against liability for consumer-initiated chargebacks, resulting from individuals' fraudulent or otherwise unauthorized use of credit and debit cards to access cash via the POS services Everi provides.

74073

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

47.     As discussed above, the casino gaming industry is one of the main targets for identity theft. As such, companies operating in the sector should apply extra care in preserving customers' data and preventing identity theft. Given the size and years of experience of Defendant's business, and the various state and federal regulations governing its business, not to mention the prevalence of financial crimes in and around its casino clients' establishments, such as the Grand Victoria Casino, at minimum Defendant acted in reckless disregard of FACTA's requirements and purpose when it allowed its system to print eight (8) digits of its customers' credit cards and debit cards on transaction receipts, together with other pieces of information about its customers, including their initialed signatures.

48.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has a written policy in place requiring compliance with all federal regulations governing its financial activities; this is evidenced by the fact that Defendant used to, subsequent to the enactment of FACTA and prior to the violative conduct alleged herein, truncate credit card and debit card account numbers in compliance with FACTA.

49.     Upon information and belief, it would take an individual less than one minute to run a test receipt to determine whether Defendant's system was in compliance with federal law(s) or Defendant's own alleged written policy requiring the truncation of credit card and debit card numbers.

50.     Additionally, for over 16 months Defendant has had actual knowledge of other FACTA litigation initiated and threatened to be initiated in courts throughout the country against its gaming company clients. Each such case alleged claims that arose from receipts printed and provided by Defendant in connection with cash access transactions at one of its' clients' establishments, processed via the same uniformly-maintained debit and credit card transaction

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

technology all of Defendant's clients utilize, including the Grand Victoria Casino in Elgin, Illinois during the relevant time period. Remarkably, Defendant's printing of transaction receipts in violation of FACTA's truncation requirement continued unabated for much if not all of that 16-month period of time, in disregard of the law and its patrons' financial privacy and security.

### D. PLAINTIFF'S FACTUAL ALLEGATIONS

51.     On or about February 22, 2018, Plaintiff used her personal credit card to perform a cash-access transaction with Defendant (the principal merchant acting through its agent or agent(s)) at a point-of-sale terminal, using Defendant's CashClub technology, located at the Grand Victoria Casino in Elgin, Illinois.

52.     In order to complete the transaction, Plaintiff was forced to pay a transaction fee to Defendant, through its agent or agent(s), in the amount of $12.99, in addition to principal amount of the transaction. Plaintiff is informed and believes, and thereupon alleges, that Defendant set the amount of the transaction fee that Plaintiff (and every other transacting patron) was charged at the Grand Victoria Casino in connection with such a transaction, that Defendant (acting as the principal merchant through its agent or agent(s)) collected the transaction fee paid by Plaintiff (and every other transacting patron), and that Defendant retained all or a substantial portion of the transaction fee paid by Plaintiff (and by all other transacting patrons).

53.     Plaintiff used her personal credit card to pay Defendant (the principal merchant with whom she transacted, via its agent or agent(s) acting as an intermediary or intermediaries) for the cash-access point-of-sale purchase she performed with Defendant at the Grand Victoria Casino in Elgin, Illinois on or about February 22, 2018. In connection with such credit card purchase, at the same time as Plaintiff received the cash she had purchased, Defendant (acting as the principal

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

merchant through its agent or agent(s)) presented Plaintiff with an electronically-printed receipt bearing the first four (4) and last four (4) digits of her credit card account number.

54.     In addition to bearing eight (8) digits of her credit card, the receipt printed by Defendant and provided to Plaintiff by Defendant identifies the complete first and last name and initialed signature of Plaintiff, the individual to whom the card is issued, as well as the card issuer (in this case VISA) and the transaction date and time.

55.     The printing of the receipt invaded Plaintiff's privacy as it disclosed her private card account information to the casino employee who handed her the receipt on Defendant's behalf and additionally was likely exposed, on information and belief, to other patrons and/or surveillance cameras recording high-definition video footage of the point-of-sale at which such receipt was provided to Plaintiff.

56.     The printing of the receipt breached Plaintiff's confidence in Defendant to properly handle her account information, and also constitutes a breach of implied bailment.

57.     The printing of the receipt additionally harmed Plaintiff because Defendant had imposed on and unjustly retained a substantial service fee from Plaintiff for the privilege of making the credit card transaction at issue in this case in a supposedly secure manner, which is the exact opposite of the true nature of the way in which Defendant processed the transaction.

58.     As a direct result of receiving the receipt containing the first and last four digits of her card number, Plaintiff took action to safeguard the receipt.

E.   DEFENDANT'S MISDEEDS

59.     At all times relevant herein, Defendant was acting by and through its subsidiaries, agents, servants and/or employees, including without limitation the owner and/or operator of the Grant Victoria Casino in Elgin, Illinois and its employees, each of whom acted within the course

74073

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

and scope of its agency or employment, under the direct supervision and control of Defendant, and, on information and belief, pursuant to the terms of a standardized contract between Defendant and the owner and/or operator of the Grand Victoria Casino in Elgin, Illinois and/or another of its subsidiaries, agents, servants and/or employees with whom it contracted, the material terms of which remained (at all relevant times) the same or substantially the same as the relevant terms of the contractual relationships between Defendant and each of its other clients in the United States.

60.     At all times relevant herein, the conduct of the Defendant, as well as that of its subsidiaries, agents, servants and/or employees, was in willful, knowing, or reckless disregard for federal law and the rights of the Plaintiff and other members of the class.

61.     Plaintiff is informed and believes, and thereupon alleges, that Defendant implements, oversees, and maintains control over the same uniform debit and credit card payment processing technology, pursuant to the same uniformly-implemented policies, practices, and procedures for performing the cash-access consumer-oriented transactions at issue in this case at all of its casino-clients' establishments nationwide (including the Grand Victoria Casino) – including by, without limitation, negotiating, entering into, and acting pursuant to contracts and agreements with its casino clients that govern the use of Defendant's electronic payment processing technology at its clients' establishments, the terms of which uniformly provide that Defendant acts as the principal merchant and that each of Defendant's clients acts as Defendant's agent with respect to the cash-access transactions performed by patrons at the Everi-maintained points-of-sale at its establishments.

62.     Defendant uniformly prints receipts for patrons in connection with each cash-access transaction performed at all of its clients' establishments, including the Grand Victoria Casino, and in connection with each such transaction uniformly mandates and requires, pursuant to the

FILED DATE: 4/12/2019 4:07 PM 2018CH15419

same uniform policies and procedures, that each of its clients, as its agents provide the printed receipt to the patron with whom Defendant performed the transaction at the point-of-sale transaction location – i.e., immediately upon receipt of credit card or debit card payment.

63. The systems of Defendant, and/or of its agent or agent(s), maintain records of all credit and debit card transactions and store all transacting patrons' identifying and contact information, including copies of patrons' drivers' licenses and duplicate hard copies and electronic copies of all payment receipts provided to customers.

64. Notwithstanding the fact that it has extensive knowledge of the requirements of FACTA and the dangers imposed upon consumers through its failure to comply, Defendant issued tens of millions of transaction receipts containing the first four (4) and last four (4) digits of credit and debit card account numbers, violating FACTA on an unprecedented scale during the relevant time period.

65. By shirking the requirements of this important federal statute on such a large scale, in an environment already ripe for identity theft and other evils, Defendant uniformly invaded Plaintiff's and the other putative Class members' privacy, breached their confidence, mishandled their personal account information, and exposed them to an elevated risk of identity theft. Defendant's conduct alleged herein resulted in the disclosure of Plaintiff's and the Class members' private financial information to the world, including to persons who might find the receipts in the trash or elsewhere, such as identity thieves who thrive in environments such as Defendant's establishment, and those of the Defendant's and its casino-clients' employees who handled the receipts.

66. Simply put, by printing numerous transaction receipts in violation of this long-standing and well-known federal statute, Defendant has caused – to paraphrase the words of the

74073

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

Honorable Judge Richard A. Posner (retired) – "an unjustifiably high risk of harm that [wa]s either known or so obvious that it should [have been] known" to Defendant. *Redman v. RadioShack Corp.*, 768 F.3d 622, 627 (7th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

67.     Moreover, Defendant also harmed Plaintiff and other consumers by imposing and unjustly retaining substantial service fees from Plaintiff and the Class members for the privilege of making the debit and credit card transactions at issue in this case in a supposedly secure manner. Indeed, a substantial portion of the service fees that Defendant charged to Plaintiff and the other members of the Class to facilitate their debit and credit card transactions was supposedly attributable to the various procedural safeguards and compliance monitoring measures that Defendant and its casino-clients had implemented to ensure the safe, secure, and legally compliant processing of consumer transactions. And in fact, Plaintiff and the other Class members paid these service fees to Defendant with the expectation that their transactions would be processed and their data secured in compliance with all applicable federal laws, including the truncation requirement of FACTA.

68.     In other words, what Plaintiff and the other members of the Class received (insecure transactions recorded on receipts printed and provided to them in violation of federal law) was less valuable than what they paid for (transactions securely processed and recorded on written receipts in compliance with federal data-privacy laws and regulations). Had Plaintiff and the other members of the Class known that Defendant would process their transactions and safeguard their transaction data insecurely, including by printing and providing to them receipts in violation of FACTA's truncation requirement, they would not have paid as much of a fee, if any fee at all, for the privilege of making the debit and credit card purchases at issue in this case.

74073

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

69.     In view of the substantial harm and other risks to Plaintiff and the Class caused by Defendant's willfully unlawful conduct, *see Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007) (defendant is liable for willfully violating FACTA where violation was committed with "reckless disregard" for the law), and the likelihood that such harms and risks will continue absent judicial relief, the Court should enjoin Defendant from continuing to print receipts at its casino terminals in violation of FACTA.

## CLASS REPRESENTATION ALLEGATIONS

70.     This action is brought as a Class Action under 735 ICLS Section 5/2-801. Plaintiff proposes the following class, defined as follows, subject to modification by the Court as required:

> **All persons in the United States who, within the two (2) years prior to the filing of the original complaint through the date of the Court's order granting class certification, (i) engaged in one or more transactions using a debit card or credit card at a point-of-sale located on non-tribal-owned land in the United States, (ii) where such transaction was processed via Defendant's CashClub technology; and (iii) for which Defendant's system was programmed to generate a printed customer receipt displaying more than the last 5 digits of the credit or debit card number used in connection with such transaction(s).**

71.     Plaintiff falls within the class definition and is a member of the class. Excluded from the class is Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, Plaintiff's attorneys and their employees, the Judge to whom this action is assigned and any member of the Judge's staff and immediate family, and claims for personal injury, wrongful death, and/or emotional distress.

72.     The members of the class are capable of being described without any significant managerial or administrative problem. The members of the class are readily ascertainable from the information and records in the possession, custody or control of Defendant.

74073

FILED DATE: 4/12/2019 4:07 PM  2018CH15419

73.     Defendant provides printed receipts to credit card and/or debit card transaction customers at hundreds of its casino-clients' establishments numerous times per day, 365 days per year. Therefore, it is reasonable to conclude that the class is sufficiently numerous such that individual joinder of all members is impractical, as required by 735 ILCS 5/2-801(1). The disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits. The Class can be identified through Defendant's records or Defendant's agents' records and the records of the banks that issued the credit/debit cards.

74.     Although FACTA does not distinguish between consumer and business transactions, on information and belief all or most transactions at Defendant's establishments for which a FACTA-violative receipt was provided were paid for using a consumer card rather than a business card. To the extent this is an issue, the payments made with the two types of cards are easily discernible: merchants are charged different interchange fees for card transactions that vary based on whether the card is a business card or a consumer card. There are different interchange categories and codes assigned to each transaction that distinguish whether a card used for a transaction is a business card or a consumer card. Defendant and its merchant bank could easily identify whether a particular transaction involved a business card or a consumer card.

75.     While all Class Members have experienced actual harm as previously explained herein, this suit seeks only statutory damages and injunctive relief on behalf of the class and it expressly is not intended to request any recovery for personal injury and claims related thereto. Plaintiff reserves the right to expand the class definition to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

74073

76.     The class is defined so that each class member will have identical claims or defenses. As such, common questions of fact and law exist as to all members of the class, which predominate over any questions affecting only individual members of the class, including Plaintiff. *See* 735 ILCS 5/2-801(2). Such questions common to the class include, but are not limited to;

a.      Whether, within the two (2) years prior to the filing of the original complaint, Defendant and/or its agents completed transactions by credit or debit card and subsequently provided a printed receipt upon which more than the last five (5) digits of the card number was displayed;

b.      Whether Defendant's violation was knowing or reckless;

c.      Whether Defendant is liable for damages, and the extent of statutory damages for each such violation; and

d.      Whether Defendant should be enjoined from engaging in such conduct in the future.

77.     The principal question is whether Defendant violated section 1681c(g) of the FCRA by providing Class Members with electronically-printed receipts in violation of the Receipt Provision. The secondary question is whether Defendant knowingly or recklessly provided such electronically printed receipts.

78.     Plaintiff and his counsel will fairly and adequately protect the interests of the class, as required by 735 ILCS 5/2-801(3). Plaintiff has no interests that conflict with the interests of the class and seeks the same relief as the class. Plaintiff is interested in pursuing her claims vigorously and has retained counsel competent and experienced in class and complex litigation, including under FACTA and other data privacy statutes.

FILED DATE: 4/12/2019 4:07 PM 2018CH15419

74073

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

79.     In light of the numerosity of the class members, the commonality of issues of law and fact among class members, and Plaintiff and her counsel's willingness and ability to fairly and adequately protect the interests of the class, a class action is an appropriate method for the fair and efficient adjudication of the controversy, as required by 735 ILCS 5/2-801(4). Moreover, class-wide damages are essential to induce Defendant to comply with the law. The interest of Class Members in individually controlling the prosecution of separate claims against Defendant is small. The maximum statutory damages in an individual action for a violation of this statute are minimal. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

80.     Plaintiff and the members of the class have all suffered harm as a result of the Defendant's unlawful and wrongful conduct. Absent a class action, the class, along with countless future patrons of Defendant's establishment, will continue to face the potential for irreparable harm. In addition, these violations of law would be allowed to proceed without remedy and Defendant will continue such illegal conduct. Because of the size of the individual Class Members' claims, few Class Members could afford to seek legal redress for the wrongs complained of herein.

81.     Defendant has acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

### COUNT I – VIOLATIONS OF 15 U.S.C. § 1691(c)(g)

82.     Plaintiff incorporates the foregoing allegations as if fully alleged herein.

83.     15 U.S.C. §1681c(g) states as follows:

Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

84.      This section applies to any "device that electronically prints receipts" (hereafter "Devices") at the transaction location. 15 U.S.C. §1681c(g)(3).

85.      During all or substantially all of the relevant time period, Defendant employed, as the principal merchant acting through its clients as its agent or agent(s), said Devices to perform cash-access transactions with its clients' patrons on non-tribal owned land throughout the United States, including at the Grand Victoria Casino establishment in Elgin, Illinois and at numerous other establishments nationwide that were owned or operated by one of Defendant's clients.

86.      Defendant contracted with the owner or operator of the Grand Victoria Casino establishment in Elgin, Illinois and had contracted with each of its other clients who operated or owned such establishments on the same or materially the same terms, pursuant to which Everi provided each clients' patrons with cash-access transaction services that Defendant processed via the same CashClub technology, with Everi acting as the principal merchant and the respective client acting as its agent.

87.      On or before the date on which this complaint was filed, Plaintiff and members of the class were provided receipt(s) by Defendant that failed to comply with the Receipt Provision.

88.      At all times relevant to this action, Defendant was actually aware, or should have been actually aware, of both the Receipt Provision.

89.      Notwithstanding the three-year period to comply with FACTA and its accompanying provisions, and the subsequent years since FACTA became effective, and despite having knowledge of the Receipt Provision and FACTA as a whole, Defendant knowingly, knowingly or recklessly violated and continues to violate the Receipt Provision.

90.      By printing more than the last five (5) digits of Plaintiff's credit card number on Plaintiff's transaction receipt, Defendant caused Plaintiff to suffer numerous harms as described

74073

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

above. This includes, but is not limited to: breach of confidence; heightened risk of identity theft, especially as the receipt displays the full name of the card holder on the it together with other sensitive information including the card holder's initialed signature; exposure of Plaintiff's private information to those of Defendant's and its casino-clients' employees who handled the receipt; being forced to take action prevent further disclosure of the information displayed on the receipt; and monetary harm in the amount of the transaction fees that Plaintiff and the unnamed class members were forced to pay Defendant in exchange for a secure and legally compliant transaction (the exact opposite of what they received).

91.    As a result of Defendant's willful violations of the FCRA, Defendant is liable to Plaintiff and members of the class pursuant to 15 U.S.C. § 1681n for statutory damages, punitive damages, attorney's fees and costs.

*      *      *

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in favor of her and the class against Defendant, as follows:

a.    Granting certification of the Class;

b.    Awarding statutory damages;

c.    Awarding punitive damages;

d.    Awarding injunctive relief;

e.    Awarding attorneys' fees, litigation expenses and costs of suit; and

f.    Awarding such other and further relief as the Court deems proper under the circumstances.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Page | 27

74073

Dated: April 12, 2019.

FILED DATE: 4/12/2019 4:07 PM   2018CH15419

Respectfully submitted,

GERALDINE DONAHUE, individually,
and on behalf of others similarly situated,

By: _s/_____
      One of Plaintiff's Attorneys

Keith J. Keogh
KEOGH LAW, LTD.
55 W. Monroe St., Ste. 3390
Chicago, Il 60603
Tel: 312-726-1092
Fax: 312-726-1093
Keith@KeoghLaw.com

Scott D. Owens
SCOTT D. OWENS, P.A.
3800 S. Ocean Dr., Ste. 235
Hollywood, FL 33019
Tel: 954-589-0588
Fax: 954-337-0666
scott@scottdowens.com

Frank S. Hedin
HEDIN HALL, LLP
1395 Brickell Ave, Suite 900
Miami, Florida 33131
Tel: 305-357-2107
Fax: 305-200-8801
fhedin@hedinhall.com

*Counsel for Plaintiff*

74073

Return Date: No return date scheduled
Hearing Date: 4/25/2019 10:00 AM - 10:00 AM
Courtroom Number:
Location:

FILED
4/17/2019 9:59 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419

4720905

**Firm No. 39042**

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| GERALDINE DONAHUE, individually and on behalf of others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| EVERI PAYMENTS, INC.; and EVERI HOLDINGS, INC., | ) ) ) |
| Defendant. | ) ) |

**CASE No.: 2018-CH-15419**

## PLAINTIFF'S AMENDED MOTION FOR CLASS CERTIFICATION

Pursuant to 735 ILCS 5/2-801, Plaintiff Geraldine Donahue, individually and on behalf of all others similarly situated, moves for class certification to remedy Everi Payments, Inc. and Everi Holdings, Inc's ("Defendant") widespread violations of the Fair and Accurate Credit Transactions Act ("FACTA"),[1] a federal consumer protection statute that, *inter alia*, requires merchants like Defendant to truncate all but the last five (5) digits of any credit or debit card account number appearing on a printed consumer transaction receipt.

## I.   INTRODUCTION

1.   Identity theft is a serious and ever-growing concern for consumers and businesses alike. As of 2018, nearly 60 million Americans have been affected by identity theft.[2] There were

---

[1] FACTA is an amendment to the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA").

[2] Source: https://www.lifelock.com/learn-identity-theft-resources-how-common-is-identity-theft.html (Last Accessed: April 11, 2019).

1

74074

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

a record high 16.7 million victims of identity fraud in 2017 alone, and account takeovers (when a thief opens a credit card account or other financial account using a victim's name and other stolen information) tripled in 2017 from 2016, causing $5.1 billion in losses.

2.      Congress enacted FACTA "to prevent identity theft" and other related evils. *See* Pub. L. No. 108-159 (December 4, 2003) ("An Act . . . to prevent identity theft . . . and for other purposes."); *Redman v. Radioshack Corp.*, 768 F.3d 622, 626 (7th Cir. 2014) ("[I]dentity theft is a serious problem, and FACTA is a serious congressional effort to combat it…the less information the receipt contains the less likely is an identity thief who happens to come upon the receipt to be able to figure out the cardholder's full account information.").

3.      When President George W. Bush signed FACTA into law, he explained that the Act was enacted "to protect individual privacy," and emphasized the importance of the truncation provision as follows: "Slips of paper that most people throw away should not hold the key to their savings and financial secrets." 39 Weekly Comp. Pres. Doc. 1746, 1757 (Dec. 4, 2003).

4.      In order to vindicate this important consumer protection statute, Plaintiff seeks to have this Court certify the following class:

> **All persons in the United States who, within the two (2) years prior to the filing of the original complaint through the date of the Court's order granting class certification, (i) engaged in one or more transactions using a debit card or credit card at a point-of-sale located on non-tribal-owned land in the United States, (ii) where such transaction was processed via Defendant's CashClub technology; and (iii) for which Defendant's system was programmed to generate a printed customer receipt displaying more than the last 5 digits of the credit or debit card number used in connection with such transaction(s).**

2

FILED DATE: 4/17/2019 9:59 AM    2018CH15419

5.      The proposed class is an ideal candidate for certification because every class member's claim arises from the same uniform course of conduct by Defendant and is thus based on the same facts and subject to the same defenses. *See Bush v. Calloway Consol. Group River City, Inc.*, No. 3:10-CV-841-J-37MCR, 2012 WL 1016871, at *11 (M.D. Fla. Mar. 26, 2012) ("Courts routinely find class resolution superior in consumer protection actions, including those brought pursuant to FACTA."); *In re Toys "R" Us – Delaware, Inc. – Fair and Accurate Credit Trans. Act (FACTA) Litig.*, 300 F.R.D. 347, 376 (C.D. Cal. 2013) ("The vast majority of courts outside this district have similarly found that common questions predominate in FACTA class actions.").[3]

6.      Indeed, courts throughout the country regularly find class treatment appropriate in actions brought to vindicate widespread violations of FACTA's truncation provision.[4]

---

[3] Because the procedural requisites of class certification are virtually the same under both 735 ILCS 5/2-801 and Federal Rule of Civil Procedure 23, this Court should find persuasive and adopt the reasoning of the federal FACTA decisions cited herein. *See Cruz v. Unilock Chicago, Inc.*, 383 Ill. App. 3d 752, 761 (2d Dist. 2008).

[4] *E.g., Velasco v. Sogro, Inc.*, No. 08-C-0244, 2014 WL 3737971, at *3-4 (E.D. Wis. July 30, 2014) (finding class certification appropriate in FACTA truncation action); *Legg v. Spirit Airlines, Inc.*, 315 F.R.D. 383 (same); *Altman v. White House Black Market, Inc.*, 2017 WL 8780202 (N.D. Ga. Oct. 25, 2017), *report and recommendation adopted*, 2018 WL 1704110 (N.D. Ga. Feb. 12, 2018) (same); *Rogers v. Khatra Petro, Inc.*, 2010 WL 3894100, *6 (N.D. Ind. Feb. 14, 2011) (same); *Miller-Huggins v. Mario's Butcher Shop, Inc.*, 2010 WL 658863, *5 (N.D. Ill. Feb. 22, 2010) (same); *Shurland v. Bacci Café & Pizzeria on Ogden, Inc.*, 259 F.R.D. 151, 161 (N.D. Ill. 2009) (same); *Harris v. Best Buy Co., Inc.*, 254 F.R.D. 82, 90 (N.D. Ill. 2008) (same); *Redmon v. Uncle Julio's of Illinois, Inc.*, 249 F.R.D. 290, 294-98 (N.D. Ill. 2008) (same); *Meehan v. Buffalo Wild Wings, Inc.*, 249 F.R.D. 284, 288 (N.D. Ill. 2008) (same); *Matthews v. United Retail, Inc.*, 248 F.R.D. 210, 217 (N.D. Ill. 2008) (same); *Brown v. 22nd Dist. Agric. Ass'n*, 2017 WL 2172239, *2 (S.D. Cal. May 15, 2017) (same, during settlement approval); *Harper v. Law Office of Harris & Zide LLP*, 2017 WL 995215, *10 (N.D. Cal. Mar. 15, 2017) (same); *Flaum v. Doctor's Assoc., Inc.*, 16-cv-61198-CMA, ECF No. 83 (S.D. Fla. March 23, 2017) (same); *Guarisma v. Microsoft*, 15-cv-24326-CMA, ECF No. 79 (S.D. Fla. Oct. 27, 2017) (same); *Legg v. Lab. Corp. of Am.*

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

## II.   FACTA'S TRUNCATION PROVISION IS WELL ESTABLISHED

7.      Defendant had years to learn about and comply with the truncation requirement before it went into effect. Although FACTA was enacted in 2003, merchants were given ample time to comply, as they were not obligated to start meeting the truncation requirement until December 4, 2006. 15 U.S.C. §1681c(g)(3). Moreover, the truncation requirement was highly-publicized long before its effective date.[5] Thereafter, VISA, MasterCard and American Express began to contractually require merchants to comply with the truncation requirement.[6]

8.      The truncation requirement made news again in 2008, after numerous merchants were sued for violating the "expiration date" element of the requirement. *See Bateman v. Am. Multi- Cinema*, 623 F.3d 708, 717 (9th Cir. 2010). Congress addressed this situation by passing a "Clarification Act" to absolve a specific type of violation that had occurred *before* June 3, 2008.

---

*Holdings*, 2016 U.S. Dist. LEXIS 122695 (S.D. Fla. Feb. 18, 2016) (same); *Muransky v. Godiva Chocolatier, Inc.*, 2016 U.S. Dist. LEXIS 133695 (S.D. Fla. Sept. 28, 2016) (same); *Wood v. J Choo USA, Inc.*, Case No. 15-cv-81487- BLOOM/Valle, ECF No. 97 (S.D. Fla. May 9, 2017) (same); *Kirchein v. Pet Supermarket, Inc.*, 16-cv-60090, ECF No. 31 at pp.2-4 (S.D. Fla. Aug. 22, 2016) (same, vacated on other grounds).

[5] For example, on March 6, 2003, the CEO of Visa USA announced "an additional measure to combat identity theft and protect consumers. Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts. The card's expiration date will be eliminated from receipts altogether...." [First Amended Complaint ¶14], *quoting PR Newswire*, "Visa USA Announces Account Truncation Initiative to Protect Consumers from ID Theft; Visa CEO Announces New Initiative at Press Conference with Sen. Dianne Feinstein" (March 6, 2003)). And within twenty-four hours after the VISA announcement, MasterCard and American Express announced they were imposing similar requirements. [*Id.*]

[6] For example, the 2006 edition of "Rules for Visa Merchants" (p.62), which is distributed to and binding upon all merchants that accept VISA cards, expressly provides that "only the last four digits of an account number should be printed on the customer's copy of the receipt" and "the expiration date should not appear at all." [First Amended Complaint ¶15.]

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

*Id.* Importantly, however, the Clarification Act did *not* eliminate or otherwise absolve any violation

of truncation requirement going forward. Thereafter, card-processing companies continued to alert

merchants about FACTA's truncation requirements.[7]

9.      Finally, to incentivize merchants to learn about and comply with FACTA, and

encourage private litigants to enforce it, Congress gave the law teeth. Specifically, Congress

incorporated FACTA into the Fair Credit Reporting Act, 15 U.S.C. §1681, *et seq.* ("FCRA"),

which entitles a successful plaintiff to statutory damages, punitive damages, costs and attorneys'

fees for any "willful" conduct that violates the law. *See Harris v. Mexican Specialty Foods, Inc.*,

564 F.3d 1301, 1306-1307 (11th Cir. 2009) (citing 15 U.S.C. §1681n(a)(1)(A), and (2)). This

includes knowing or reckless conduct, such as when a defendant violates the statute despite being

aware of its requirements. *See id.* at 1310 (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 59-

60 (2007) (an FCRA violation is "willful" if it is knowing or reckless)); *Steinberg v. Stitch & Craft,

Inc.*, No. 09-60660, 2009 U.S. Dist. LEXIS 72908, *9 (S.D. Fla. Aug. 18, 2009) (a complaint states

claim for willful violation under FACTA if the defendant violated statute despite knowing its

requirements).

**III.    FACTS**

10.     The complaint's allegations are "taken as true for purposes of determining class

certification." *Chultem v. Ticor Title Ins. Co.*, 401 Ill. App. 3d 226, 235 (1st Dist. 2010).

---

[7] A Visa Best Practice Alert in 2010 stated "Some countries already have laws mandating PAN truncation and the suppression of expiration dates on cardholder receipts. For example, the United States Fair and Accurate Credit Transactions Act (FACTA) of 2006 prohibits merchants from printing more than the last five digits of the [account number] ... on any cardholder receipt." [First Amended Complaint ¶18]. Likewise, MasterCard warned merchants that: "A Transaction receipt generated by an electronic POI Terminal, whether attended or unattended, must not include the Card Expiration Date." [*Id.* ¶20.]

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

11.     On or about February 22, 2018, Plaintiff used her personal credit card to perform a transaction at the Grand Victoria Casino in Elgin, Illinois, an establishment in which, at the time of Plaintiff's transaction, Defendant operated machines that processed credit and debit card cash-access transactions. [First Amended Complaint ¶51.]

12.     Plaintiff used her personal credit card to pay Defendant (the principal merchant with whom she transacted, via its agent or agent(s) acting as an intermediary or intermediaries) for the cash-access purchase she performed with Defendant at the Grand Victoria Casino in Elgin, Illinois. In connection with the credit card purchase, at the same time as Plaintiff received the cash she had purchased, Defendant (acting as the principal merchant through its agent or agent(s)) presented Plaintiff with an electronically-printed receipt bearing the first four (4) and last four (4) digits of her credit card account number. [*Id.* ¶53.]

13.     In addition to bearing eight (8) digits of her credit card, the receipt identifies the complete first and last name and initialed signature of Plaintiff, as well as the card issuer (in this case VISA) and the transaction date and time. [*Id.* ¶54.]

14.     The printing of the receipt additionally harmed Plaintiff because Defendant had imposed on and unjustly retained a substantial service fee from Plaintiff for the privilege of making the credit card transaction at issue in this case in a supposedly secure manner, which is the exact opposite of the true nature of the way in which Defendant processed the transaction. [*Id.* ¶57.]

**IV.     CLASS CERTIFICATION IS APPROPRIATE**

15.     Class certification is a matter left to the Court's discretion, so long as such discretion is "exercised within the framework of the rules of civil procedure governing class

FILED DATE: 4/17/2019 9:59 AM   2016CH15419

actions." *S37 Mgmt. v. Advance Refrigeration Co.*, 2011 IL App (1st) 102496, ¶15 (1st Dist. 2011) (citing *Smith v. Ill. Central R.R. Co.*, 223 Ill. 2d 441, 447 (2006)).

16.     The rule of civil procedure governing class certification is 735 ILCS 5/2-801, which has four requirements: (1) the class is so numerous that joinder of all members as parties is impracticable ("Numerosity"); (2) Plaintiff's and the class members' claims present common questions of law or fact that predominate over any questions affecting only individual members ("Commonality"); (3) Plaintiff will fairly and adequately represent the class ("Adequacy"); and (4) a class action is an appropriate method for fairly and efficiently resolving the dispute. ("Appropriateness"). *See* 735 ILCS 5/2-801. Each requirement is readily satisfied in this case.

17.     Numerosity. "A class consisting of more than forty members generally satisfies the numerosity requirement." *Chavez v. Don Stoltzner Mason Contr., Inc.*, 272 F.R.D. 450, 454 (N.D. Ill. 2011); *accord Heritage Operations Grp., LLC v. Norwood*, 322 F.R.D. 321, 325 (N.D. Ill. 2017). Here, Defendant generated printed receipts bearing the first four (4) and last four (4) digits of customers' credit and debit card numbers numerous times per day, 365 days per year. It is reasonable to conclude that the class is sufficiently numerous such that individual joinder of all members is impractical, as required by 735 ILCS 5/2-801(1).).[8] [First Amended Complaint ¶73.]

18.     Commonality. "Determining whether issues common to the class predominate over individual issues requires the court to identify the substantive issues that will control the outcome, assess which issues will predominate, and then determine whether these issues are common to the

---

[8] Plaintiff is "not required to specify the exact number of persons in the class..." *Chavez*, 272 F.R.D. at 453, *quoting Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989). Furthermore, "[c]ourts rely on common sense to determine whether an estimate of a class size is reasonable." *Chavez*, 272 F.R.D. at 454 (quoting *Schmidt v. Smith & Wollensky, LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010)).

class." *Ramirez v. Midway Moving & Storage, Inc.*, 378 Ill. App. 3d 51, 54-55 (1st Dist. 2007) (quoting *Smith*, 223 Ill. 2d at 449). This requirement is met because the substantive issues that control the outcome of this case are: Such questions common to the class include, but are not limited to:

    a.  Whether, within the two (2) years prior to the filing of the original complaint, Defendant and/or its agents completed transactions for which Defendant's system was programmed to generate a printed customer receipt displaying more than the last 5 digits of the credit or debit card number used in connection with such transaction(s);

    b.  Whether Defendant's violation was knowing or reckless;

    c.  Whether Defendant is liable for damages, and the extent of statutory damages for each such violation; and

    d.  Whether Defendant should be enjoined from engaging in such conduct in the future.

[First Amended Complaint ¶76].

19. The principal question is whether Defendant violated §1681c(g) of the FCRA by providing class members with electronically-printed receipts in violation of the Receipt Provision. The secondary question is whether Defendant knowingly or recklessly provided such electronically printed receipts.

20. These questions predominate because "the successful adjudication of the plaintiff's individual claims will establish a right of recovery in favor of the other class members." *S37 Mgmt.*, 2011 IL App (1st) 102496, ¶17 (citing *Hall v. Sprint Spectrum, L.P.*, 376 Ill. App. 3d 822, 831 (5th Dist. 2007)). Moreover, these questions are common because all class members were Defendant's and/or its agents' customers who completed transactions by credit or debit card and

FILED DATE: 4/17/2019 9:59 AM 2018CH15419

FILED DATE: 4/17/2019 9:59 AM  2018CH15419

subsequently provided a printed receipt upon which more than the last five (5) digits of the card number was displayed. [First Amended Complaint ¶76].

21.     *Adequacy.* This element requires that the named plaintiff's interests be aligned with and not antagonistic to the interests of the unnamed class members, and that the plaintiff's counsel be qualified, experienced and generally able to conduct the litigation. *See Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 338-39 (1977); *Ramirez*, 378 Ill. App. 3d at 56. That is the case here. Plaintiff's and the class members' interests align perfectly because all of their claims arise from the same underlying uniform course of conduct, resulting in materially identical violations of FACTA.  Moreover, as a result of Defendant's uniform violations of the truncation provision of FACTA, Plaintiff and unnamed class members are each entitled to recover the same statutory damages.

22.     Plaintiff's counsel and proposed class counsel at Scott D. Owens, P.A., Hedin Hall LLP, and Keogh Law, LTD., all possess significant consumer class action litigation experience (in the FACTA context and otherwise) and have all previously been found adequate and appointed class counsel in numerous similar class actions. *See Flaum*, 16-cv-61198-CMA, [ECF No. 83 ¶ 6] ("[T]he Court determines that Plaintiff's counsel, Scott D. Owens, Keith J. Keogh, Michael S. Hilicki, Bret L. Lusskin, are adequate to represent the Class and appoints them Class Counsel."); *Guarisma*, 15-cv-24326-CMA, ECF No. 57, ¶ 5 (S.D. Fla. Feb. 28, 2017) ("[T]he Court determines that Plaintiff's counsel, Scott D. Owens, Keith J. Keogh, … are adequate to represent the Class and appoints them Class Counsel."); *Legg v. Spirit*, 315 F.R.D. at 390 ("The Court has no cause for concern . . . Plaintiff's attorneys are experienced and capable, and have served as class counsel in similar consumer class actions before."); *Muransky*, 2016 U.S. Dist. LEXIS 133695 at *7

9

FILED DATE: 4/17/2019 9:59 AM 2018CH15419

("Class Counsel effectively pursued the Settlement Class Members' claims before this Court."); *Legg v. Lab. Corp.*, 2016 WL 3944069, *2 (S.D. Fla. Feb. 18, 2016) ("[T]his Court recognizes the experience of Class Counsel Michael Hilicki, Bret Leon Lusskin, Jr., Scott David Owens[.]"); *Chimeno-Buzzi v. Hollister Co.*, 2015 WL 9269266, at *2 (S.D. Fla. 2014) (appointing attorney of Hedin Hall LLP, "whom the Court finds [is] experienced and adequate," as class counsel in consumer privacy action in which he achieved $10 million settlement on behalf of class); *Farnham v. Caribou Coffee Co., Inc.*, No. 16-cv-295 (W.D. Wisc. 2016) (appointing attorney of Hedin Hall LLP as class counsel in consumer privacy action resulting in $8.5 million class settlement); *Luczak v. Nat'l Beverage Corp.*, No. 18-cv-61631-KMM, ECF No. 20, at 4, 5 (S.D. Fla. Oct. 12, 2018) (noting that "Hedin Hall LLP . . . has extensive experience in class actions"). *See Exhibit 1* (Hedin Declaration at ¶4-¶8); *Exhibit 2* (Owens Declaration) at ¶15-¶27; and *Exhibit 3* (Keogh Declaration) at ¶7-¶14.

23.    Appropriateness. A class action is an appropriate method for fairly and efficiently resolving a dispute when it can "best secure economies of time, effort and expense or accomplish the other ends of equity and justice that class actions seek to obtain." *Ramirez*, 378 Ill.App.3d at 56 (quoting *Walczak v. Onyx Acceptance Corp.*, 365 Ill. App. 3d 664, 679 (2d Dist. 2006)). A class action will best secure economies of time, effort and expense here because it will resolve hundreds of identical claims in one fell swoop instead of requiring individual litigation of the same issues over and over. A class action also will accomplish the ends of equity and justice because the class members are individuals, their claims are relatively small, and there is no reason to assume that most or even many of them possess the time, energy and wherewithal to try to vindicate their rights on their own. As noted by the First District:

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

Our courts have recognized that, 'in a large and impersonal society, class actions are often the last barricade of consumer protection.' The consumer class action is an inviting procedural device to address frauds that cause small damages to large groups. When brought by plaintiffs who have no other avenue of legal redress, the consumer class action provides restitution to the injured and deterrence to the wrongdoer.

*Gordon v, Boden*, 224 Ill. App. 3d 195, 204 (1st Dist. 1991) (quotation omitted). Accordingly, a class action is an appropriate method for resolving this dispute.

24.     Because this case meets all of the requirements for class certification, the proposed class should be certified.

25.     Plaintiff will submit a supplemental memorandum in support of this motion upon the completion of appropriate discovery.

## V.   CONCLUSION

It is beyond reasonable dispute that this case satisfies the requirements of 735 ILCS 5/2-801. To the extent the Defendant nonetheless chooses to contest class certification, discovery will quickly confirm that the requirements of 735 ILCS 5/2-801 are met. Accordingly, Plaintiff requests the following relief:

a.     To the extent Defendant contests class certification, entry of a scheduling order setting dates for Plaintiff to file a memorandum in support of this motion (and for the parties to file response and reply briefs) after the completion of appropriate discovery;

b.     To the extent Defendant declines to contest class certification, an order certifying the proposed class as defined above (or whatever amended definition(s) the Court finds to be appropriate under the law and facts);

c.     Appointment of Ms. Donahue as representative of the certified class; and

11

FILED DATE: 4/17/2019 9:59 AM 2018CH15419

d.      Appointment of Scott D. Owens, P.A., Hedin Hall LLP, and Keogh Law,

Ltd. as class counsel. Dated:

April 17, 2019                      Respectfully submitted,

*s/Michael S. Hilicki*
Keith J. Keogh
Michael Hilicki
Keogh Law, Ltd., Firm No. 39042
55 W. Monroe St., Ste. 3390
Chicago, Il 60603
Tel: 312-726-1092
Fax: 312-726-1093
keith@keoghlaw.com
mhilicki@keoghlaw.com

Scott D. Owens
Scott D. Owens, P.A.
3800 S. Ocean Dr., Ste. 235
Hollywood, FL 33019
Tel: 954-589-0588
Fax: 954-337-0666
scott@scottdowens.com

Frank S. Hedin
David W. Hall
HEDIN HALL LLP
1395 Brickell Ave, Suite 900
Miami, Florida 33131
Tel: 305-357-2107
Fax: 305-200-8801
fhedin@hedinhall.com
dhall@hedinhall.com

*Counsel for Plaintiff*

FILED DATE: 4/17/2019 9:59 AM    2018CH15419

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2019, I caused the above Plaintiff's Amended Motion for Class Certification to be filed and served on the following individuals appearing in this matter for Defendant through the Court's electronic filing system:

Robert E. Sidkey
Cunningham, Meyer, & Vedrine, P.C.
One East Wacker Drive, Suite 2200
Chicago, Illinois 606061
(312) 578-0049

_s/Michael S. Hilicki_
Keogh Law, Ltd.

13

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

# EXHIBIT 1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| GERALDINE DONAHUE, individually, and on behalf of others similarly situated, | ) ) | CASE No. _____ |
| | ) | **JURY TRIAL DEMANDED** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MGM RESORTS INTERNATIONAL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

FILED DATE: 4/17/2019 9:59 AM 2018CH15419

## DECLARATION OF FRANK S. HEDIN IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

I, Frank S. Hedin, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and based on my own personal knowledge, that the following statements are true:

1.      I am one of the attorneys of record for Plaintiff Geraldine Donahue and the proposed class in the above-entitled action, and I submit this declaration in support of Plaintiff's motion for class certification.

2.      I am a member in good standing of the Florida Bar and the State Bar of California; of the United States District Courts for the Southern District of Florida, Northern District of California, Southern District of California, Central District of California, and Western District of Wisconsin; and of the United States Courts of Appeals for the Second Circuit and Seventh Circuit.

3.      I received my Bachelor of Arts from University of Michigan in 2008 and my Juris Doctor, *magna cum laude*, from Syracuse University College of Law in 2012.

4.      I served as law clerk to the Honorable William Q. Hayes, United States District Judge for the Southern District of California, from August 2012 through October 2013, during which time I worked on, *inter alia*, numerous class action matters at all stages of litigation.

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

5.      From early 2014 until February of this year, I practiced law at the Miami office of Carey Rodriguez Milian Gonya, LLP, where I represented both plaintiffs and defendants in consumer and data-privacy class actions, employment-related collective actions, and patent and trademark litigation, and routinely represented indigent litigants in civil rights and housing matters on a *pro bono* basis. In just four years, I built Carey Rodriguez's class action litigation practice from the ground up, became a partner and was appointed head of the firm's practice in this area, and served as class counsel and lead plaintiffs' counsel in many matters of national significance.

6.      I co-founded Hedin Hall LLP in March 2018. With offices in Miami, Florida and San Francisco, California, our firm specializes in securities, consumer protection, and data privacy matters and has "extensive experience in class actions," as recently noted by U.S. District Judge K. Michael Moore of the Southern District of Florida.[1]

7.      I have served as court-appointed class counsel and as lead plaintiffs' counsel in several nationwide class actions. *E.g., Chimeno-Buzzi v. Hollister Co.*, 2015 WL 9269266, at *2 (S.D. Fla. 2014) (class counsel in consumer privacy action, $10 million class settlement); *Farnham v. Caribou Coffee Co., Inc.*, No. 16-cv-295 (W.D. Wisc. 2016) (class counsel in consumer privacy action, $8.5 million class settlement); *Luczak v. National Beverage Corp., et al.*, No. 18-cv-61631-KMM (S.D. Fla.) (class liaison counsel in federal securities action); *Norberg v. Shutterfly, Inc*, No. 15-cv-5351 (N.D. Ill.) (interim class counsel in consumer privacy action); *Cano Lopez v. Miami-Dade County, et al.*, No. 15-cv-22943-MGC (S.D. Fla.) (lead plaintiff's counsel in FACTA litigation); *Groover v. U.S. Corrections, LLC, et al.*, No. 15-cv-61902-BB (lead plaintiff's counsel in civil rights action); *Soukhaphonh v. Hot Topic, Inc.*, No. 16-cv-5024 (C.D. Cal.) (lead plaintiffs' counsel in consumer privacy action); *Rivera v. Google, Inc.*, No. 16-cv-02714 (N.D. Ill.) (lead plaintiffs' counsel in data-privacy action); *Monroy v. Shutterfly, Inc.*, No. 16-cv-10984 (N.D. Ill.) (same).

---

[1]      *See Luczak v. Nat'l Beverage Corp.*, No. 18-cv-61631-KMM, docket entry no. 20, at 4, 5 (S.D. Fla. Oct. 12, 2018) (noting that "Hedin Hall LLP . . . has extensive experience in class actions").

FILED DATE: 4/17/2019 9:59 AM    2018CH15419

8.    My work has resulted in many favorable legal decisions for my clients, notable examples of which include the following published opinions:

    a.  *Norberg v. Shutterfly, Inc.*, 152 F. Supp. 3d 1103 (N.D. Ill. 2015);

    b.  *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088 (N.D. Ill. 2017);

    c.  *Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. 2017);

    d.  *Monroy v. Shutterfly, Inc.*, No. 16 C 10984, 2017 WL 4099846 (N.D. Ill. Sept. 15, 2017);

    e.  *Gullen v. Facebook, Inc.*, No. 3:16-CV-00937-JD, 2018 WL 1989497 (N.D. Cal. Mar. 2, 2018);

    f.  *Chimeno–Buzzi v. Hollister Co.*, No. 14-23120-CIV, 2015 WL 9269266 (S.D. Fla. Dec. 18, 2015);

    g.  *Soukhaphonh v. Hot Topic, Inc.*, No. CV165124DMGAGRX, 2017 WL 2909403 (C.D. Cal. Jan. 13, 2017);

    h.  *Groover v. Prisoner Transportation Servs., LLC*, No. 15-CV-61902, 2018 WL 4743555 (S.D. Fla. Oct. 2, 2018).

9.    Together with Ms. Donahue and co-counsel, I have thoroughly investigated the underlying facts and all potential claims in this matter.

10.    My law firm is well suited to continue to represent and protect the interests of Plaintiff and the proposed class in this matter, and will commit all necessary resources, financial, professional, and otherwise, to ensure that this litigation is administered and prosecuted in the best interests of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of December 2018 at Miami, Florida.

                                  Frank S. Hedin

FILED DATE: 4/17/2018 9:59 AM   2018CH15419

EXHIBIT 2

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| GERALDINE DONAHUE, individually and on behalf of others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) ) | CASE No.: 2018-CH-15419 |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| MGM RESORTS INTERNATIONAL, | ) ) ) ) | |
| Defendant. | ) | |

## DECLARATION OF SCOTT D. OWENS

I, Scott D. Owens, declare under penalty of perjury, as provided for by the laws of the United States, 28 U.S.C. § 1746, that the following statements are true:

1.      I am an attorney who heads a law firm which operates under the name Scott D. Owens, P.A. I am one of the attorneys representing Plaintiff in this matter.

2.      I am currently a member in good standing of the bars of the following courts:

| Court | Date Admitted |
|---|---|
| State of Florida | October 2, 2002 |
| United States District Court Southern District of Florida | October 10, 2008 |
| United States District Court Middle District of Florida | June 23, 2009 |
| Eleventh Circuit Court of Appeals | April 30, 2012 |
| United States District Court | January 9, 2014 |

1

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

| Eastern District of Michigan | |
| --- | --- |
| Sixth Circuit Court of Appeals | May 20, 2015 |

3.      I am a 2000 graduate of the New England School of Law. After a short time working in a debt collection law firm, I began to represent persons in consumer rights litigation, both in State and Federal Court; currently, 100% percent of my workload consists of consumer protection litigation, which includes claims brought under FACTA as well as both the FDCPA, and the TCPA. Since 2007, I have been an active member of the National Association of Consumer Advocates (NACA).

4.      My federal litigation practice was featured in the *Daily Business Review* on June 15, 2009 in an article entitled "Federal Law Used Against Abusive Debt Collectors."

5.      At the specific request of Judge Myriam Lehr of Miami-Dade County, I was asked to conduct a Continue Legal Education (CLE) seminar on the basics of FDCPA litigation entitled "How to Defend Against Abusive Debt Collectors"; the event was sponsored by the Miami-Dade Consumer Advocate and held on October 30, 2009.

6.      I was featured on WSVN News (Channel 7) on November 22, 2010 for my pro-consumer work in the area of the Fair Debt Collection Practices Act.

7.      I was a Guest Lecturer at the National Consumer Law Center's "Fair Debt Collection Training Conference" held in Jacksonville, Florida on March 5-6, 2010.

8.      I was Featured Guest Speaker at the request of the Miami-Dade Consumer Services Department during *National Consumer Protection Week* on March 11, 2011.

9.      I instructed a CLE seminar for Legal Services of Greater Miami, Inc., dealing with consumer protection (May 2011).

10.     I conducted a CLE on the topic of consumer protection at Florida International University (June 2012).

2

FILED DATE: 4/17/2019 9:59 AM   2016CH15419

11.    I conducted a webinar dealing with the FDCPA and TCPA at the request of the National Association of Consumer Advocates (December 2012).

12.    I was invited by the Consumer Protection Law Committee to be a guest speaker at the Florida Bar's Annual Convention to be held in Orlando, Florida (June 25-28, 2014). My topics of discussion included the Telephone Consumer Protection Act.

13.    I regularly attend legal seminars hosted by the National Consumer Law Center (NCLC), including the following:

*National Consumer Law Center, 17th Annual Consumer Rights Litigation Conference (2008)*

*National Consumer Law Center, Fair Debt Collection Training Conference (2009)*

*National Association of Consumer Advocates, Fair Credit Reporting Act Conference (2009)*

*National Consumer Law Center, 18th Annual Consumer Rights Litigation Conference (2009)*

*National Consumer Law Center, Fair Debt Collection Training Conference (2010)*

*National Consumer Law Center, 19th Annual Consumer Rights Litigation Conference (2010)*

*National Consumer Law Center, 20th Annual Consumer Rights Litigation Conference (2011)*

*National Consumer Law Center, 21st Annual Consumer Rights Litigation Conference (2012)*

*National Consumer Law Center 22nd Annual Consumer Rights Litigation Conference (2013)*

*National Consumer Law Center, Fair Debt Collection Training Conference (2014)*

*National Consumer Law Center 23rd Annual Consumer Rights*

3

FILED DATE: 4/17/2019 9:59 AM 2018CH15419

*Litigation Conference (2014)[1]*

*National Consumer Law Center, Fair Debt Collection Training Conference (2015)*

*National Consumer Law Center 24th Annual Consumer Rights Litigation Conference (2015)*

*National Consumer Law Center, Fair Debt Collection Training Conference (2016)*

*National Consumer Law Center 25th Annual Consumer Rights Litigation Conference (2016)*

*National Consumer Law Center, Fair Debt Collection Training Conference (2017)*

*National Consumer Law Center 26th Annual Consumer Rights Litigation Conference (2017)*

*National Consumer Law Center, Fair Debt Collection Training Conference (2018)*

*National Consumer Law Center 27th Annual Consumer Rights Litigation Conference (2018)*

14. Of the aforesaid legal seminars, I have attended at least five intensive full-day seminars which have dealt exclusively with class action litigation; I am familiar with the ethical and professional guidelines governing class action litigation.

15. I am generally regarded by my peers as one of the leading authorities in the State of Florida with respect to the Fair and Accurate Credit Transactions Act ("FACTA"), the Fair Debt Collection Practices Act, and the Telephone Consumer Protection Act.

16. My law practice was featured on the cover of the Sun-Sentinel on September 11, 2011 in an article entitled *Ticked off at debt collectors calling their cellphones, Floridians are fighting back.* The article dealt specifically with the Telephone Consumer Protection Act.

---

[1] I also served as the co-chairperson for the aforementioned conference.

4

17.    I was appointed as class counsel in the matter of *McMullen v. Jennings &
Valancy, P.A.*, Case No. 10-CV-60050. In certifying me for class counsel, Judge Adalberto
Jordan stated, "I find that Mr. Owens can fairly and adequately represent the interests of the
class..." and "Mr. Owens has the requisite mastery in these types of claims." I also served as
class counsel in the case of *Lithgow v. Eisinger, Brown, Lewis, Frankel, Chaiet & Krut, P.A.*
Case No. 0-10-cv-61185-WJZ [See Order dated Dec. 9, 2010]. In March 2012, I was
appointed class counsel in *Lee v. Greenspoon Marder*, Case No. 10-cv-61184-
Lenard/O'Sullivan and I also served as class counsel in *Bummolo v. The Law Offices of
Charles W. McKinnon, P.L.*, No. 2:11- cv-14408-KMM and served as class counsel in
*Collins v. Erin Capital Management, LLC*, No. 1:12−cv−22839−CMA; *Rigney v. Livingston
Financial, LLC*, No. 6:12-cv-00617-RBD-TBS; and *Walker v. Greenspoon Marder, P.A.*, No.
13-CV-14487, 2015 WL 233472 (S.D. Fla. Jan. 5, 2015).

18.    I was also appointed joint interim lead counsel in the Southern District of
Florida TCPA class action lawsuit, *Soto v. Gallup, Inc.*, No. 0:13-cv-61747-RSR wherein
Judge Robin S. Rosenbaum stated that **"Scott D. Owens has vast experience in the area of
consumer protection litigation..."** (emphasis added); I was later appointed co-lead counsel
after the case was later certified ($12 million-dollar common fund settlement).

19.    I was appointed co-lead class counsel in the TCPA class action, *De Los Santos
v. Millward Brown, Inc.*, No. 13-80670-CV, ECF No. 77 (S.D. Fla. Feb. 10, 2015). The case
established an $11 million-dollar common fund settlement.

20.    I served as co-lead counsel in the TCPA class action, *Guarisma v. ADCAHB
Medical Coverages, Inc., et al.*, No. 1:13-cv-21016 (S.D. Fla. June 24, 2015) wherein my
firm established a common fund of $4.5 million dollars in settlement. My firm, along with
co-counsel was awarded one-third of the common fund (plus costs).

21.    I served as co-lead counsel in the successful FACTA class action, *Legg v.
Laboratory Corporation of America Holdings*, No. 14−61543-CIV (S.D. Fla. Filed July 6,
2014) ($11 million-dollar settlement).

FILED DATE: 4/17/2019 9:59 AM  2018CH15419

22.     I served as co-lead counsel in the successful FACTA class action, *Legg v. Spirit Airlines, Inc.*, No. 14−cv−61978 (S.D. Fla. Filed August 29, 2014) ($7.5 million-dollar settlement).

23.     I served as co-lead counsel in the successful FACTA class action, *Wood v. J. Choo USA, Inc,* Case No. 15−cv−81487 (S.D. Fla. Filed Oct. 27, 2015) ($2.5 million-dollar class settlement).

24.     I served as co-lead counsel in the successful FACTA class action, *Guarisma v. Microsoft Corporation*, Case No. 15−cv−24326 (S.D. Fla. Filed Nov. 20, 2015) ($1.2 million-dollar class settlement).

25.     I served as co-lead counsel in the successful FACTA class action, *Legg v. E-Z Rent a Car*, No. 14−cv−01716−PGB−DAB (M.D. Fla. Filed Oct. 22, 2014).

26.     I am also co-counsel in *Melito v American Eagle Outfitters, Inc.*, Case No. 14-cv-02440 (E.D.N.Y. Filed Apr. 8, 2014) ($14.5 million-dollar class settlement, currently on appeal).

27.     I represented the Appellee at the Eleventh Circuit in the matter of *Muransky v. Godiva Chocolatier, Inc.*, 905 F.3d 1200 (11th Cir. 2018) (holding that consumer plaintiff had suffered a concrete for alleged violation of FACTA and affirming a $6.3 million-dollar class settlement). The Objector-Appellant has petitioned for *en banc* review in that matter.

28.     I have conducted a thorough pre-suit investigation of this matter and am fully prepared to devote my firm's full resources to serve the best interest of the Class.

Executed at Hollywood, Florida, on Wednesday, December 12, 2018.

s/ *Scott D. Owens*
Scott D. Owens, Esq.
SCOTT D. OWENS, P.A.
3800 S. Ocean Dr., Suite 235
Hollywood, Florida 33019

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

Telephone: 954-589-0588
Facsimile: 954-337-0666
scott@scottdowens.com

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

# EXHIBIT 3

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | |
|---|---|
| GERALDINE DONAHUE, individually and on behalf of others similarly situated, | ) ) ) |
| Plaintiff, | ) **CASE No.: 2018-CH-15419** ) |
| v. | ) **JURY TRIAL DEMANDED** ) |
| MGM RESORTS INTERNATIONAL, | ) ) |
| Defendant. | ) ) ) |

**DECLARATION OF KEITH J. KEOGH**

Keith J. Keogh declares under penalty of perjury, that the following statements are true:

1.       I am over the age of eighteen and am fully competent to make this declaration. This declaration is based upon my personal knowledge and if called upon to testify to the matters stated herein, I could and would do so competently.

2.       As shown below, my firm has regularly engaged in major complex litigation involving FACTA and other consumer issues. My firm has the resources necessary to conduct litigation of this nature, and has experience prosecuting class actions of similar size, scope, and complexity to the instant case. Additionally, I have often served as class counsel in similar actions.

3.       Keogh Law, Ltd. consists of six attorneys and focuses on consumer protection class actions.  I am a shareholder of the firm and member of the bars of the United States Court of Appeals for the First, Second, Third, Seventh, Ninth and Eleventh Circuits, Eastern District of Wisconsin, Northern District of Illinois, Central District of Illinois, Southern District of Indiana, District of Colorado, Middle District of Florida, Southern District of Florida, the Illinois State Bar,

- 1 -

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

and the Florida State Bar, as well as several bar associations and the National Association of Consumer Advocates.

4.    In 2015, the National Association of Consumer Advocates honored me as the Consumer Attorney of the Year for my work in courts and with the FCC insuring the safeguards of the TCPA were maintained.

5.    My firm was class counsel in the four largest all cash FACTA class action settlements. *Flaum v Doctors Associates,* 16-CV-61198-CMA (S.D. Fla. Pending Final Approval)($30.9 million dollars); *Legg v. Laboratory Corporation of America Holdings,* No. 14-cv-61543-RLR (S.D. Fla., filed July 6, 2014) ($11 million dollars); *Legg v. Spirit Airlines, Inc.,* No. 14-cv-61978-JIC (S.D. Fla., filed Aug. 29, 2014) ($7.5 million dollars) and *Muransky v. Godiva Chocolatier, Inc.,* 15-cv-60716-WPD (S.D. Fla., filed Apr. 6, 2015) ($6.3 million dollars)(on appeal).

6.    I was also appointed class counsel in numerous FACTA and FCRA class actions *Osada v. Experian Info. Solutions, Inc.*, 2012 U.S. Dist. LEXIS 42330 (N.D. Ill. Mar. 28, 2012) (FCRA class); *Cicilline* v. *Jewel Food Stores, Inc.*, 542 F.Supp.2d 831 (N.D.Ill. 2008)(Co-Lead Counsel for FACTA class); *Harris* v. *Best Buy Co.,* 07 C 2559,2008 U.S. Dist. LEXIS 22166 (N.D.Ill. March 20, 2008)( FACTA class); *Matthews* v. *United Retail, Inc.,* 248 F.R.D. 210 (N.D.Ill. 2008)( FACTA class); *Redmon* v. *Uncle Julio's, Inc.,* 249 F.R.D. 290 (N.D.Ill. 2008)( FACTA class); *Harris* v. *Circuit City Stores, Inc.,* 2008 U.S. Dist. LEXIS 12596,2008 WL 400862 (N.D. Ill. 2008)( FACTA class); *Pacer* v *Rockenbach Chevrolet Sales, Inc.,* 07 C 5173 (N.D. Ill. 2008)( FACTA class).

7.    I am class counsel in some of the largest Telephone Consumer Protection Act ("TCPA") settlements in the country. *See Hageman v. AT&T Mobility LLC, et al.,* Case 1:13-cv-

FILED DATE: 4/17/2019 9:59 AM  2018CH15419

00050-DLC-RWA (D. MT.) (Co-Lead) (Final Approval Granted February 11, 2015 providing for

a $45 million settlement for a class of 16,000 persons) and *Capital One Telephone Consumer*

*Protection Act Litigation*, et al., 12-cv-10064 (N.D. Ill. Judge Holderman) (Liaison Counsel and

additional Class Counsel)(Final Approval Granted February 12, 2015 for a $75 million settlement).

8.      In addition to the above, I was lead or class counsel in the following consumer

class settlements: *See Leung v XPO Logistics, Inc.*, 15 CV 03877, (N.D. Ill. 2018) (TCPA);

*Martinez v Medicredit*, 4:16CV01138 ERW (E.D. Mo. 2018) (TCPA); *Martin v. Wells Fargo*

*Bank, N.A.*, 16-cv-09483 (N.D. Ill. 2018)(FCRA); *Town & Country Jewelers, LLC v.*

*Meadowbrook Insurance Group, Inc., et al*, 15-CV-02419-PGS-LHG (D. NJ. 2018)(TCPA);

*Legg v AEO*, 14-cv-02440-VEC (TCPA)(on appeal after final approval from professional

objector); *Markos v Wells Fargo*, 15-cv-01156-LMM (N.D. Ga. (TCPA); *Ossola v Amex* 1:13-

cv-04836 (N.D. Ill. 2016)(TCPA);  *Luster v. Wells Fargo*, 15-1058-TWT (N.D. Ga.)(TCPA);

*Prather v Wells Fargo*, 15-CV-04231-SCJ (ND. Ga)(TCPA); *Joseph et al. v. TrueBlue, Inc. et*

*al.*, Case No. 3:14-cv-05963 (D. Wa.) (TCPA case pending final approval for $5 million for

1,948 class members); *Tripp v. Berman & Rabin, P.A.*, 310 F.R.D. 499 (D. Kan. 2015); *Willett,*

*et al. v. Redflex Traffic Systems, Inc., et al.*, Case No. 13-cv-01241-JCH-RHS; *In re Convergent*

*Outsourcing, Inc. Telephone Consumer Protection Act Litigation,* Master Docket No. 3:13-cv-

1866-AWT (D. Conn) (Interim Co-Lead); *De Los Santos v Millword Brown, Inc.*, 9:13-cv-

80670-DPG (S.D. Fl) (TCPA); *Allen v. JPMorgan Chase Bank, N.A.* 13-cv-08285 (N.D. Ill.

Judge Pallmeyer) (TCPA); *Cooper v NelNet*, 6:14-cv-314-Orl-37DAB (M.D. Fl.) (TCPA);

*Thomas v Bacgroundchecks*.com, 3:13-CV-029-REP (E.D. Va.)(additional class counsel);

*Carrero v. LVNV Funding*, LLC, 11-CV-62439-KMW (S.D. Fl. 2016)(Unlicensed debt collector

under Fl. law); *Lopera v RMS*, 12-c-9649 (N.D. Ill. Judge Wood),  *Kubacki v Peapod*, 13-cv-729

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

(N.D. Ill. Judge Mason); *Wojcik v. Buffalo Bills, Inc.*, 8:12 CV 2414-SDM-TBM (M.D. Fl. Judge Merryday) (TCPA); *Curnal v LVNV Funding, LLC.*, 10 CV 1667 (Wyandotte County, KS 2014) (Unlicensed debt collector under KS law); *Cummings v Sallie Mae*, 12 C-9984 (N.D. Ill. Judge Gottschall)   (TCPA) (co-lead); *Brian J. Wanca, J.D., P.C. v. L.A. Fitness International, LLC*, Case No. 11-CV-4131 (Lake County, Il. Judge Berrones) (TCPA); *Osada v. Experian Info. Solutions, Inc.*, 2012 U.S. Dist. LEXIS 42330 (N.D. Ill. Mar. 28, 2012) (FCRA class); *Saf-T-Gard International, Inc. v. Vanguard Energy Services, L.L.C., et al*, 12-cv-3671 (N.D. Ill. 2013 Judge Gottschall) (TCPA); *Saf-T-Gard v TSI*, 10-c-7671, (N.D. Ill. Judge Rowland) (TCPA); *Cain v Consumer Portfolio Services, Inc.* 10-cv-02697 (N.D. Ill. Judge Keys) (TCPA); *Iverson v Rick Levin & Associates*, 08 CH 42955 Circuit Court Cook County (Judge Cohen) (TCPA); *Saf-T-Gard v Seiko*, 09 C 776 (N.D. Ill. Judge Bucklo) (TCPA); *Jones v. Furniture Bargains*, LLC, 09 C 1070 (N.D. Ill) (FLSA collective action); *Saf-T-Gard v Metrolift*, 07 CH 1266 Circuit Court Cook County (Judge Rochford) (Co-Lead) (TCPA); *Bilek v Countrywide*, 08 C 498 (N.D. Ill. Judge Gottschell); *Pacer v Rochenback*, 07 C 5173 (N.D. Ill. Judge Cole); *Overlord Enterprises v. Wheaton Winfield Dental Associates*, 04 CH 01613, Circuit Court Cook County (Judge McGann) (TCPA); *Whiting v SunGard*, 03 CH 21135, Circuit Court Cook County (Judge McGann) (TCPA); *Whiting v. Golndustry, 03* CH 21136, Circuit Court Cook County (Judge McGann) (TCPA).

9.    I was the attorney primarily responsible for the following class settlements: *Wollert v. Client Services*, 2000 U.S. Dist. LEXIS 6485 (N.D. Ill. 2000); *Rentas v. Vacation Break USA*, 98 CH 2782, Circuit Court of Cook County (Judge Billik); *McDonald v. Washington Mutual Bank*, supra; *Wright v. Bank One Credit Corp.*, 99 C 7124 (N.D. Ill. Judge Guzman); *Arriaga v. Columbia Mortgage*, 01 C 2509 (N.D. Ill. Judge Lindberg); *Frazier v. Provident Mortgage*, 00 C

- 4 -

FILED DATE: 4/17/2019 9:59 AM 2018CH15419

5464 (N.D. Ill. Judge Coar); *Largosa* v. *Universal Lenders,* 99 C 5049 (N.D. Ill. Judge Leinenweber); *Arriaga* v. *GNMortgage,* (N.D. Ill. Judge Holderman); *Williams* v. *Mercantile Mortgage,* 00 C 6441 (N.D. Ill. Judge Pallmeyer); *Reid* v. *First American Title,* 00 C 4000 (N.D. Ill. Magistrate Judge Ashman); *Fabricant* v. *Old Kent, 99* C 6846 (N.D. Ill. Magistrate Judge Bobrick); *Mendelovits* v. *Sears,* 99 C 4730 (N.D. Ill. Magistrate Judge Brown); *Leon* v. *Washington Mutual,* 01 C 1645 (N.D. Ill. Judge Alesia).

10.    The individual class members' recovery in some of these settlements was substantial. For example, in one of the cases against a major bank the class members' recovery was 100% of their actual damages resulting in a payout of $1,000 to $9,000 per class member. In another case against a major lender regarding mortgage servicing responses, each class member who submitted a claim form received $1,431. *McDonald v. Washington Mutual Bank.*

11.    In addition, to the above settlements and class actions, I was appointed class counsel in *In Re Convergent Outsourcing, Inc. Telephone Consumer Protection Act Litigation,* Master Docket No. 3:13-cv-1866-AWT (D. Conn) (Interim Co-Lead); *Galvan v. NCO Fin. Sys.,* 2012 U.S. Dist. LEXIS 128592 (N.D. Ill. 2012);; *Pesce v First Credit Services,* 11-cv-01379 (N.D. Ill. December 19 2011) (TCPA Class); *Smith v Greytsone Alliance,* 09 CV 5585 (N.D. Ill. 2010).

12.    Some reported cases of mine involving consumer protection include: *Franklin v. Parking Revenue Recovery Servs.,* 832 F.3d 741 (7th Cir. 2016);*Galvan v. NCO Portfolio Mgmt. Inc.,* 794 F.3d 716, 721 (7th Cir. 2015); *Leeb v. Nationwide Credit Corp.,* 806 F.3d 895 (7th Cir. 2015); S*mith v Greystone,* 772 F.3d 448 (7th Cir. 2014); *Clark v Absolute Collection Agency,* 741 F.3d 487 (4th 2014); *Lox v. CDA, Ltd,* 689 F.3d 818 (7th Cir. 2012)*Townsel v. DISH Network L.L.C.,* 668 F.3d 967 (7th Cir. Ill. 2012); *Catalan v. GMAC Mortgage Corp.,* No. 09-2182 (7th Cir. 2011) ; *Gburek v Litton Loan,* 614 F.3d 380 (7th Cir. 2010); *Sawyer v. Ensurance Insurance*

FILED DATE: 4/17/2019 9:59 AM 2018CH15419

*Services* consolidated with *Killingsworth* v. *HSBC Bank Nev., NA.,* 507 F3d 614, 617 (7th Cir.

2007), *Echevarria et al.* v. *Chicago Title and Trust Co.,* 256 F3d 623 (7th Cir. 2001*); Demitro* v.

*GMAC,* 388 Ill. App. 3d 15, 16 (lst Dist. 2009); *Hill* v. *St. Paul Bank,* 329 Ill. App. 3d 7051,

1768 N.E.2d 322 (lst Dist. 2002); *In re Mercedes-Benz Tele Aid Contract Litig., 2009* U.S. Dist.

LEXIS 35595 (D.N.J. 2009); *Catalan v. RBC Mortg. Co.,* 2009 U.S. Dist. LEXIS 26963 (N.D.

Ill. 2009); *Elkins v. Equifax, Inc.,* 2009 U.S. Dist. LEXIS 18522 (N.D. Ill. 2009*); Harris* v.

*DirecTV Group, Inc.,* 2008 U.S. Dist. LEXIS 8240 (N.D. Ill. 2008); *In re TJX Cos., Inc., Fair &*

*Accurate Credit Transactions Act* (FACTA) Litig., 2008 U.S. Dist. LEXIS 38258 (D. Kan.

2008); *Martin* v. *Wal- Mart Stores, Inc.,* 2007 U.S. Dist. LEXIS 89715 (N.D. Ill. 2007); *Elkins* v.

*Ocwen Fed. Sav. Bank Experian Info. Solutions, Inc.,* 2007 U.S. Dist. LEXIS 84556 (N.D. Ill.

2007); *Harris* v. *Wal-Mart Stores, Inc.,* 2007 U.S. Dist. LEXIS 76012 (N.D. Ill. *2007); Stegvilas*

v. *Evergreen Motors, Inc.,* 2007 U.S. Dist. LEXIS 35303 (N.D. Ill. 2007); *Cook* v. *River Oaks*

*Hyundai, Inc.,* 2006 U.S. Dist. LEXIS 21646 (N. D. Ill. 2006); *Gonzalez* v. *W. Suburban Imps.,*

Inc., 411 F. Supp. 2d 970 (N.D. Ill. 2006); *Eromon* v. *GrandAuto Sales, Inc.,* 333 F. Supp. 2d

702 (N.D. Ill. 2004); *Williams* v. *Precision Recovery, Inc.,* 2004 U.S. Dist. LEXIS 6190 (N.D.

Ill. 2004); *Doe* v. *Templeton,* 2003 U.S. Dist. LEXIS 24471 (N.D. Ill. 2003); *Ayala* v.

*Sonnenschein Fin. Servs.,* 2003 U.S. Dist. LEXIS 20148 (N.D. Ill. 2003); *Gallegos* v. *Rizza*

*Chevrolet, Inc., 2003* U.S. Dist. LEXIS 18060 (N.D. Ill. 2003); *Szwebel* v. *Pap's Auto Sales,*

*Inc.,* 2003 U.S. Dist. LEXIS 13044 (N.D. Ill. 2003); *Johnstone* v. *Bank of America,* 173 F.

Supp.2d 809 (N.D. Ill. 2001); *Leon* v. *Washington Mutual Bank,* 164 F. Supp.2d 1034 (N.D. Ill.

2001); *Ploog v. HomeSide Lending,* 2001 WL 987889 (N.D. Ill. 2001); *Christakos* v. *Intercounty*

*Title,* 196 F.R.D. 496 (N.D. Ill. 2000); *Batten* v. *Bank One,* 2000 WL 1364408 (N.D. Ill. 2000);

*McDonald* v. *Washington Mutual Bank,* 2000 WL 875416 (N.D. Ill. 2000); and *Williamson* v.

FILED DATE: 4/17/2019 9:59 AM  2018CH15419

*Advanta Mtge Corp.,* 1999 U.S. Dist. LEXIS 16374 (N.D. Ill. 1999). The *Christakos* case significantly broadened title and mortgage companies' liability under Real Estate Settlement Procedures Act ("RESPA") and *McDonald* is the first reported decision to certify a class regarding mortgage servicing issues under the Cranston-Gonzales Amendment of RESPA.

13.    I have argued before the Seventh Circuit, the First District of Illinois and the MultiLitigation Panel in *Townsel v. DISH Network L.L.C.,* 668 F.3d 967 (7th Cir. Ill. 2012); *Catalan* v *GMACM* (7th Cir. 2010); *Gburek* v *Litton Loan Servicing* (7th Cir. 2009); *Sawyer* v *Esurance* (7th Cir. 2007), *Echevarria, et al.* v. *Chicago Title and Trust Co.* (7th Cir. 2001); *Morris* v *Bob Watson,* (lst. Dist. 2009); *Iverson* v *Gold Coast Motors Inc.,* (lst. Dist. 2009); *Demitro* v. *GMAC* (lst Dist. 2008), *Hill v. St. Paul Bank* (lst Dist. 2002), and *In Re: Sears, Roebuck & Company Debt Redemption Agreements Litigation* (MDL Docket No. 1389.) *Echevarria* was part of a group of several cases that resulted in a nine million dollar settlement with Chicago Title.

14.    My published works include co-authoring and co-editing the 1997 supplement to *Lane's Goldstein Trial Practice Guide* and *Lane's Medical Litigation Guide.*

15.    I have lectured extensively on consumer litigation, including extensively on class actions and consumer claims.  For example, I:

a.  Presented at the 2018 Fair Debt Collection Training Conference for two sessions on the TCPA.

b.  Presented at the National Consumer Law Center 2017 annual conference on the TCPA.

c.  Presented at the National Consumer Law Center 2016 annual conference on the TCPA.

d.  Presented at the 2016 Fair Debt Collection Training Conference for a session on TCPA Developments.

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

e. Presented for the National Association of Consumer Advocates November 2015 webinar titled Developments and Anticipated Impact of Recent FCC TCPA Rules.

f. Presented at the National Consumer Law Center 2015 annual conference in San Antonio, Tx. on the TCPA.

g. Presented at the 2015 Fair Debt Collection Training Conference for three sessions on the TCPA.

h. Presented at the National Consumer Law Center 2014 annual conference in Tampa Fl. for two sessions on the TCPA.

i. Panelist for the December 2013 Strafford CLE Webinar titled TCPA Class Actions: Pursuing or Defending Claims Over Phone, Text and Fax Solicitations.

j. Panelist for the December 2014 Chicago Bar Association Class Action Seminar titled "Class Action Settlements in the Seventh Circuit: Navigating Turbulent Waters."

k. Presented at the 2014 Fair Debt Collection Training Conference for three sessions on the TCPA.

l. Panelist for the December 2013 Strafford CLE Webinar titled Class Actions for Telephone and Fax Solicitation and Advertising Post-Mims. Leveraging TCPI lectured at the 2014 Fair Debt Collection Training Conference for three sessions on the TCPA.

m. Panelist for the December 2013 Strafford CLE Webinar titled Class Actions for Telephone and Fax Solicitation and Advertising Post-Mims. Leveraging TCPA Developments in Federal Jurisdiction, Class Suitability, and New Technology.

n. Presented for the National Association of Consumer Advocates November 2013 webinar titled Current Telephone Consumer Protection Act Issues Regarding Cell Phones.

FILED DATE: 4/17/2019 9:59 AM  2018CH15419

o. Presenter for the November 2013 Chicago Bar Association Class Action Committee presentation titled Future of TCPA Class Actions.

p. Speaker at the Social Security Administration's Chicago office in August 2013 on a presentation on identity theft, which included consumers' rights under the Fair Credit Reporting Act.

q. Panelist for the May 14, 2013 Chicago Bar Association Class Action Seminar titled "The Shifting Landscape of Class Litigation" as well as for the March 20, 2013 Strafford CLE webinar titled "Class Actions for Telephone and Fax Solicitation and Advertising Post-Mims. Leveraging TCPA Developments in Federal Jurisdiction, Class Suitability, and New Technology."

r. Lectured at the June 6, 2013 Consumer Law Committee of the Chicago Bar Association on the topic "Employment Background Reports under the Fair Credit Reporting Act: Improper consent forms to failure to provide background report prior to adverse action."

s. Lectured at the 2013 Fair Debt Collection Training Conference for three sessions on the TCPA.

t. Presented at the 2012 National Consumer Law Center annual conference for a session on the TCPA.

u. Presented at the 2012 Fair Debt Collection Training Conference for a session on the TCPA.

v. Panelist for Solutions for Employee Classification & Wage/Hour Issues at the 2011 Annual Employment Law Conference hosted by Law Bulletin Seminars.

w. Lectured at the 2011 National Consumer Law Center conference for a session titled Telephone Consumer Protection Act: Claims, Scope, Remedies as well as lectured at the

FILED DATE: 4/17/2019 9:59 AM 2018CH15419

same 2011 National Consumer Law Center conference for a double session titled ABC's of Class Actions.

x. Taught *Defenses to Foreclosures* for Lorman Education Services, which was approved for CLE credit, in 2008 and 2010.

y. Guest lecturer on privacy issues at University of Illinois at Urbana-Champaign School of Law. In March 2010.

z. Guest speaker for the Legal Services Office of The Graduate School and Kellogg MBA Program at Northwestern University for its seminar titled: "Financial Survival Guide: Legal Strategies for Graduate Students During A Period of Economic Uncertainty."

16.　I was selected as an Illinois Super Lawyer in 2018-2014 and an Illinois Super Lawyer Rising Star each year from 2008 through 2013 and my cases have been featured in local newspapers such as the Chicago Tribune, Chicago Sun-Times, The Naperville Sun, Daily Herald and RedEye.

17.　In April 2011, Timothy J. Sostrin joined the firm. He is a member in good standing of the Illinois bar, the U.S. District Court District of Colorado, U.S. District Court Northern District of Illinois, U.S. District Court Northern and Southern Districts of Indiana, U.S. District Court Eastern and Western Districts of Michigan, U.S. District Court Eastern District of Missouri, U.S. District Court Southern District of Texas and U.S. District Court Eastern and Western Districts of Wisconsin.

18.　Timothy J. Sostrin has zealously represented consumers in Illinois and in federal litigation nationwide against creditors, debt collectors, retailers, and other businesses engaging in unlawful practices. Tim has extensive experience with consumer claims brought under the Fair Debt Collection Practices Act, The Telephone Consumer Protection Act, the Fair Credit Reporting

- 10 -

FILED DATE: 4/17/2019 9:59 AM  2018CH15419

Act, the Electronic Fund Transfer Act, and Illinois law.  Some of Tim's representative cases include: *Osada v. Experian Info. Solutions, Inc.*, 2012 U.S. Dist. LEXIS 42330 (N.D. Ill. Mar. 28, 2012) (granting class certification*); Galvan v. NCO Financial Systems, Inc.*, 2012 U.S. Dist. LEXIS 128592 (N.D. Ill. 2012)(granting class certification); *Saf-T-Gard International, Inc. v. Vanguard Energy Services, LLC*, (2012 U.S. Dist. LEXIS 174222 (N.D. Ill. December 6, 2012)(granting class certification); *Jelinek v. The Kroger Co.*, 2013 U.S. Dist. LEXIS 53389 (N.D. Ill. 2013)(denying defendant's motion to dismiss); *Hanson v. Experian Information Solutions, Inc.*, 2012 U.S. Dist. LEXIS 11450 (N.D. Ill. January 27, 2012)(denying defendant's motion for summary judgment); *Warnick v. DISH Network, LLC*, 2013 U.S. Dist. LEXIS 38549 (D. Colo. 2013)(denying defendant's motion to dismiss);*Torres v. Nat'l Enter. Sys.*, 2013 U.S. Dist. LEXIS 31238 (N.D. Ill. 2013)(denying defendant's motion to dismiss); *Griffith v. Consumer Portfolio Serv.*, 838 F. Supp. 2d 723 (N.D. Ill. 2011)(denying defendant's motion for summary judgment); *Frydman et al v. Portfolio Recovery Associates, LLC*, 2011 U.S. Dist. LEXIS 69502 (N.D. Ill 2011)(denying defendant's motion to dismiss); *Rosen Family Chiropractic S.C. v. Chi-Town Pizza*, 2013 U.S. Dist. LEXIS 6385 (N.D. Ill. 2013)(denying defendant's motion to dismiss); *Sengenberger v. Credit Control Services, Inc.*, 2010 U.S. Dist. LEXIS 43874 (N.D. Ill. May 5, 2010) (granting summary judgment on TCPA claim);

19.     Tim is a member of the National Association of Consumer Advocates and ISBA. He received his Juris Doctorate, *cum laude*, from Tulane University Law School in 2006.

20.     In 2014, Michael Hilicki joined the firm. He has spent nearly all of his approximately 20-year legal career helping consumers and workers subjected to unfair and deceptive business practices, and unpaid wage practices. He is experienced in a variety of consumer and wage-related areas including, but not limited to, the Fair Debt Collection Practices

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

Act, Truth-in-Lending Act, Fair Credit Reporting Act, Real Estate Settlement Procedures Act, Illinois Consumer Fraud & Deceptive Business Practices Act, Telephone Consumer Protection Act, Fair Labor Standards Act and the Illinois Wage & Hour Law. He is experienced in all aspects of consumer and wage litigation, including arbitrations, trials and appeals.

21.     Examples of the numerous certified class actions in which Michael has represented consumers or workers include: *Legg v. Spirit Airlines, Inc.*, No. 14-61978-Civ (S.D. Fla.); *Eibert v. Jaburg & Wilk, P.C.*, 13-cv-301 (D. Minn.); *Brinkley v. Zwicker & Associates, P.C.*, 13 C 1555 (N.D. Ill.); *Kraskey v. Shapiro & Zielke, LLP*, 11-cv-3307 (D. Minn.); *Short v. Anastasi & Associates, P.A.*, 11-cv-1612 SRN/JSM (D. Minn.); *Kimball v. Frederick J. Hanna & Associates, P.C.*, 10-cv-130 MJD/JJG (D. Minn.); *Murphy v. Capital One Bank*, 08 C 801 (N.D. Ill.); *In re American Family Mut. Ins. Co. Overtime Pay Litig.*, 06-cv-17430 WYD/CBS (D. Colo.); *Nettles v. Allstate Ins. Co.*, 02 CH 14426 (Cir. Ct. Cook Cty.); *Sanders v. OSI Educ. Servs., Inc.*, 01 C 2081 (N.D. Ill.); *Kort v. Diversified Collection Servs., Inc.*, 01 C 0689 (N.D. Ill.); *Hamid v. Blatt Hasenmiller, et al.*, 00 C 4511 (N.D. Ill.); *Durkin v. Equifax Check Servs., Inc.*, 00 C 4832 (N.D. Ill.); *Torres v. Diversified Collection Services, et al.*, 99-cv-00535 (RL-APR) (N.D. Ind.); *Morris v. Trauner Cohen & Thomas*, 98 C 3428 (N.D. Ill.), *Mitchell v. Schumann*, 97 C 240 (N.D. Ill.); *Pandolfi, et al. v. Viking Office Prods., Inc.*, 97 CH 8875 (Cir. Ct. Cook Cty.); *Trull v. Microsoft Corp.*, 97 CH 3140 (Cir. Ct. Cook Cty.); *Deatherage v. Steven T. Rosso, P.A.*, 97 C 0024 (N.D. Ill.); *Young v. Meyer & Njus, P.A.*, 96 C 4809 (N.D. Ill.); *Newman v. Boehm, Pearlstein & Bright, Ltd.*, 96 C 3233 (N.D. Ill.); *Holman v. Red River Collections, Inc.*, 96 C 2302 (N.D. Ill.); *Farrell v. Frederick J. Hanna*, 96 C 2268 (N.D. Ill.); *Blum v. Fisher and Fisher*, 96 C 2194 (N.D. Ill.); *Riter v. Moss & Bloomberg, Ltd.*, 96 C 2001 (N.D. Ill.); *Clayton v. Cr Sciences Inc.*, 96 C 1401 (N.D. Ill.); *Thomas v. MAC/TCS Inc., Ltd.*, 96 C 1519 (N.D. Ill.); *Young v. Bowman, et al.*, 96 C

1767 (N.D. Ill.); *Depcik v. Mid-Continent Agencies, Inc.*, 96 C 8627 (N.D. Ill.); and *Dumetz v. Alkade, Inc.*, 96 C 4002 (N.D. Ill.)

22. Michael has lectured on consumer law issues at Upper Iowa University and the Chicago Bar Association. He is a member of the Trial Bar of the United States District Court for the Northern District of Illinois, and he has represented consumers in state and federal courts around the country on a *pro hac vice* basis.

23. Michael's published work includes *"AND THE SURVEY SAYS..." When Is Evidence of Actual Consumer Confusion Required to Win a Case Under Section 1692g of the Fair Debt Collection Practices Act in the Seventh Circuit?*, 13 Loy. Consumer L. Rev. 224 (2001).

24. In 2015, Amy Wells joined the firm. Amy brings a wealth of consumer litigation experience. In 2014, Amy Wells was installed as the President of the Miami Valley Trial Lawyers Association. The Miami Valley Trial Lawyers Association (MVTLA) is an association of attorneys throughout Ohio's Miami Valley (Montgomery, Miami, Darke, Preble, Clark, Greene, Warren, Champaign, and Butler Counties). Their members are dedicated to the advancement of fair trials and free access of individuals to the courts of this state. Their members represent injured persons, criminal defendants, consumers and families in the areas of negligence, criminal law, consumer protection, workers' compensation, professional malpractice, products liability, family law, insurance law, employment, and civil rights law.

25. The Ohio Association for Justice named Ms. Wells as recipient of the 2012 President's Award. Ms. Wells was honored by Ohio Association for Justice at the Annual Convention, where she received her award from President Denise Houston at the Association's flagship President's Dinner on May 3, 2012. The dinner was attended by over 400 attorneys and their guests at the Hilton at Easton Town Center in Columbus, Ohio.

- 13 -

FILED DATE: 4/17/2019 9:59 AM 2018CH15419

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

26.     Ms. Wells received the highest possible Attorney rating (Superb) by Avvo, Inc., which ranks attorneys according to a variety of criteria, including feedback from clients and peers.

27.     In 2011, Ms. Wells was selected to serve on Ohio Attorney General Mike DeWine's Advisory Committee. This panel was assembled by the OAG to review Ohio's primary consumer protection law, the Consumer Sales Practices Act (R.C. 1345 et seq.). Ms. Wells is the only consumer protection attorney in private practice selected for this committee. Ms. Wells has repeatedly been named by Super Lawyers Magazine as a Rising Star. Only 2.5 percent of the attorneys in the state are selected to the Rising Stars list. Super Lawyers, a Thomson Reuters business, is a rating service of attorneys from more than 70 practice areas who have attained a high-degree of peer recognition and professional achievement. The annual selections are made using a statewide survey of attorneys, independent research evaluation of candidates, and peer reviews by practice area. The Super Lawyers lists are published nationwide in Super Lawyers magazines and in leading city and regional magazines across the country.

**Education**

28.     Ms. Wells graduated from the University of Dayton School of Law joint-degree program, earning a Juris Doctorate and Masters of Business Administration. She was the only student in her graduating class to receive this dual degree. During law school, Ms. Wells was a member of the Moot Court Team and Moot Court Board. Ms. Wells was Vice President of the UDSL Women's Caucus and also served as a teaching assistant in the legal research and writing program. Amy was a summer associate at a Dayton law firm in the litigation section. She also clerked in-house at NCR's world headquarters throughout law school, acting as the lead intern during her final year. Amy earned her undergraduate degree in business administration from Ohio University in Athens.

29.     Some of Ms. Wells published work include:

a.     2008 article - The Price of Identity Theft for Ohio Consumers was published in Ohio Trial Magazine, Volume 18, Issue 1.

b.     In April 2009 her article Protecting Consumers from a "New Breed" of Debt Collector was published in the Dayton Bar Association's Bar Briefs magazine.

c.     In 2011, the article titled Proposed Deconstruction of Ohio's UDAP Law, a National Trend? was published by the National Association of Consumer Advocate's publication, The Consumer Advocate, Volume 17, No. 4.

d.     Ms. Wells wrote Ohio's Consumer Protection Law, which was published in the October 2011 issue of the Advisory.

e.     In November 2011 "HB 275 – The Undoing of Ohio's Consumer Protection Law" was published in the Dayton Bar Briefs, Vol. 61, No.3.

f.     Ms. Wells is a featured blogger on Neighborhood Housing Services Consumer Law Center Blog

g.     Ms. Wells authored a chapter in the Consumer Law Basics book while serving as faculty of the Practicing Law Institute.

h.     Ms. Wells is a contributing freelance author for NOLO.com (2015- present)

30.     Speaking Engagements for Ms. Wells include:

a.     Ms. Wells is regularly invited to speak to attorneys and consumers on a state and national basis regarding consumer advocacy issues and laws. Recent presentations include:

b.     2010 National Consumer Law Center Fair Debt Collection Training Conference, Jacksonville, FL, "FDCP Fundamentals: The Care and Feeding of Your FDCP Case."

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

   c.  CORT Consumer Law Training 2010, Ann Arbor, MI, "Bringing Claims Under the FCRA and FACTA."

   d.  2010 Ohio Association for Justice Annual Convention, Columbus, OH, "Appraisal Litigation: Critical Evidence in an Inflated Appraisal Case & Eminent Domain: Friend or Foe?"

   e.  2011 Ohio Association for Justice Insurance Law CLE, Columbus & Dayton, OH, "Protect Thy Consumer, Today's Consumer Law Issues."

   f.  2011 Ohio Association for Justice Annual Convention, Columbus, OH, Moderator for the Consumer Law Continuing Legal Education panel.

   g.  2012 Ohio Association for Justice Annual Convention, Columbus, OH, "How to Practice Under the New Ohio Consumer Law."

   h.  2012 American Bankruptcy Law Forum, Dayton, OH, "Consumer Law for Bankruptcy Attorneys"

   i.  2013 Served as faculty for CLE about Representing the Pro Bono Client, Consumer Law Basics in San Francisco, CA. My presentation was entitled "Introduction to the Fair Credit Reporting Act."

   j.  2015 Ohio State Bar Association Consumer Law CLE, Columbus, OH, "The Basics of the FCRA Including Recent Changes/Oversight from the CFPB"

  31. Ms. Wells has been featured in the following media:

   a.  Ms. Wells has been interviewed by various media outlets, including the following pieces.

   b.  ALEC Leads the Legal War Against Consumers, A Lawyers.com Series, Posted May 3, 2012.

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

       c.      Right-to-cure bill seen powering its way to approval, Business First, Dec. 16, 2011.

       d.      2012, Guest on Americas Workforce Radio, topic: consumer credit reporting.

32.     Finally, Ms. Wells served on the Board of Trustees of the Ohio Association for Justice and chaired the Consumer Law Section from 2009-2014. She also served on the Association's Legislative Committee. Ms. Wells is an active member of the National Association of Consumer Advocates and is currently a state chair for the organization. Ms. Wells currently sits on the board of the Miami Valley Trial Lawyers Association, and will served as the Association's President from 2014-2015. Ms. Wells is a member of the American Association for Justice, Illinois Bar Association, Lake County Bar Association, Ohio State Bar Association, and the Dayton Bar Association, Carl D. Kessler Inn of Court, and serves on the DBA Certified Grievance Committee.

33.     In 2015, Michael Karnuth joined the firm. His practice focuses on Securities Fraud and Shareholder litigation, as well as consumer protection and other complex litigation matters.

34.     In the Securities Fraud area, Mr. Karnuth has extensive experience in prosecuting claims under the federal securities laws, and has actively litigated cases at all levels up to trial, and has obtained significant recoveries for investors. Representative cases and reported decisions include:

In re DVI, Inc. Sec. Litig., 2:03-cv-5336 (E.D. Pa.). Mike has been instrumental in representing equity and debt investors in case raising 10b-5 and 20(a) claims involving a failed healthcare financing company which misrepresented financial statements for several years. To-date, the firm has recovered over $21 million for investors from ten different defendants, and has achieved important legal victories in the case, including prevailing on numerous motions to

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

dismiss, In re DVI Inc. Sec. Litig., 2005 WL 1307959 (E.D. Pa. May 31, 2005); obtaining class certification, 249 F.R.D. 196 (E.D. Pa. 2008), aff'd, 639 F.3d 623 (3d Cir. 2011),*petition for rehearing and en banc denied* (June 24, 2011), and in prevailing on motions for summary judgment, 2010 WL 352086 (E.D. Pa. Sept. 3, 2010), and 2010 WL 3522090 (E.D. Pa. Sept. 3, 2010). Mike presented oral argument to the Third Circuit Court of Appeals and prevailed on an auditor defendant's challenges to market efficiency, loss causation and the adequacy of an institutional investor to be class representative based on its trading strategies and access to company management.

In re Safety-Kleen Corp. Rollins Shareholder Litigation, No. 3:00-1343-17 (D.S.C.). Mike was also instrumental in the firm's extensive representation of Rollins Environmental Services shareholders in a Section 14(a) proxy case, involving the reverse acquisition of Rollins by Laidlaw Environmental Services, Inc., predecessor of Safety Kleen Corp. The firm obtained a $3.15 million recovery for the class on the eve of trial, after overcoming numerous legal challenges. The class recovery represented a large percentage of the class's estimated damages in the case.

In re BankAmerica Corp. Sec. Litig., 228 F.Supp.2d 1061 (E.D. Mo. 2002). Mike assisted in the firm's role as Executive Committee Member of the BankAmerica shareholder class, which challenged the 1998 merger of BankAmerica and Nationsbank. Mike's involvement included reviewing discovery, taking depositions and drafting pleadings. The claims of the BankAmerica class settled for over $160 million.

35.     Mike also has extensive experience in consumer protection and other complex litigation. Representative cases and reported decisions include:

Empire Healthchoice Assur., Inc. v. McVeigh, 547 U.S. 677 (2006), where Mike filed an

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

amicus brief in support of both respondents and the firm's pending certiorari petition on behalf of injured FEHBA-plan insureds, which prevailed in a 5 to 4 ruling that then led to the favorable Supreme Court decision in the firm's case of <u>Cruz v. Blue Cross and Blue Shield of Illinois</u>, 548 U.S. 901 (2006). On remand to the Seventh Circuit, Mike successfully argued that federal preemption and creation of federal common law should not trump state law, which ultimately resulted in the case settling for $1.5 million in the pending state court case and the class obtaining full recovery of their losses. *See* <u>Blue Cross Blue Shield v. Cruz</u>, 495 F.3d 510 (7th Cir. 2007). Other notable and reported decisions in this case that Mike was integral in achieving include <u>Blue Cross Blue Shield of Illinois v. Cruz</u>, 2003 WL 22715815 (N.D. Ill. Nov. 17, 2003) (dismissing Blue Cross's federal action attacking plaintiff's state court rights); <u>Doyle v. Blue Cross Blue Shield of Illinois</u>, 149 F.Supp.2d 427 (N.D. Ill. 2001) (remanding insured's complaint to state court); and obtaining class certification and summary judgment for the named plaintiff in the state court class action, despite numerous challenges including a brief and oral argument submitted by the U.S. Department of Justice advocating for federal law trumping plaintiff's state law claims. An illustration of Mike's commitment and tenacity to class members' interests is shown in his further representation of a Blue Cross FEHBA-plan class member, a member of the military, who was denied a right to participate in the settlement because her claim form was submitted late. After a rigorous briefing and oral argument process, Mike prevailed in having her claim allowed, which resulted in an individual payment to her of over $30,000. See, March 23, 2011 Order allowing Taylor Claim.

<u>Doyle v. Blue Cross Blue Shield of Illinois</u>, 00 CH 14182 (Cir. Ct. Cook County, Ill., Chancery Division) (firm was co-counsel on behalf of ERISA-plan insureds and achieved a $6.95 million settlement and injunctive relief in 2004 for the class, representing near full recovery of estimated

losses; case involved Blue Cross's alleged practice of liening against third-party recoveries obtained by their insureds in excess of what they were entitled to recover).

Primax Recoveries Inc. v. Sevilla, 324 F.3d 544 (7th Cir. 2003). Mike successfully argued to the Seventh Circuit that federal law did not preempt health insured's state law claims seeking application of Illinois' common fund doctrine to insurer's reimbursement lien asserted against insured's third-party recoveries, and that insurer's strategic waiver in state court barred its claims in federal court. *See also* Primax Recoveries, Inc. v. Sevilla, 2002 WL 58816 (N.D. Ill. Jan. 15, 2002) (granting motion to dismiss); Health Cost Controls v. Sevilla, 365 Ill.App.3d 795 (1st Dist. 2006) (reversing denial of class certification). In 2011, after 15 years of litigation, Mike was integral in the firm obtaining full recovery for the class, plus pre- and post-judgment interest, and attorneys' fees from the insurer.

LVNV Funding, Inc. v. Trice, 2011 Ill. App. (1st) 092,773 (Mike was integral in obtaining a modified decision which denied a debt collector's petition for rehearing of an order voiding a default judgment obtained by an unlicensed debt collector; and in having LVNV's petition for leave to appeal to the Illinois Supreme Court denied (Nov. 30, 2011)).

Citibank v. Busuioc, No. 09 CH 49196 (Cir. Ct. Cook County, Ill.) (Mike successfully and extensively briefed and argued a case brought on behalf of homeowners/borrowers who had a mortgage foreclosure pursued against them by an entity who purportedly acquired ownership of the loan through a fraudulent assignment prepared by Lender Processing Services and/or its subsidiary DocX and who lacked standing to pursue the foreclosure; Mike prevailed on Citibank's motion to dismiss the case pursuant to Illinois' Citizens Participation Act and in getting the petition for leave to appeal voluntarily dismissed).

FILED DATE: 4/17/2019 9:59 AM    2018CH15419

FILED DATE: 4/17/2019 9:59 AM 2018CH15419

Stinette v. Fisher & Shapiro, et al., No. 09 CH 19758 (Cir. Ct. Cook County, Ill.) (Mike successfully briefed and argued objections to a competing class's proposed settlement on behalf of debtors against a debt collector brought in federal court solely seeking relatively nominal relief under the FDCPA, but which released all viable non-FDCPA claims.

### Activities/Honors/Publications/Memberships

- September 2014 – article published in ISBA's Business & Securities Law Forum Newsletter titled "Dodd-Frank provides incentives and enhanced protections to blow its new, shiny "whistle," but Sarbanes-Oxley's old whistleblower protections may have more luster in certain situations."
- November 2013 – article published in ISBA's Business & Securities Law Forum Newsletter titled "*Amgen* eases securities fraud plaintiffs' burden at class certification, but the dissent invites challenges to the long-standing 'fraud-on-the-market' theory."
- 2012 – Speaker at the 7th Annual Illinois Public Employee Retirement Systems Summit on the topic of Securities Litigation (Identifying and Pursuing Recoverable Losses).
- 2010 – Speaker and Panelist at Chicago Bar Association Seminar "Defending Federal Securities Class Actions" (May 12, 2010)
- 2009 and 2008 – selected as an Illinois Rising Star by Super Lawyer's Magazine
- 2008 – Speaker and Panelist at Best Practices Forum regarding litigation against accounting firms (September 3, 2008)
- 2006 to Present – Pro bono attorney for the Center for Disability and Elder Law; volunteer attorney to low income, disabled and elderly individuals on various legal issues
- 2010 to Present – Pro bono attorney for Chicago Volunteer Legal Services; providing assistance to homeowners facing foreclosure
- Member of CBA, ISBA, ABA, AICPA and ICPAS; member of ISBA's Business & Securities Law Section (June 2012 to present).

### Education

Mike earned his J.D. from Chicago-Kent College of Law, December 1998 (w/ Honors) and received Merit Scholarships, Deans List recipient and received CALI Award in Advanced Research – Securities. Mike interned for United States District Court Judge Blanche Manning of the Northern District of Illinois, Spring 1998. In addition to obtaining his law degree, Mike is a Certified Public Accountant since 1991 (passed entire exam on first attempt).

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

36.     In March 2018, Theodore H. Kuyper joined the firm.  Ted is currently a member in good standing of the Illinois State Bar, the United States District Court for the Northern District of Illinois, and the Seventh Circuit Court of Appeals, and has been admitted to practice *pro hac vice* in several additional United States District Courts.

37.     Ted has diverse experience prosecuting and defending class action and other large-scale litigation in trial and appellate courts under a variety of substantive laws, including without limitation the Telephone Consumer Protection Act, the Racketeer Influenced & Corrupt Organizations Act (RICO), the Fair Credit Reporting Act, the Illinois Consumer Fraud & Deceptive Business Practices Act, and the Real Estate Settlement Procedures Act, as well as Illinois and other state statutory and common law.

38.     Since joining the firm, Ted has represented consumers as counsel of record or otherwise in the following putative class actions: *Cranor v. Skyline Metrics, LLC*, No. 4:18-cv-00621-DGK (W.D. Mo.); *Cranor v. The Zack Group, Inc.*, No. 4:18-cv-00628-FJG (W.D. Mo.); *Cranor v. Classified Advertising Ventures, LLC, et al.*, No. 4:18-cv-00651-HFS (W.D. Mo.); *Morgan v. Orlando Health, Inc., et al.*, No. 6:17-cv-01972-CEM-GJK (M.D. Fla.); *Morgan v. Adventist Health System/Sunbelt, Inc.*, No. 6:18-cv-01342-PGB-DCI (M.D. Fla.); *Burke v. Credit One Bank, N.A., et al.*,

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

No. 8:18-cv-00728-EAK-TGW (M.D. Fla.); *Motiwala v. Mark D. Guidubaldi & Associates, LLC*, No. 1:17-cv-02445 (N.D. Ill.); *Buja v. Novation Capital, LLC*, No. 9:15-cv-81002-KAM (S.D. Fla.); and *Detter v. Keybank, N.A.*, No. 1616-CV10036 (Circuit Ct. of Jackson County, Missouri).

39.     Immediately prior to joining Keogh Law, Ted worked at a boutique Chicago law firm where he represented clients in a range of complex commercial and other litigation, including contract, tort, professional liability, premises and products liability, bad faith and class action. Previously, he was an associate at a nationally-renowned class action law firm, where he focused on complex commercial, consumer, class action and other large-scale, high-stakes litigation.

40.     Ted earned his Juris Doctorate from Washington University School of Law in St. Louis in 2007. During law school, he worked as a Summer Extern for Magistrate Judge Morton Denlow (Ret.) of the United States District Court for the Northern District of Illinois, served as primary editor and executive board member of the Global Studies Law Review, and authored a student note that was published in 2007. Ted also earned a number of scholarships and other academic accolades, including the Honors Scholar Award (top 10% for academic year) and repeated appearances on the Dean's List.

FILED DATE: 4/17/2019 9:59 AM   2018CH15419

Executed at Chicago, Illinois, on December 12, 2018.

Keith J. Keogh

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

GERALDINE DONAHUE, individually )
and on behalf of others similarly situated, )
)
    Plaintiff, )     **CASE No.: 2018-CH-15419**
)
v. )     **JUDGE DAVID B. ATKINS**
)
MGM RESORTS INTERNATIONAL, )     **APR 19 2019**
)
    Defendant. )     **Circuit Court-1879**
)

**AGREED ORDER**

By agreement of the parties, IT IS HEREBY ORDERED:

1.    Plaintiff's April 11, 2019 Motion to File First Amended Complaint and April 11, 2019 Motion for Class Certification are hereby deemed withdrawn, and the presentment hearings on those motions noticed for April 24, 2019 are hereby stricken.

2.    Plaintiff's April 12, 2019 Corrected Motion to File First Amended Complaint is granted, and the presentment hearing on that motion noticed for April 25, 2019 is hereby stricken. Plaintiff shall file her first amended complaint substituting Everi Payments, Inc. and Everi Holdings, Inc. as defendants for MGM Resorts International ("MGM").

3.    Defendant MGM is hereby dismissed from this action. This case will proceed against Everi Payments, Inc. and Everi Holdings, Inc. only, with the change to be reflected in the case caption.

4.    Defendant MGM's pending motion to dismiss is hereby denied as moot, and the May 2, 2019 due date for MGM's reply, May 6, 2019 due date for courtesy copies, and May 15, 2019 clerk status on that motion are hereby stricken.

1

74366

    5.    Plaintiff's April 17, 2019 Amended Motion for Class Certification is entered and continued generally, and the presentment hearing on that motion noticed for April 25, 2019 is hereby stricken.

    6.    This case is set for status hearing on June 19, 2019, at 10:30 a.m.

IT IS SO ORDERED:

JUDGE DAVID B. ATKINS

APR 19 2019

Judge Atkins

Circuit Court-1879

Prepared By:
Keogh Law, Ltd.
55 W. Monroe St., Ste. 3390
Chicago, Il 60603
Tel: 312-726-1092
Fax: 312-726-1093
keith@keoghlaw.com
mhilicki@keoghlaw.com
Firm No. 39042

2

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
4/22/2019 10:45 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419
4768317

**Firm No. 39042**

FILED DATE: 4/22/2019 10:45 AM   2018CH15419

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

GERALDINE DONAHUE, individually
and on behalf of others similarly situated, )
)
)
     Plaintiff, )
)
v. )
)
EVERI PAYMENTS, INC.; and EVERI )
HOLDINGS, INC., )
)
     Defendant.

**CASE No.: 2018-CH-15419**

### FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Geraldine Donahue, on behalf of herself and other similarly situated individuals,

hereby sues Everi Payments, Inc. and Everi Holdings, Inc. (collectively hereinafter, "Defendant"

or "Everi"), and alleges as follows based on personal knowledge as to herself and on information

and belief as to all other matters, and demands trial by jury:

### INTRODUCTON

1.    This action arises from Defendant's violations of the Fair and Accurate Credit

Transactions Act ("FACTA") amendment to the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et*

*seq.* (the "FCRA"), which requires Defendant to truncate certain credit card and debit card

information on printed receipts provided to consumers. Despite the clear language of the statute,

Defendant knowingly or recklessly failed to comply with the FCRA by printing eight (8) digits of

its customers' credit card or debit card numbers on their transaction receipts. As such, Plaintiff and

other consumers who conducted business with Defendant during the time frame relevant to this

Complaint, each of whom engaged in a transaction using a credit card or debit card, suffered a

number of harms including, but not limited to, violation of their substantive statutory rights under

74468

FILED DATE: 4/22/2019 10:45 AM   2018CH15419

15 U.S.C. § 1681c(g), breach of their confidence in the safe handling of their account information, invasion of their privacy as a result of the disclosure of their account information to those of Defendant's and its casino-clients' staff or agents who handled the receipts, exposure to an elevated risk of identity theft as determined by Congress, the burden of having to keep or destroy the receipt to prevent further disclosure of their account information, and monetary harm as a result of having paid a fee for a secure and legally compliant transaction that was anything but. Accordingly, Plaintiff and the unnamed class members are entitled to an award of statutory damages and other relief as further detailed herein.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this action pursuant to 735 ILCS 5/2-209(a)(1) because Defendant is registered to do business in Illinois and conducts substantial business in Illinois, and because Defendant committed the tortious acts complained of in substantial part within Illinois, either directly or through its agent or agent(s) acting on its behalf at the Grand Victoria Casino in Cook County, Illinois, such that the conduct giving rise to Plaintiff's claim, on behalf of herself and the class, occurred in substantial part from the Defendant's conduct in Illinois.

3.      Venue is proper because Plaintiff resides, and at all times relevant herein resided, in Cook County, Illinois; because the cause of action alleged by Plaintiff, on behalf of herself and the class, arose in substantial part from the Defendant's conduct in Cook County, Illinois; and because Defendant conducts, and conducted at all relevant times alleged herein, substantial business in Cook County, Illinois, including at the Grand Victoria Casino in Cook County, Illinois at the time Plaintiff's cause of action arose.

74468

FILED DATE: 4/22/2019 10:45 AM 2018CH15419

## PARTIES

4.     Plaintiff Geraldine Donahue is a natural person who resides, and at all times relevant herein resided, in Cook County, Illinois.

5.     Defendants Everi Payments, Inc. and Everi Holdings, Inc. are each a Delaware corporation whose corporate headquarters and principal office is located at 7250 South Tenaya Way, Suite 100, Las Vegas, NV 89113, and whose registered agent for service of process is Registered Agent Solutions, Inc. 4625 W. Nevso Drive, Suite 2, Las Vegas, NV 89103. Everi provides, among other things, debit and credit card cash advance transaction services to gamblers at thousands of casino gaming and other wagering establishments across the country and the world. Everi is the principal merchant in each cash-access transaction that a patron performs at each establishment where Everi's services are provided, and Everi's clients (the owners and operators of these underlying establishments) act as Everi's agent in providing such services to patrons.

6.     Acting as the principal merchant, Everi provides – either directly or through its gaming establishment clients (with whom it contracts) acting as its agents – various cash-access services at thousands of points-of-sale located at its clients' gaming establishments across the country – including by dispensing cash withdrawn from its proprietary automated teller machines leased to its clients ("ATMs") and by processing credit and debit card cash-advance transactions on electronic terminals (also owned by Everi and leased to its clients) located at points-of-sale ("POS") in its clients' gaming establishments.

74468

FILED DATE: 4/22/2019 10:45 AM   2018CH15419

## FACTUAL ALLEGATIONS

### A.   BACKGROUND OF FACTA

7.     Identity theft is a serious issue affecting both consumers and businesses. As of 2018, a Harris Poll revealed that nearly 60 million Americans have been affected by identity theft.[1] There were a record high 16.7 million victims of identity fraud in 2017 alone, and account takeovers (when a thief opens a credit card account or other financial account using a victim's name and other stolen information) tripled in 2017 from 2016, causing $5.1 billion in losses.[2]

8.     Congress enacted FACTA to prevent identity theft and related harm. See Pub. L. No. 108-159 (December 4, 2003) ("An Act . . . to prevent identity theft . . . and for other purposes.")

9.     "[I]dentity theft is a serious problem, and FACTA is a serious congressional effort to combat it...the less information the receipt contains the less likely is an identity thief who happens to come upon the receipt to be able to figure out the cardholder's full account information." *Redman v. Radioshack Corp.*, 768 F.3d 622, 626 (7th Cir. 2014).

10.    Upon signing FACTA into law, President George W. Bush remarked that "[s]lips of paper that most people throw away should not hold the key to their savings and financial secrets." 39 Weekly Comp. Pres. Doc. 1746, 1757 (Dec. 4, 2003). President Bush added that the government, through FACTA, was "act[ing] to protect individual privacy." *Id.*

11.    One such FACTA provision was specifically designed to thwart identity thieves' ability to gain sensitive information regarding a consumer's credit or bank account from a receipt

---

[1]      Source: https://www.lifelock.com/learn-identity-theft-resources-how-common-is-identity-theft.html

[2]      Source: https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime.

74468

FILED DATE: 4/22/2019 10:45 AM   2018CH15419

provided to the consumer during a transaction, which, through any number of ways, could fall into the hands of someone other than the consumer.

12.     Codified at 15 U.S.C. § 1681c(g), this provision states the following:

> Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

15 U.S.C. § 1681c(g) (the "Receipt Provision").

13.     After enactment, FACTA provided three (3) years in which to comply with its requirements, mandating full compliance with its provisions no later than December 4, 2006.

14.     The requirement was widely publicized among retailers and the FTC. For example, on March 6, 2003, in response to earlier state legislation enacting similar truncation requirements, then-CEO of Visa USA, Carl Pascarella, explained that, "Today, I am proud to announce an additional measure to combat identity theft and protect consumers. Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts. The card's expiration date will be eliminated from receipts altogether. ... The first phase of this new policy goes into effect July 1, 2003 for all new terminals."[3] Within 24 hours, MasterCard and American Express announced they were imposing similar requirements.

15.     Card issuing organizations proceeded to require compliance with FACTA by contract, in advance of FACTA's mandatory compliance date. For example, the publication, "Rules for Visa Merchants," which is distributed to and binding upon all merchants that accept

---

[3]     Source: *Visa USA Announces Account Truncation Initiative to Protect Consumers from ID Theft*, PR NEWSWIRE (Mar 06, 2003).

74468

FILED DATE: 4/22/2019 10:45 AM   2018CH15419

Visa cards, expressly requires that "only the last four digits of an account number should be printed on the customer's copy of the receipt" and "the expiration date should not appear at all."[4]

16.     Because a handful of large retailers did not comply with their contractual obligations with the card companies and the straightforward requirements of FACTA, Congress passed The Credit and Debit Card Receipt Clarification Act of 2007 in order to make temporary changes to the definition of willful noncompliance with respect to violations involving the printing of an expiration date on certain credit and debit card receipts before the date of the enactment of this Act.[5]

17.     Importantly, the Clarification Act did not amend FACTA to allow publication of the expiration date or more than the last five digits of the card account number. Instead, it simply provided amnesty for certain past violators who disclosed card expiration dates, and only up to June 3, 2008. Expert proof continues to show the disclosure of excess card account number information or card expiration date information creates an increased risk of identity theft.

18.     Accordingly, card processing companies continued to alert their merchant clients, including Defendant, of FACTA's requirements. According to a Visa Best Practice Alert in 2010:

> Some countries already have laws mandating PAN truncation and the suppression of expiration dates on cardholder receipts. For example, the United States Fair and Accurate Credit Transactions Act (FACTA) of 2006 prohibits merchants from printing more than the last five digits of the PAN or the card expiration date on any cardholder receipt. (Please visit http://www.ftc.gov/os/statutes/fcrajump.shtm for more information on the FACTA.) To reinforce its commitment to protecting consumers, merchants, and the overall payment system, Visa is pursuing a global security objective that will enable merchants to eliminate the storage of full PAN and expiration date information from their payment systems when not needed for

---

[4]     Source: *Rules for Visa Merchants* (Sept. 1, 2007).

[5]     Source: https://www.govtrack.us/congress/bills/110/hr4008/text, *.R. 4008 (110th): Credit and Debit Card Receipt Clarification Act of 2007* (May 20, 2008).

74468

FILED DATE: 4/22/2019 10:45 AM 2018CH15419

specific business reasons. To ensure consistency in PAN truncation methods, Visa has developed a list of best practices to be used until any new global rules go into effect.

19.     As noted above, the processing companies have required that credit card or debit card expiration dates not be shown since 2003 and still require it. For example, American Express requires:

> Pursuant to Applicable Law, truncate the Card Number and do not print the Card's Expiration Date on the copies of Charge Records delivered to Card Members. Truncated Card Number digits must be masked with replacement characters such as "x," "*," or "#," and not blank spaces or numbers.

20.     Similarly, MasterCard required in a section titled Primary Account Number (PAN) truncation and Expiration Date Omission:

> A Transaction receipt generated by an electronic POI Terminal, whether attended or unattended, must not include the Card expiration date. In addition, a Transaction receipt generated for a Cardholder by an electronic POI Terminal, whether attended or unattended, must reflect only the last four digits of the primary account number (PAN). All preceding digits of the PAN must be replaced with fill characters, such as "X," "*," or "#," that are neither blank spaces nor numeric characters.

21.     According to data from the Federal Trade Commission's 2016 Consumer Sentinel Network Data Book, Illinois has among the highest per capita rate of reported fraud and other types of complaints.  For identity theft in particular, Illinois is ranked No. 5 in the country with a total of 17,660 complaints.  Also, several of the top 50 metro areas for identity theft are in Illinois, according to the report.[6]

22.     So problematic is the crime of identity theft that the three main credit reporting agencies, Experian, Equifax, and Transunion, joined to set-up a free website

---

[6]     Source: https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-january-december-2016/csn_cy-2016_data_book.pdf, *Consumer Sentinel Network Data Book for January-December 2016.*

74468

FILED DATE: 4/22/2019 10:45 AM   2018CH15419

(http://www.annualcreditreport.com) in order to comply with FACTA requirements and to provide the citizens of this country with a means of monitoring their credit reports for possible identity theft.

23.     FACTA expressly prohibits printing of more than the last five (5) digits of the card account number on transaction receipts to protect persons from identity theft and other evils.

### B.   THE ESTABLISHMENTS OF DEFENDANT'S CASINO-CLIENTS ARE BREEDING GROUNDS FOR IDENTITY THIEVES AND OTHER WHITE-COLLAR CRIMINALS

24.     Consumer identity theft, which the Receipt Provision was designed to protect against, is especially rampant at gambling establishments like those served by Defendant.

25.     It has been estimated that "40 percent of white-collar crime has its root in gambling."[7]

26.     "[T]he ready availability of credit in and around casinos," including in    the establishments of Defendant's casino-clients, "can lead to irresponsible gambling and problem and pathological gambling behavior. Forty to sixty percent of the cash wagered by individuals in casinos is not physically brought onto the premises.  Each year casinos extend billions of dollars in loans to their customers in the form of credit markers. Additional sums are charged by casino customer on their credit cards as cash advances. Casinos charge fees for cash advances ranging from 3 percent to 10 percent or more."[8]

27.     "Not surprisingly, . . . many problem and pathological gamblers steal or commit other crimes to finance their habit.   According to the National Research Council, 'as access to

---

[7]     Source: https://www.congress.gov/crec/1997/02/10/CREC-1997-02-10-pt1-PgH401.pdf, The Congressional Record, Feb. 10, 1997.

[8]     Source: https://govinfo.library.unt.edu/ngisc/reports/7.pdf, Chapter 7: Gambling's Impact on People and Places, *National Gambling Impact Study Commission Report* (June 18, 1999).

74468

FILED DATE: 4/22/2019 10:45 AM   2018CH15419

money becomes more limited, gamblers often resort to crime in order to pay debts, appease bookies, maintain appearances, and garner more money to gamble.'"[9]  In fact, the correlation between casino gambling and crime is so strong that, "[d]uring the first three years of casino gambling [in] Atlantic City, [the city] went from 50th in the nation in per capita crime to first. Overall, from 1977 to 1990, the crime rate in that city rose by an incredible 230%."[10]

28.    "Over the past two decades, there have been numerous suggestions in the academic literature and in political debate that gambling is associated with <u>white-collar crimes, such as embezzlement, forgery and fraud.</u>"[11]  (emphasis added).  For instance, "[i]n a survey of nearly 400 Gamblers Anonymous members, 57 percent admitted stealing to finance their gambling. Collectively they stole $30 million, for an average of $135,000 per individual. One witness before the Commission indicated that '80 to 90 percent of people in Gamblers Anonymous will tell you they did something illegal in order to get money to gamble.' <u>A lot of them do white collar crimes, fraud, credit card and employee theft.</u>"[12] (emphasis added).

29.    Indeed, casinos throughout the United States have been bastions of identity theft, credit card fraud and other white-collar crime for nearly three decades.  For example, since as far back as 1992, there have been numerous instances in which "tens of thousands of dollars" have

---

[9]      Source: *Id.* at 7-13.

[10]     Source: https://www.fdle.state.fl.us/cms/FCJEI/Programs1/SLP/Documents/Full-Text/Yates.aspx, *Casino Gambling: Is it A Good Bet for Florida's Future?*, Jerry J. Yates, at 11.

[11]     Source: http://www.leg.state.fl.us/GamingStudy/docs/FGIS_Spectrum_28Oct2013.pdf, *Gambling Impact Study: Part 1, Section A: Assessment of the Florida Gaming Industry and its Economic Effects*, Spectrum Gaming Group (Oct. 28, 2013).

[12]     Source: *Chapter 7: Gambling's Impact on People and Places,* Final Report of the National Gambling Impact Study Commission, Government Publishing Office, at 7-13.

74468

FILED DATE: 4/22/2019 10:45 AM   2018CH15419

been stolen by individuals using forged or stolen credit cards in casinos -- including, by way of illustration, through the following scam employed at the "Foxwoods" casino in Connecticut:

> The men fed forged or stolen credit cards into machines at the casino that are designed to check credit limits and authorize cash advances instantly. If the advance is approved, the machine notifies a teller in the casino cashier's booth and spits out a receipt for the borrower. The borrower takes the receipt to the teller and is issued cash after showing the credit card and other identification.[13]

30.     More recently, in November 2010 and February 2011, five people were arrested in Rancho Mirage, California and two in Santa Barbara, California for using fake credit cards at casinos, manufactured using stolen personal information.[14] In March 2012, a Connecticut man was arrested for "leading a criminal organization using counterfeit Discover cards at Mohegan Sun and Foxwoods casinos to obtain cash advances at least twice a week over three months[.]"[15] In 2014, "[a] New York man pleaded guilty . . . to conspiracy to use counterfeit cards to draw cash advances in Louisiana casinos,"[16] and ten people were arrested in New Orleans, Louisiana "on

---

[13]     Source: *Gaming Industry Encounters Misfortune, Fortune*, The Courant (May 16, 1992), http://articles.courant.com/19920516/news/0000201897_1_creditcardscamcasinocashiercasinoso pening (last accessed Mar. 12, 2017).

[14]     Source: *2 Arrested, Accused of Casino Credit Card Fraud,* The Orange County Register (Nov. 28, 2010), http://www.ocregister.com/articles/casino-277896-cards-credit.html (last accessed Mar. 12, 2017); *Deputies Nab Five for Credit Card Fraud,* Santa Barbara Independent (Feb. 18, 2011), http://www.independent.com/news/2011/feb/18/deputiesnabfivecreditcardfraud/ (last accessed Mar. 12, 2017).

[15]     Source: *Police Break Up Casino Credit Card Scam*, NBC Connecticut (Mar. 16, 2012), http://www.nbcconnecticut.com/news/local/PoliceBreakUpCasioCreditCardScam142965455.ht ml (last accessed Mar. 12, 2017).

[16]     Source: Guilty plea entered in casino scam case, The Acadiana Advocate (May 19, 2014), http://www.theadvocate.com/acadiana/news/article_3ee22c93-0eb7-5d46-a571-2f624954b84f.html (last accessed Mar. 12, 2017); *10 charged in cash-advance fraud scheme at Harrah's Casino*, The Acadiana Advocate (July 31, 2014), http://www.theadvocate.com/new_orleans/news/article_bba2fa01-e821-563b-b9b7-43f7bb8129ea.html (last accessed Mar. 12, 2017).

74468

FILED DATE: 4/22/2019 10:45 AM   2018CH15419

racketeering charges in an identity theft and counterfeit credit card scheme involving a group of New Yorkers who received tens of thousands of dollars in allegedly fraudulent cash advances from Harrah's New Orleans Casino."[17]  And in January 2016, "[a] man suspected of making fake credit cards was arrested at a hotel at Foxwoods casino[.]"[18]

31.     The Federal Trade Commission Red Flags Rule requires businesses and organizations such Defendant's casino clients to implement a written Identity Theft Prevention Program designed to detect the warning signs – or red flags – of identity theft in their day-to-day operations.

32.     Casinos like those of Defendant's clients are subject to an array of federal laws and regulations, including the Bank Secrecy Act and the 2003 FACTA amendments to FCRA, under which federal agencies such as the Federal Trade Commission ("FTC") and Securities and Exchange Commission ("SEC") have promulgated anti-money-laundering and identity-theft Red Flag Rules.  Among other requirements, these Red Flag Rules require "creditors," which includes casinos like those served by Defendant, to:  1) develop and implement a written identity theft protection programs designed to detect, prevent and mitigate identity theft; and 2) periodically perform risk assessments to determine whether the casino's practices pose any "reasonably foreseeable risk" of identity theft to its patrons.  Failure to comply with the Red Flags Rules could risk regulatory penalties, loss of licensure, and civil liability.

---

[17] Source: *10 charged in cash-advance fraud scheme at Harrah's Casino*, (July 31, 2014) http://www.theadvocate.com/new_orleans/news/article_bba2fa01-e821-563b-b9b7-43f7bb8129ea.html (last accessed Feb. 12, 2018).

[18] Source: *Police Make Credit Card Fraud Arrests at Foxwoods Hotel*, NBC Connecticut (Jan. 19, 2016), http://www.nbcconnecticut.com/news/local/PoliceMakeCreditCardFraudArrestsatFoxwoodsHotel365746371.html (last accessed Mar. 12, 2017).

74468

FILED DATE: 4/22/2019 10:45 AM 2018CH15419

33.     In developing, implementing, and refining its Red Flag Rule identity-theft compliance program, Defendant and their casino-clients would certainly have considered and addressed, among other things, the need for strict compliance with FACTA's receipt truncation provisions. This would include training cage personnel and other employees to prioritize and keep in confidence patrons' credit card numbers and other sensitive financial information, a review of best practices for identity theft prevention in consumer financial transactions, including a review of current best practices for compliance with FACTA's receipt truncation requirements, and an ongoing periodic review and refinement of cage processes and procedures in light of current guidance from their own payment processors and other relevant vendors, as well as from major payment processors, such as VISA and Mastercard.

34.     As part of its ongoing duty to consistently update its identity-theft prevention program, Defendant and their casino-clients would periodically hire third-party service providers to audit and propose improvements to its compliance program and to train cage and other personnel in best practices for identity-theft prevention. These training programs routinely emphasize the critical importance of strict compliance with FACTA, and the severe identity-theft risks posed by casinos' failure to comply. Through these and other training programs, Defendant would have repeatedly been presented with and considered the requirements of and need for FACTA compliance, including FACTA's receipt truncation requirements.

## C.     DEFENDANT'S PRIOR KNOWLEDGE OF FACTA

35.     Defendant had actual knowledge of FACTA's truncation requirement before it began failing to comply with the requirement *en masse*.

36.     Everi provides credit and debit card cash-access services to its clients' patrons at points of sale located in all of its clients' gaming establishments.

74468

FILED DATE: 4/22/2019 10:45 AM 2018CH15419

37.     Everi provides these services to each of its clients' patrons, including the owner and/or operator of the Grand Victoria Casino in Elgin, Illinois during the time period relevant to this action (which, on information and belief, was MGM Resorts International, Inc. or one of its subsidiaries or affiliates), pursuant to a contractual relationship that Everi maintains with all of its clients across the country, pursuant to a standardized services agreement written by Everi at its complete and sole discretion, the material terms of which do not vary in a way material way for purposes of this litigation. On information and belief, the standardized services agreement entered into between Everi and each of its clients, including the owner and/or operator of the Grand Victoria Casino in Elgin, Illinois during the time period relevant to this action, specifically provides that Everi acts as the principal merchant and each of Everi's clients acts as Everi's agent in performing and processing all of the credit and debit card cash-access purchases performed by patrons of Everi's clients at points-of-sale located in all of the gaming establishments owned or operated by Everi's clients, including the Grand Victoria Casino in Elgin, Illinois at all times relevant to this action.

38.     The underlying technology used by Everi to perform such transactions (including all equipment and software) – by way of each of its clients acting as its agent, including the owner and/or operator of the Grand Victoria Casino in Elgin, Illinois during the time period relevant to this action – is proprietary to Everi; owned by Everi (and leased to its clients); operated, maintained, and controlled by Everi; and overseen remotely on a cloud-based system by Everi. All of the guidelines, procedures, and requirements for processing cash-access transactions via such technology are developed, controlled, and strictly maintained, mandated, and uniformly imposed by Everi. Everi develops and provides various training programs to the employees of each of Everi's clients with respect to the processing of cash-access transactions, including the

74468

FILED DATE: 4/22/2019 10:45 AM  2018CH15419

printing and providing of receipts to customers. And the information printed on the automatically-printed customer-copy transaction receipts that Everi provides to patrons in connection with all such transactions is controlled entirely by Everi.

39.     Simply put: it is Everi, the principal merchant, acting through each of its gaming conglomerate clients as its agent, including the owner and/or operator of the Grand Victoria Casino in Elgin, Illinois during the time period relevant to this action, who processes and performs all of the credit and debit card cash-access transactions conducted by its clients' patrons at points-of-sale at its clients' establishments nationwide, and it is therefore Everi who prints and provides paper transaction receipts to all of the patrons with whom it transacts.

40.     Everi's clients and their employees, who thereafter act as Everi's agents in processing the cash-access transactions in question, have been well trained by Everi regarding the requirements imposed by FACTA and its truncation provision. For instance, current employees at the Grand Victoria Casino tout knowledge of these requirements. For example, Kathryn Miller, Compliance Officer at the Grand Victoria Casino in Elgin, claims to be a Certified Anti-Money Laundering Specialist with a CAMS designation, which designation required her to pass a rigorous CAMS examination addressing in detail the full range of financial and identity-theft regulations, best practices, and strict compliance with, *inter alia*, the Red Flags rules, the Bank Secrecy Act, Title 31, as well as FACTA's truncation requirement.[19]

41.     There are numerous state and federal statutes and operating regulations governing the gambling, pari-mutuel wagering, slot machines and card rooms where Everi's cash-access services are provided – all of which Ms. Miller and Defendant's and its casino-clients' other

---

[19]     Source: *Kathyn Miller*, LinkedIn, https://www.linkedin.com/in/kathryn-miller-cams-7850b0a6/ (last accessed May 9, 2018); *see also* https://www.acams.org.

74468

FILED DATE: 4/22/2019 10:45 AM 2018CH15419

employees are well-versed in — which require Defendant to maintain full compliance with state and federal regulations such as FACTA.

42. Most of Defendant's business peers and competitors currently and diligently ensure their credit card and debit card receipt printing process remains in compliance with FACTA by consistently verifying their card machines and devices comply with the Receipt Provision. Defendant could have readily done the same.

43. Defendant's self-professed knowledge and experience regarding federal laws governing financial transactions no doubt translates to Defendant having intimate knowledge of the requirements of FACTA, a federal law governing financial transactions.

44. Not only was Defendant informed not to print more than the last five digits of credit cards or debit cards on transaction receipts, it was contractually prohibited from doing so. Defendant accepts credit cards and debit cards from all major issuers, such as Visa, MasterCard, American Express and Discover Card. Each of these companies sets forth requirements that merchants, including Defendant, must follow, including the Receipt Provision.

45. Defendant, and thus each of its casino clients, each of whom acted and acts as Everi's agent in the course of performing the transactions in questions in this litigation, had actual knowledge, at all relevant times, of FACTA's truncation provision and of Defendant's failure to comply with the requirements of FACTA's truncation provision at all of its clients' establishments nationwide. Despite having such knowledge, Everi chose to systematically violate FACTA anyway.

46. Cynically, Defendant intentionally violated FACTA to protect itself against liability for consumer-initiated chargebacks, resulting from individuals' fraudulent or otherwise unauthorized use of credit and debit cards to access cash via the POS services Everi provides.

74468

FILED DATE: 4/22/2019 10:45 AM  2018CH15419

47.     As discussed above, the casino gaming industry is one of the main targets for identity theft.  As such, companies operating in the sector should apply extra care in preserving customers' data and preventing identity theft. Given the size and years of experience of Defendant's business, and the various state and federal regulations governing its business, not to mention the prevalence of financial crimes in and around its casino clients' establishments, such as the Grand Victoria Casino, at minimum Defendant acted in reckless disregard of FACTA's requirements and purpose when it allowed its system to print eight (8) digits of its customers' credit cards and debit cards on transaction receipts, together with other pieces of information about its customers, including their initialed signatures.

48.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has a written policy in place requiring compliance with all federal regulations governing its financial activities; this is evidenced by the fact that Defendant used to, subsequent to the enactment of FACTA and prior to the violative conduct alleged herein, truncate credit card and debit card account numbers in compliance with FACTA.

49.     Upon information and belief, it would take an individual less than one minute to run a test receipt to determine whether Defendant's system was in compliance with federal law(s) or Defendant's own alleged written policy requiring the truncation of credit card and debit card numbers.

50.     Additionally, for over 16 months Defendant has had actual knowledge of other FACTA litigation initiated and threatened to be initiated in courts throughout the country against its gaming company clients. Each such case alleged claims that arose from receipts printed and provided by Defendant in connection with cash access transactions at one of its' clients' establishments, processed via the same uniformly-maintained debit and credit card transaction

74468

FILED DATE: 4/22/2019 10:45 AM  2018CH15419

technology all of Defendant's clients utilize, including the Grand Victoria Casino in Elgin, Illinois during the relevant time period. Remarkably, Defendant's printing of transaction receipts in violation of FACTA's truncation requirement continued unabated for much if not all of that 16-month period of time, in disregard of the law and its patrons' financial privacy and security.

### D. PLAINTIFF'S FACTUAL ALLEGATIONS

51.    On or about February 22, 2018, Plaintiff used her personal credit card to perform a cash-access transaction with Defendant (the principal merchant acting through its agent or agent(s)) at a point-of-sale terminal, using Defendant's CashClub technology, located at the Grand Victoria Casino in Elgin, Illinois.

52.    In order to complete the transaction, Plaintiff was forced to pay a transaction fee to Defendant, through its agent or agent(s), in the amount of $12.99, in addition to principal amount of the transaction. Plaintiff is informed and believes, and thereupon alleges, that Defendant set the amount of the transaction fee that Plaintiff (and every other transacting patron) was charged at the Grand Victoria Casino in connection with such a transaction, that Defendant (acting as the principal merchant through its agent or agent(s)) collected the transaction fee paid by Plaintiff (and every other transacting patron), and that Defendant retained all or a substantial portion of the transaction fee paid by Plaintiff (and by all other transacting patrons).

53.    Plaintiff used her personal credit card to pay Defendant (the principal merchant with whom she transacted, via its agent or agent(s) acting as an intermediary or intermediaries) for the cash-access point-of-sale purchase she performed with Defendant at the Grand Victoria Casino in Elgin, Illinois on or about February 22, 2018. In connection with such credit card purchase, at the same time as Plaintiff received the cash she had purchased, Defendant (acting as the principal

74468

FILED DATE: 4/22/2019 10:45 AM  2018CH15419

merchant through its agent or agent(s)) presented Plaintiff with an electronically-printed receipt bearing the first four (4) and last four (4) digits of her credit card account number.

54.     In addition to bearing eight (8) digits of her credit card, the receipt printed by Defendant and provided to Plaintiff by Defendant identifies the complete first and last name and initialed signature of Plaintiff, the individual to whom the card is issued, as well as the card issuer (in this case VISA) and the transaction date and time.

55.     The printing of the receipt invaded Plaintiff's privacy as it disclosed her private card account information to the casino employee who handed her the receipt on Defendant's behalf and additionally was likely exposed, on information and belief, to other patrons and/or surveillance cameras recording high-definition video footage of the point-of-sale at which such receipt was provided to Plaintiff.

56.     The printing of the receipt breached Plaintiff's confidence in Defendant to properly handle her account information, and also constitutes a breach of implied bailment.

57.     The printing of the receipt additionally harmed Plaintiff because Defendant had imposed on and unjustly retained a substantial service fee from Plaintiff for the privilege of making the credit card transaction at issue in this case in a supposedly secure manner, which is the exact opposite of the true nature of the way in which Defendant processed the transaction.

58.     As a direct result of receiving the receipt containing the first and last four digits of her card number, Plaintiff took action to safeguard the receipt.

E.     **DEFENDANT'S MISDEEDS**

59.     At all times relevant herein, Defendant was acting by and through its subsidiaries, agents, servants and/or employees, including without limitation the owner and/or operator of the Grant Victoria Casino in Elgin, Illinois and its employees, each of whom acted within the course

FILED DATE: 4/22/2019 10:45 AM  2018CH15419

and scope of its agency or employment, under the direct supervision and control of Defendant, and, on information and belief, pursuant to the terms of a standardized contract between Defendant and the owner and/or operator of the Grand Victoria Casino in Elgin, Illinois and/or another of its subsidiaries, agents, servants and/or employees with whom it contracted, the material terms of which remained (at all relevant times) same or substantially the same as the relevant terms of the contractual relationships between Defendant and each of its other clients in the United States.

60.     At all times relevant herein, the conduct of the Defendant, as well as that of its subsidiaries, agents, servants and/or employees, was in willful, knowing, or reckless disregard for federal law and the rights of the Plaintiff and other members of the class.

61.     Plaintiff is informed and believes, and thereupon alleges, that Defendant implements, oversees, and maintains control over the same uniform debit and credit card payment processing technology, pursuant to the same uniformly-implemented policies, practices, and procedures for performing the cash-access consumer-oriented transactions at issue in this case at all of its casino-clients' establishments nationwide (including the Grand Victoria Casino) – including by, without limitation, negotiating, entering into, and acting pursuant to contracts and agreements with its casino clients that govern the use of Defendant's electronic payment processing technology at its clients' establishments, the terms of which uniformly provide that Defendant acts as the principal merchant and that each of Defendant's clients acts as Defendant's agent with respect to the cash-access transactions performed by patrons at the Everi-maintained points-of-sale at its establishments.

62.     Defendant uniformly prints receipts for patrons in connection with each cash-access transaction performed at all of its clients' establishments, including the Grand Victoria Casino, and in connection with each such transaction uniformly mandates and requires, pursuant to the

74468

FILED DATE: 4/22/2019 10:45 AM  2018CH15419

same uniform policies and procedures, that each of its clients, as its agents provide the printed receipt to the patron with whom Defendant performed the transaction at the point-of-sale transaction location – i.e., immediately upon receipt of credit card or debit card payment.

63.     The systems of Defendant, and/or of its agent or agent(s), maintain records of all credit and debit card transactions and store all transacting patrons' identifying and contact information, including copies of patrons' drivers' licenses and duplicate hard copies and electronic copies of all payment receipts provided to customers.

64.     Notwithstanding the fact that it has extensive knowledge of the requirements of FACTA and the dangers imposed upon consumers through its failure to comply, Defendant issued tens of millions of transaction receipts containing the first four (4) and last four (4) digits of credit and debit card account numbers, violating FACTA on an unprecedented scale during the relevant time period.

65.     By shirking the requirements of this important federal statute on such a large scale, in an environment already ripe for identity theft and other evils, Defendant uniformly invaded Plaintiff's and the other putative Class members' privacy, breached their confidence, mishandled their personal account information, and exposed them to an elevated risk of identity theft. Defendant's conduct alleged herein resulted in the disclosure of Plaintiff's and the Class members' private financial information to the world, including to persons who might find the receipts in the trash or elsewhere, such as identity thieves who thrive in environments such as Defendant's establishment, and those of the Defendant's and its casino-clients' employees who handled the receipts.

66.     Simply put, by printing numerous transaction receipts in violation of this long-standing and well-known federal statute, Defendant has caused – to paraphrase the words of the

74468

FILED DATE: 4/22/2019 10:45 AM    2018CH15419

Honorable Judge Richard A. Posner (retired) – "an unjustifiably high risk of harm that [wa]s either known or so obvious that it should [have been] known" to Defendant. *Redman v. RadioShack Corp.*, 768 F.3d 622, 627 (7th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

67.     Moreover, Defendant also harmed Plaintiff and other consumers by imposing and unjustly retaining substantial service fees from Plaintiff and the Class members for the privilege of making the debit and credit card transactions at issue in this case in a supposedly secure manner. Indeed, a substantial portion of the service fees that Defendant charged to Plaintiff and the other members of the Class to facilitate their debit and credit card transactions was supposedly attributable to the various procedural safeguards and compliance monitoring measures that Defendant and its casino-clients had implemented to ensure the safe, secure, and legally compliant processing of consumer transactions. And in fact, Plaintiff and the other Class members paid these service fees to Defendant with the expectation that their transactions would be processed and their data secured in compliance with all applicable federal laws, including the truncation requirement of FACTA.

68.     In other words, what Plaintiff and the other members of the Class received (insecure transactions recorded on receipts printed and provided to them in violation of federal law) was less valuable than what they paid for (transactions securely processed and recorded on written receipts in compliance with federal data-privacy laws and regulations). Had Plaintiff and the other members of the Class known that Defendant would process their transactions and safeguard their transaction data insecurely, including by printing and providing to them receipts in violation of FACTA's truncation requirement, they would not have paid as much of a fee, if any fee at all, for the privilege of making the debit and credit card purchases at issue in this case.

74468

69.     In view of the substantial harm and other risks to Plaintiff and the Class caused by Defendant's willfully unlawful conduct, *see Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007) (defendant is liable for willfully violating FACTA where violation was committed with "reckless disregard" for the law), and the likelihood that such harms and risks will continue absent judicial relief, the Court should enjoin Defendant from continuing to print receipts at its casino terminals in violation of FACTA.

## CLASS REPRESENTATION ALLEGATIONS

70.     This action is brought as a Class Action under 735 ICLS Section 5/2-801. Plaintiff proposes the following class, defined as follows, subject to modification by the Court as required:

> **All persons in the United States who, within the two (2) years prior to the filing of the original complaint through the date of the Court's order granting class certification, (i) engaged in one or more transactions using a debit card or credit card at a point-of-sale located on non-tribal-owned land in the United States, (ii) where such transaction was processed via Defendant's CashClub technology; and (iii) for which Defendant's system was programmed to generate a printed customer receipt displaying more than the last 5 digits of the credit or debit card number used in connection with such transaction(s).**

71.     Plaintiff falls within the class definition and is a member of the class. Excluded from the class is Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, Plaintiff's attorneys and their employees, the Judge to whom this action is assigned and any member of the Judge's staff and immediate family, and claims for personal injury, wrongful death, and/or emotional distress.

72.     The members of the class are capable of being described without any significant managerial or administrative problem. The members of the class are readily ascertainable from the information and records in the possession, custody or control of Defendant.

FILED DATE: 4/22/2019 10:45 AM  2018CH15419

74468

FILED DATE: 4/22/2019 10:45 AM 2018CH15419

73.     Defendant provides printed receipts to credit card and/or debit card transaction customers at hundreds of its casino-clients' establishments numerous times per day, 365 days per year. Therefore, it is reasonable to conclude that the class is sufficiently numerous such that individual joinder of all members is impractical, as required by 735 ILCS 5/2-801(1). The disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits. The Class can be identified through Defendant's records or Defendant's agents' records and the records of the banks that issued the credit/debit cards.

74.     Although FACTA does not distinguish between consumer and business transactions, on information and belief all or most transactions at Defendant's establishments for which a FACTA-violative receipt was provided were paid for using a consumer card rather than a business card. To the extent this is an issue, the payments made with the two types of cards are easily discernible: merchants are charged different interchange fees for card transactions that vary based on whether the card is a business card or a consumer card. There are different interchange categories and codes assigned to each transaction that distinguish whether a card used for a transaction is a business card or a consumer card. Defendant and its merchant bank could easily identify whether a particular transaction involved a business card or a consumer card.

75.     While all Class Members have experienced actual harm as previously explained herein, this suit seeks only statutory damages and injunctive relief on behalf of the class and it expressly is not intended to request any recovery for personal injury and claims related thereto. Plaintiff reserves the right to expand the class definition to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

74468

FILED DATE: 4/22/2019 10:45 AM 2018CH15419

76. The class is defined so that each class member will have identical claims or defenses. As such, common questions of fact and law exist as to all members of the class, which predominate over any questions affecting only individual members of the class, including Plaintiff. *See* 735 ILCS 5/2-801(2). Such questions common to the class include, but are not limited to;

a. Whether, within the two (2) years prior to the filing of the original complaint, Defendant and/or its agents completed transactions by credit or debit card and subsequently provided a printed receipt upon which more than the last five (5) digits of the card number was displayed;

b. Whether Defendant's violation was knowing or reckless;

c. Whether Defendant is liable for damages, and the extent of statutory damages for each such violation; and

d. Whether Defendant should be enjoined from engaging in such conduct in the future.

77. The principal question is whether Defendant violated section 1681c(g) of the FCRA by providing Class Members with electronically-printed receipts in violation of the Receipt Provision. The secondary question is whether Defendant knowingly or recklessly provided such electronically printed receipts.

78. Plaintiff and his counsel will fairly and adequately protect the interests of the class, as required by 735 ILCS 5/2-801(3). Plaintiff has no interests that conflict with the interests of the class and seeks the same relief as the class. Plaintiff is interested in pursuing her claims vigorously and has retained counsel competent and experienced in class and complex litigation, including under FACTA and other data privacy statutes.

74468

FILED DATE: 4/22/2019 10:45 AM  2018CH15419

79.     In light of the numerosity of the class members, the commonality of issues of law and fact among class members, and Plaintiff and her counsel's willingness and ability to fairly and adequately protect the interests of the class, a class action is an appropriate method for the fair and efficient adjudication of the controversy, as required by 735 ILCS 5/2-801(4). Moreover, class-wide damages are essential to induce Defendant to comply with the law. The interest of Class Members in individually controlling the prosecution of separate claims against Defendant is small. The maximum statutory damages in an individual action for a violation of this statute are minimal. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

80.     Plaintiff and the members of the class have all suffered harm as a result of the Defendant's unlawful and wrongful conduct. Absent a class action, the class, along with countless future patrons of Defendant's establishment, will continue to face the potential for irreparable harm. In addition, these violations of law would be allowed to proceed without remedy and Defendant will continue such illegal conduct. Because of the size of the individual Class Members' claims, few Class Members could afford to seek legal redress for the wrongs complained of herein.

81.     Defendant has acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

### COUNT I – VIOLATIONS OF 15 U.S.C. § 1691(c)(g)

82.     Plaintiff incorporates the foregoing allegations as if fully alleged herein.

83.     15 U.S.C. §1681c(g) states as follows:

Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

74468

FILED DATE: 4/22/2019 10:45 AM 2018CH15419

84.     This section applies to any "device that electronically prints receipts" (hereafter "Devices") at the transaction location. 15 U.S.C. §1681c(g)(3).

85.     During all or substantially all of the relevant time period, Defendant employed, as the principal merchant acting through its clients as its agent or agent(s), said Devices to perform cash-access transactions with its clients' patrons on non-tribal owned land throughout the United States, including at the Grand Victoria Casino establishment in Elgin, Illinois and at numerous other establishments nationwide that were owned or operated by one of Defendant's clients.

86.     Defendant contracted with the owner or operator of the Grand Victoria Casino establishment in Elgin, Illinois and had contracted with each of its other clients who operated or owned such establishments on the same or materially the same terms, pursuant to which Everi provided each clients' patrons with cash-access transaction services that Defendant processed via the same CashClub technology, with Everi acting as the principal merchant and the respective client acting as its agent.

87.     On or before the date on which this complaint was filed, Plaintiff and members of the class were provided receipt(s) by Defendant that failed to comply with the Receipt Provision.

88.     At all times relevant to this action, Defendant was actually aware, or should have been actually aware, of both the Receipt Provision.

89.     Notwithstanding the three-year period to comply with FACTA and its accompanying provisions, and the subsequent years since FACTA became effective, and despite having knowledge of the Receipt Provision and FACTA as a whole, Defendant knowingly, knowingly or recklessly violated and continues to violate the Receipt Provision.

90.     By printing more than the last five (5) digits of Plaintiff's credit card number on Plaintiff's transaction receipt, Defendant caused Plaintiff to suffer numerous harms as described

74468

above. This includes, but is not limited to: breach of confidence; heightened risk of identity theft, especially as the receipt displays the full name of the card holder on the it together with other sensitive information including the card holder's initialed signature; exposure of Plaintiff's private information to those of Defendant's and its casino-clients' employees who handled the receipt; being forced to take action prevent further disclosure of the information displayed on the receipt; and monetary harm in the amount of the transaction fees that Plaintiff and the unnamed class members were forced to pay Defendant in exchange for a secure and legally compliant transaction (the exact opposite of what they received).

91.    As a result of Defendant's willful violations of the FCRA, Defendant is liable to Plaintiff and members of the class pursuant to 15 U.S.C. § 1681n for statutory damages, punitive damages, attorney's fees and costs.

*      *      *

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in favor of her and the class against Defendant, as follows:

a.    Granting certification of the Class;

b.    Awarding statutory damages;

c.    Awarding punitive damages;

d.    Awarding injunctive relief;

e.    Awarding attorneys' fees, litigation expenses and costs of suit; and

f.    Awarding such other and further relief as the Court deems proper under the circumstances.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

74468

FILED DATE: 4/22/2019 10:45 AM   2018CH15419

Dated: April 22, 2019

Respectfully submitted,

GERALDINE DONAHUE, individually,
and on behalf of others similarly situated,

By: _s/Keith J. Keogh_
      One of Plaintiff's Attorneys

Keith J. Keogh
KEOGH LAW, LTD.
55 W. Monroe St., Ste. 3390
Chicago, Il 60603
Tel: 312-726-1092
Fax: 312-726-1093
Keith@KeoghLaw.com

Scott D. Owens
SCOTT D. OWENS, P.A.
3800 S. Ocean Dr., Ste. 235
Hollywood, FL 33019
Tel: 954-589-0588
Fax: 954-337-0666
scott@scottdowens.com

Frank S. Hedin
HEDIN HALL, LLP
1395 Brickell Ave, Suite 900
Miami, Florida 33131
Tel: 305-357-2107
Fax: 305-200-8801
fhedin@hedinhall.com

_Counsel for Plaintiff_

74468

Return Date: No return date scheduled
Return Date: No return date scheduled
Hearing Date: 4/29/2019 10:00 AM - 10:00 AM
Courtroom Number: N/A
Location: District 1 Court
    Cook County, IL

FILED
5/7/2019 2:27 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419

4962416

FILED
4/22/2019 11:07 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419

4768491

FILED DATE: 5/7/2019 2:27 PM   2018CH15419
FILED DATE: 4/22/2019 11:07 AM   2018CH15419

| 2120 - Served | 2121 - Served |
|---|---|
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| Summons - Alias Summons | (08/01/18) CCG 0001 A |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Geraldine Donahue

          (Name all parties)

v.

Everi Payments, Inc. and Everi Holdings, Inc.

Case No.   2018-CH-15419

### ☑ SUMMONS   ☐ ALIAS SUMMONS

To each Defendant:   Everi Holdings, Inc., c/o Registered Agent Solutions, Inc.

         901 S. 2nd Street, Suite 201, Springfield IL 62704

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**

cookcountyclerkofcourt.org

Page 1 of 3

**Summons - Alias Summons**                    (08/01/18) CCG 0001 B

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

Atty. No.: 39042

Atty Name: Michael Hilicki

Atty. for: Plaintiff

Address: 55 W. Monroe St, Suite 3390

City: Chicago

State: IL    Zip: 60603

Telephone: 312-726-1092

Primary Email: MHilicki@KeoghLaw.com

Witness: _____

5/7/2019 2:27 PM DOROTHY BROWN

DOROTHY BROWN, Clerk of Court

Date of Service: May 1st 2019
(To be inserted by officer on copy left with
Defendant or other person):

FILED DATE: 5/7/2019 2:27 PM  2018CH15419
FILED DATE: 4/22/2019 11:07 AM  2018CH15419

## AFFIDAVIT OF SERVICE

FILED DATE: 5/7/2019 2:27 PM 2018CH15419

State of Illinois           County of Cook           Circuit Court

Case Number: 2018-CH-15419

Plaintiff:
**Geraldine Donahue,**

vs.

Defendant:
**Everi Payments, Inc. and Everi Holdings, Inc.,**

For:
Keogh Law, Ltd.
55 W. Monroe, Suite 3390
Chicago, IL 60603

Received by Clutter Investigations Inc. DBA Courthouse Courier on the 30th day of April, 2019 at 4:08 pm to be served on **Everi Holdings, Inc. c/o Registered Agent, Registered Agent Solutions, Inc., 901 S. 2nd Street, Suite 201, Springfield, IL 62704.**

I, Michelle Tomlin, being duly sworn, depose and say that on the **1st day of May, 2019** at **2:30 pm, I:**

served an **AUTHORIZED** entity by delivering a true copy of the **Summons and First Amended Class Action Complaint with Jury Demand** with the date and hour of service endorsed thereon by me, to: **AJ Peterson c/o Registered Agent, Registered Agent Solutions, Inc.** as **Corporate Fullfillment Specialist** at the address of: **901 S. 2nd Street, Suite 201, Springfield, IL 62704,** who stated they are authorized to accept service for **Everi Holdings, Inc.,** and informed said person of the contents therein, in compliance with all applicable law.

**Description** of Person Served: Age: 36, Sex: M, Race/Skin Color: White, Height: 6'2", Weight: 210, Hair: Light Brown, Glasses: N

## AFFIDAVIT OF SERVICE For 2018-CH-15419

FILED DATE: 5/7/2019 2:27 PM   2018CH15419

I being first duly sworn on oath, states that I am over 18 years of age and not a party to this lawsuit.  Under penalties of perjury as provided by law, pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the above statement is true and correct.

Michelle Tomlin
129-316088

**Clutter Investigations Inc. DBA Courthouse Courier**
**1 West Old State Capitol Plaza**
**Suite 818**
**Springfield, IL 62701**
**(217) 528-5997**

Subscribed and Sworn to before me on the 1st day of May, 2019 by the affiant who is personally known to me.

NOTARY PUBLIC

OFFICIAL SEAL
MELISSA A DEAN
Notary Public - State of Illinois
My Commission Expires May 20, 2019

Our Job Serial Number: CLU-2019000704

Copyright © 1992-2019 Database Services, Inc. - Process Server's Toolbox V8.0m

Hearing Date: 4/29/2019 10:00 AM - 10:00 AM
Courtroom Number: N/A
Location: District 1 Court
    Cook County, IL

FILED
5/7/2019 2:32 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419

FILED
4/22/2019 11:10 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419
4769217

4962538

FILED DATE: 5/7/2019 2:32 PM  2018CH15419

FILED DATE: 4/22/2019 11:10 AM  2018CH15419

| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| Summons - Alias Summons | (08/01/18) CCG 0001 A |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Geraldine Donahue
_____
(Name all parties)

v.

Everi Payments, Inc. and Everi Holdings, Inc.
_____

Case No.   2018-CH-15419

☑ **SUMMONS**   ☐ **ALIAS SUMMONS**

To each Defendant:   Everi Payments, Inc., c/o Registered Agent Solutions, Inc.

             901 S. 2nd Street, Suite 201, Springfield IL 62704

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org
Page 1 of 3

**Summons - Alias Summons** (08/01/18) CCG 0001 B

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

FILED DATE: 5/7/2019 2:32 PM 2018CH15419
FILED DATE: 4/22/2019 11:10 AM 2018CH15419

Atty. No.: 39042

Atty Name: Michael Hilicki

Atty. for: Plaintiff

Address: 55 W. Monroe St, Suite 3390

City: Chicago

State: IL Zip: 60603

Telephone: 312-726-1092

Primary Email: MHilicki@KeoghLaw.com

Witness: 4/22/2019 11:10 AM DOROTHY BROWN

DOROTHY BROWN, Clerk of Court

Date of Service: May 1 2019
(To be inserted by officer on copy left with Defendant or other person):

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org
Page 2 of 3

## AFFIDAVIT OF SERVICE

State of Illinois                County of Cook                Circuit Court

Case Number: 2018-CH-15419

Plaintiff:
**Geraldine Donahue,**

vs.

Defendant:
**Everi Payments, Inc. and Everi Holdings, Inc.,**

For:
Keogh Law, Ltd.
55 W. Monroe, Suite 3390
Chicago, IL 60603

Received by Clutter Investigations Inc. DBA Courthouse Courier on the 30th day of April, 2019 at 4:08 pm to be served on **Everi Payments, Inc. c/o Registered Agent, Registered Agent Solutions, Inc., 901 S. 2nd Street, Suite 201, Springfield, IL 62704.**

I, Michelle Tomlin, being duly sworn, depose and say that on the **1st day of May, 2019** at **2:30 pm, I:**

served an **AUTHORIZED** entity by delivering a true copy of the **Summons and First Amended Class Action Complaint with Jury Demand** with the date and hour of service endorsed thereon by me, to: **AJ Peterson c/o Registered Agent, Registered Agent Solutions, Inc. as Corporate Fullfillment Specialist** at the address of: **901 S. 2nd Street, Suite 201, Springfield, IL 62704,** who stated they are authorized to accept service for **Everi Payments, Inc.,** and informed said person of the contents therein, in compliance with all applicable law.

**Description** of Person Served: Age: 36, Sex: M, Race/Skin Color: White, Height: 6'2", Weight: 210, Hair: Light Brown, Glasses: N

FILED DATE: 5/7/2019 2:32 PM   2018CH15419

## AFFIDAVIT OF SERVICE For 2018-CH-15419

I being first duly sworn on oath, states that I am over 18 years of age and not a party to this lawsuit. Under penalties of perjury as provided by law, pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the above statement is true and correct.

FILED DATE: 5/7/2019 2:32 PM   2018CH15419

**Michelle Tomlin**
129-316088

Subscribed and Sworn to before me on the 1st day of May, 2019 by the affiant who is personally known to me.

NOTARY PUBLIC

**Clutter Investigations Inc. DBA Courthouse Courier**
1 West Old State Capitol Plaza
Suite 818
Springfield, IL 62701
(217) 528-5997

Our Job Serial Number: CLU-2019000703

OFFICIAL SEAL
MELISSA A DEAN
Notary Public - State of Illinois
My Commission Expires May 20, 2019

Copyright © 1992-2019 Database Services, Inc. - Process Server's Toolbox V8.0m

FILED
5/21/2019 3:36 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419

5138693

FILED DATE: 5/21/2019 3:36 PM  2018CH15419

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| GERALDINE DONAHUE, individually and on behalf of others similarly situated, | ) ) ) |
| Plaintiff, | ) Case No. 2018 CH 15419 ) |
| v. | ) Calendar 16 ) |
| EVERI PAYMENTS, INC. and EVERI HOLDINGS, INC., | ) Judge David B. Akins ) ) |
| Defendants. | ) ) |

**NOTICE OF FILING**

TO:     See attached Certificate of Service

PLEASE TAKE NOTICE that on the 21st day of May, 2019, we caused to be filed with the Clerk of the Circuit Court of Cook County, Illinois:

- Verified Statement of Out-of-State Attorney Pursuant to Illinois Supreme Court Rule 707 of Sara F. Holladay-Tobias;

- Verified Statement of Out-of-State Attorney Pursuant to Illinois Supreme Court Rule 707 of Emily Y. Rottmann;

- Appearance of Sara F. Holladay-Tobias; and

- Appearance of Emily Y. Rottmann.

Copies of which are hereby served upon you.

Dated:  May 21, 2019                    Respectfully submitted,

                                        EVERI PAYMENTS, INC. and EVERI
                                        HOLDINGS, INC.


                                        By:___*/s/ David L. Hartsell*_____
                                            David L. Hartsell
                                            One of Its Attorneys

FILED DATE: 5/21/2019 3:36 PM   2018CH15419

David L. Hartsell (6192380)
McGUIREWOODS LLP
77 W. Wacker Drive, Suite 4100
Chicago, IL  60601
Tel.:  (312) 849-8100
dhartsell@mcguirewoods.com
Firm No. 40426

Sara F. Holladay-Tobias (6331630) (*admitted pro hac vice*)
Emily Y. Rottmann (6331629) (*admitted pro hac vice*)
McGUIREWOODS LLP
Bank of America Tower
50 N. Laura Street, Suite 3300
Jacksonville, FL  32202
Tel.: (904) 798-3200
stobias@mcguirewoods.com
erottmann@mcguirewoods.com

FILED DATE: 5/21/2019 3:36 PM   2018CH15419

## <u>CERTIFICATE OF SERVICE</u>

I, David L. Hartsell, an attorney, certify that the foregoing Notice of Filing and

- Verified Statement of Out-of-State Attorney Pursuant to Illinois Supreme Court Rule 707 of Sara F. Holladay-Tobias;

- Verified Statement of Out-of-State Attorney Pursuant to Illinois Supreme Court Rule 707 of Emily Y. Rottmann;

- Appearance of Sara F. Holladay-Tobias; and

- Appearance of Emily Y. Rottmann.

were served on the following Counsel of Record:

Keith J. Keogh
Keogh Law, Ltd.
55 W. Monroe St., Ste. 3390
Chicago, IL  60603
Keith@KeoghLaw.com

on this 21st day of May, 2019, by email and e-Service through File & Serve Illinois.

*/s/ David L. Hartsell*

116900431_1

FILED
5/21/2019 3:36 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419

5138693

Appearance and Jury Demand *                                                                 (04/04/19) CCG 0009

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

CHANCERY _____ DEPARTMENT/_____ DISTRICT

| | |
|---|---|
| GERALDINE DONAHUE, | Case No. 2018CH15419 |
| Plaintiff | Claimed $: _____ |
| v. | Return Date: _____ Time: _____ |
| EVERI PAYMENTS, INC. and EVERI HOLDINGS, INC., | |
| Defendant | Court Date: _____ Room No.: _____ |

Address of Court District for Filing

## APPEARANCE AND JURY DEMAND *

☑ General Appearance          ☐ 0900 - Fee Paid                                   ☐ 0904 - Fee Waived
                              ☐ 0908 - Trial Lawyers Appearance - No Fee
☐ Jury Demand *               ☐ 1900 - Appearance and Jury Demand/Fee Paid        ☐ Twelve-person Jury
                              ☐ 1904 - Appearance and Jury Demand/No Fee Paid     ☐ Six-person Jury

The undersigned enters the appearance of:  ○ Plaintiff  ● Defendant

Litigant's Name: Everi Payments, Inc. and Everi Holdings, Inc.

Signature: _____

☐ Initial Counsel of Record      ☐ Pro Se (Self-represented)    ☑ 2810 Rule 707 Out-of-State Counsel
                                                                   (pro hac vice)
☐ Additional Appearance          ☐ Substitute Appearance

● Atty. No.: 40426          ○ Pro Se 99500

Name: Emily Y. Rottmann (#6331629), McGuireWoods LLP

Atty. for (if applicable):

Everi Payments, Inc. and Everi Holdings, Inc.

Address: 50 N. Laura Street, Suite 3300

City: Jacksonville

State: FL   Zip: 32202   Phone: (904) 798-3200

Primary Email: erottmann@mcguirewoods.com

| IMPORTANT |
|---|
| *Once this Appearance form is filed, photocopies of this form must be sent to all other parties named in this case (or to their attornies) using either regular mail, fax, email or personal delivery. (See Illinois Supreme Court Rules 11 and 13 for more information.)* |

Pro Se Only:
☐ I have read and agree to the terms of Clerk's Office
   Electronic Notice Policy and choose to opt in to electronic
   notice from the Clerk's office for this case at this email address:

Email: _____

* Strike demand for trial by jury if not applicable.
I certify that a copy of the within instrument was served on all parties who have appeared and have not heretofore been found by the
Court to be in default for failure to plead.

_____

Attorney for  ○ Plaintiff  ● Defendant

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**

cookcountyclerkofcourt.org

Page 1 of 1

FILED
5/21/2019 3:36 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419

5138693

FILED DATE: 5/21/2019 3:36 PM   2018CH15419

Appearance and Jury Demand *                                    (04/04/19) CCG 0009

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

_____ CHANCERY _____ DEPARTMENT/_____ DISTRICT

GERALDINE DONAHUE,

                                     Plaintiff

          v.

EVERI PAYMENTS, INC. and EVERI HOLDINGS, INC.,

                                 Defendant

Case No.   2018CH15419

Claimed $: _____

Return Date: _____ Time: _____

Court Date: _____ Room No.: _____

_____

Address of Court District for Filing

## APPEARANCE AND JURY DEMAND *

- [✓] General Appearance
- [ ] Jury Demand *

- [ ] 0900 - Fee Paid
- [ ] 0908 - Trial Lawyers Appearance - No Fee
- [ ] 1900 - Appearance and Jury Demand/Fee Paid
- [ ] 1904 - Appearance and Jury Demand/No Fee Paid

- [ ] 0904 - Fee Waived
- [ ] Twelve-person Jury
- [ ] Six-person Jury

The undersigned enters the appearance of: ◯ Plaintiff  ⦿ Defendant

Litigant's Name: Everi Payments, Inc. and Everi Holdings, Inc.

Signature: _____

- [ ] Initial Counsel of Record
- [ ] Additional Appearance

- [ ] Pro Se (Self-represented)
- [ ] Substitute Appearance

- [✓] 2810  Rule 707 Out-of-State Counsel
  (pro hac vice)

⦿ Atty. No.: 40426     ◯ Pro Se 99500

Name: Sara F. Holladay-Tobias (#6331630), McGuireWoods LLP

Atty. for (if applicable):

Everi Payments, Inc. and Everi Holdings, Inc.

Address: 50 N. Laura Street, Suite 3300

City: Jacksonville

State: FL   Zip: 32202   Phone: (904) 798-3200

Primary Email: stobias@mcguirewoods.com

**IMPORTANT**

*Once this Appearance form is filed, photocopies of this form must be sent to all other parties named in this case (or to their attorneys) using either regular mail, fax, email or personal delivery. (See Illinois Supreme Court Rules 11 and 13 for more information.)*

Pro Se Only:
- [ ] I have read and agree to the terms of Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

Email: _____

**\* Strike demand for trial by jury if not applicable.**

I certify that a copy of the within instrument was served on all parties who have appeared and have not heretofore been found by the Court to be in default for failure to plead.

_____

Attorney for   ◯ Plaintiff   ⦿ Defendant

## Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois

FILED DATE: 5/21/2019 3:36 PM   2018CH15419

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

FILED
5/21/2019 3:36 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419

5138693

| | |
|---|---|
| GERALDINE DONAHUE, individually and on behalf of others similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) Case No. 2018-CH-15419 |
| EVERI PAYMENTS, INC., and EVERI HOLDINGS, INC., | ) ) ) |
| Defendants. | ) ) ) ) ) |

**VERIFIED STATEMENT OF OUT-OF-STATE ATTORNEY
PURSUANT TO ILLINOIS SUPREME COURT RULE 707**

I, Emily Y. Rottmann, submit this Verified Statement pursuant to Illinois Supreme Court Rule 707.

1.    My full name is Emily Y. Rottmann.  The address of offices from which I practice law and related email address and telephone numbers are as follows:

> McGuireWoods LLP
> Bank of America Tower
> 50 N. Laura Street
> Suite 3300
> Jacksonville, FL 32202
> Tel:  904-798-3200
> erottmann@mcguirewoods.com
> clambert@mcguirewoods.com

2.    I represent Everi Payments Inc. and Everi Holdings Inc. in the matter captioned *Geraldine Donahue, individually and on behalf of others similarly situated v. Everi Payments, Inc. and Everi Holdings, Inc.*, Circuit Court of Cook County, Illinois, County Department, Chancery Division, Case No. 2018-CH-15419.

3(a).    I have not filed any other appearance pursuant to this rule during this calendar year.

3(b).    I have not received a registration number from the ARDC.

FILED DATE: 5/21/2019 3:36 PM    2018CH15419

4(a).    I, Emily Y. Rottmann am a licensed attorney and a member in good standing with the bar of the State of Florida, Bar No. 0093154.

4(b).    I attach a letter or certificate of good standing for each of the jurisdictions listed in paragraph 4(a) above.

5.    I have no office or other presence in Illinois for the practice of law.

6.    I submit to the disciplinary authority of the Supreme Court of Illinois;

7.    I have undertaken to become familiar with and to comply, as if admitted to practice in Illinois, with the rules of the Supreme Court of Illinois, including the Illinois Rules of Professional Conduct and the Supreme Court Rules on Admission and Discipline of Attorneys, and other Illinois law and practices that pertain to the proceeding;

(8)    The full name, business address and ARDC number of the Illinois attorney with whom I have associated in the matter is:

David L. Hartsell
McGuireWoods LLP
77 W. Wacker Drive, Suite 4100
Chicago, Illinois 60601
Tel:  312.849.8100
dhartsell@mcguirewoods.com
ARDC No.:  6192380

9.    I certify that I have served this Statement upon the following parties and that these parties are all entitled to service under this rule.

Keith J. Keogh
Keogh Law, LTD.
55 W. Monroe St., Suite 3390
Chicago, IL 60603
Keith@KeoghLaw.com

FILED DATE: 5/21/2019 3:36 PM    2018CH15419

## VERIFICATION

I verify the accuracy and completeness of each of the above statements.

_____

Emily Y. Rottmann

FILED DATE: 5/21/2019 3:36 PM   2018CH15419



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

**Joshua E. Doyle**
**Executive Director**

850/561-5600
www.FLORIDABAR.org

State of Florida     )

County of Leon       )

In Re:  0093154
         Emily Yandle Rottmann
         50 N. Laura Street 50 N Laura St Ste 3300
         Jacksonville, FL 32202-3661

I CERTIFY THE FOLLOWING:

I am the custodian of membership records of The Florida Bar.

Membership records of The Florida Bar indicate that The Florida Bar member listed above was admitted to practice law in the state of Florida on **October 3, 2011**.

The Florida Bar member above is an active member in good standing of The Florida Bar who is eligible to practice law in the state of Florida.

Dated this <u>14th</u> day of **May, 2019**.

Cynthia B. Jackson, CFO
Administration Division
The Florida Bar

PG:R10
CTM-43247



FILED DATE: 5/21/2019 3:36 PM   2018CH15419

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

FILED
5/21/2019 3:36 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH15419

5138693

| | |
|---|---|
| GERALDINE DONAHUE, individually and on behalf of others similarly situated,<br><br>        Plaintiff,<br><br>  vs.<br><br>EVERI PAYMENTS, INC., and EVERI HOLDINGS, INC.,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 2018-CH-15419 |

## VERIFIED STATEMENT OF OUT-OF-STATE ATTORNEY
## PURSUANT TO ILLINOIS SUPREME COURT RULE 707

I, Sara F. Holladay-Tobias, submit this Verified Statement pursuant to Illinois Supreme Court Rule 707.

1.     My full name is Sara F. Holladay-Tobias. The address of offices from which I practice law and related email address and telephone numbers are as follows:

McGuireWoods LLP
Bank of America Tower
50 N. Laura Street
Suite 3300
Jacksonville, FL 32202
Tel: 904-798-3200
stobias@mcguirewoods.com
flservice@mcguirewoods.com

2.     I represent Everi Payments Inc. and Everi Holdings Inc. in the matter captioned *Geraldine Donahue, individually and on behalf of others similarly situated v. Everi Payments, Inc. and Everi Holdings, Inc.*, Circuit Court of Cook County, Illinois, County Department, Chancery Division, Case No. 2018-CH-15419.

3(a).    I have not filed any other appearance pursuant to this rule during this calendar year.

3(b).    I have not received a registration number from the ARDC.

FILED DATE: 5/21/2019 3:36 PM   2018CH15419

4(a).   I, Sara F. Holladay-Tobias am a licensed attorney and a member in good standing with the bar of the State of Florida, Bar No. 0026225.

4(b).   I attach a letter or certificate of good standing for each of the jurisdictions listed in paragraph 4(a) above.

5.   I have no office or other presence in Illinois for the practice of law.

6.   I submit to the disciplinary authority of the Supreme Court of Illinois;

7.   I have undertaken to become familiar with and to comply, as if admitted to practice in Illinois, with the rules of the Supreme Court of Illinois, including the Illinois Rules of Professional Conduct and the Supreme Court Rules on Admission and Discipline of Attorneys, and other Illinois law and practices that pertain to the proceeding;

(8)   The full name, business address and ARDC number of the Illinois attorney with whom I have associated in the matter is:

David L. Hartsell
McGuireWoods LLP
77 W. Wacker Drive, Suite 4100
Chicago, Illinois 60601
Tel:  312.849.8100
dhartsell@mcguirewoods.com
ARDC No.:  6192380

9.   I certify that I have served this Statement upon the following parties and that these parties are all entitled to service under this rule.

Keith J. Keogh
Keogh Law, LTD.
55 W. Monroe St., Suite 3390
Chicago, IL 60603
Keith@KeoghLaw.com

FILED DATE: 5/21/2019 3:36 PM    2018CH15419

## VERIFICATION

I verify the accuracy and completeness of each of the above statements.

_____
Sara F. Holladay-Tobias

FILED DATE: 5/21/2019 3:36 PM   2018CH15419



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

**Joshua E. Doyle**
**Executive Director**

850/561-5600
www.FLORIDABAR.org

State of Florida    )

County of Leon    )

In Re:  0026225
Sara F Holladay-Tobias
McGuire Woods L L P 50 N Laura St Ste 3300
Jacksonville, FL 32202-3661

I CERTIFY THE FOLLOWING:

I am the custodian of membership records of The Florida Bar.

Membership records of The Florida Bar indicate that The Florida Bar member listed above was admitted to practice law in the state of Florida on **September 21, 2006**.

The Florida Bar member above is an active member in good standing of The Florida Bar who is eligible to practice law in the state of Florida.

Dated this 14th day of **May**, **2019**.

*Cynthia B. Jackson*

Cynthia B. Jackson, CFO
Administration Division
The Florida Bar

PG:R10
CTM-43264

